**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Brightmark Plastics Renewal LLC, *et al.*,[1] | Case No. 25-10472 (LSS) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF CRAIG R. JALBERT IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Craig R. Jalbert, CIRA, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of Brightmark Plastics Renewal LLC ("Brightmark Ashley"), Brightmark Plastics Renewal Indiana LLC ("Brightmark Indiana"), and Brightmark Plastics Renewal Services LLC ("Brightmark Services," and together with Brightmark Ashley and Brightmark Indiana, the "Debtors" or the "Company").  I am also a principal at Verdolino & Lowey, P.C. ("Verdolino"). Verdolino, which will be providing services to support me in fulfilling my duties as the Company's CRO, is a business consulting and accounting firm with decades of experience in the fields of bankruptcy and insolvency.  In my capacity as the CRO, I have become familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.      I have over 40 years of experience in accounting and business advisory services, tax planning, compliance, forensic accounting, and bankruptcy matters, including valuation and insolvency, preference and fraudulent transactions, plan development, cash flow and business

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Brightmark Plastics Renewal LLC (7907); Brightmark Plastics Renewal Indiana LLC (7118); and Brightmark Plastics Renewal Services LLC (3789).  The Debtors' headquarters are located at 1725 Montgomery St, Floor 3, San Francisco, CA 94111.

analysis, records reconstruction and post-confirmation administration, wind-down services, and expert reporting. I have been involved in over 500 Chapter 11 cases since 1990. I have regularly been appointed as both a Federal and State Court Receiver, Trustee, as well as multiple C-Level Executive titles. I received a Bachelor of Science degree in Accountancy with honors from Boston College in 1983, and I am a Certified Insolvency Restructuring Advisor, and I am a member of the American College of Bankruptcy.

3.      The Debtors engaged myself and Verdolino in March 2025 to provide restructuring advisory services, including providing me as CRO and additional personnel to assist, as necessary. Since commencing my engagement, I have worked closely with the Debtors' management team and other key personnel, including the finance, legal, operations, and human resources teams to understand the Debtors' cash flows and operations and prepare for the above-captioned chapter 11 cases (these "Chapter 11 Cases").

4.      In my capacity as CRO of the Debtors, and as a result of my discussions with the Debtors' employees, consultants, professionals, and members of their respective boards (the "Boards"), I have become familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am also familiar with the Debtors' relationships with their vendors, service providers, employees, third party contractors, customers, investors, and other key stakeholders.

5.      On March 16, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"). To minimize any disruption or other adverse effect resulting from the filing of the Chapter 11 Cases, the Debtors filed various motions seeking certain "first day" relief (collectively, the "First Day Motions"). I

2

submit this Declaration in support of the First Day Motions and to assist the Court and parties in interest in understanding the Debtors, their business, and the circumstances leading to these Chapter 11 Cases.    This Declaration is organized into the following sections:

- **Part I** describes the Debtors' business, including their corporate history and operations;
- **Part II** describes the Debtors' prepetition capital structure;
- **Part III** provides an overview of the Debtors' anticipated trajectory for these Chapter 11 Cases; and
- **Part IV** discusses the First Day Motions.

## I.    Corporate History and Business Operations

### A.    General Background

6.    The Debtors own and operate a plastics recycling circularity center located in Ashley, Indiana (the "Circularity Center") which utilizes advanced recycling technology to capture the value in plastic waste by converting mixed post-consumer and post-industrial plastic waste into pyrolysis oil.[2]

7.    Construction on the Circularity Center commenced in 2019 and the first sale of pyrolysis oil was in 2023.  When fully operational, the Circularity Center will have the capacity to process 100,000 tons per year of plastic waste and, to date, has recycled over 10 million pounds of plastics that might have otherwise ended up in landfills.

8.    What makes the Circularity Center unique is that it was constructed to utilize a licensed proprietary technology (the "Licensed IP") to renew plastics into the Debtors' pyrolysis oil ("PyBright™").  The Licensed IP is licensed to Brightmark Indiana by an affiliate, Brightmark Plastics Renewal Technologies LLC f/k/a RES Polyflow LLC ("Brightmark Technologies")

---

2    Pyrolysis is the process of applying extreme heat in low or zero oxygen environments to materials to restructure the materials' covalent bonds.  In the case of plastics subjected to pyrolysis, the end product is a raw oil (i.e. pyrolysis oil).  The process dates back to 30,000 BC, which is when humans used the process to begin manufacturing charcoal from wood.

pursuant to a License Agreement dated April 10, 2019 (the "IP License").  The IP License is limited in scope to one facility with six (6) pyrolysis vessels and the Debtors only have exclusivity for the Licensed IP within a 300-mile radius of the Circularity Center.

9.     The Debtors' original business plan, which envisioned converting plastic waste into fuels (naphtha and diesel) and/or wax, involved three major steps:

   a.   Feedstock Preparation — the purchase and densification of post-consumer and post-industrial plastic waste;

   b.   Pyrolysis Conversion — continuously feeding densified plastic into the reactors, which heat the plastic in the absence of oxygen until the hydrocarbons turn into a vapor separating from other materials in plastic.  The hydrocarbon vapor is then cooled and results in pyrolysis oil;

   c.   Upgrade System — the pyrolysis oil would be run through two systems designed to improve the quality of the oil: a hydrotreater, which cleans the pyrolysis oil, and a fractionator, which can separate the oil into various cuts.  As originally designed, a de-oiling unit was necessary to turn one of the cuts into a wax product.  To date, the Upgrade System has not been operational.

10.    Subsequently, upon construction, commissioning, and start-up of the facility, various aspects of the Circularity Center did not operate as intended and have required substantial re-engineering and re-design.

11.    Additionally, in recent years, the Debtors determined that the economic and market circumstances had changed such that it was no longer economically feasible to produce fuel

products and instead focused on pyrolysis oil, the building block for circular plastic products.  To date, the Circularity Center has only produced PyBright™, altering the Debtors' business plans.

12.    The Circularity Center currently operates at about 5% of the 100,000 tons per year nameplate capacity.  While the Debtors continue to focus on increasing their production output; as of February 28, 2025, they have produced a limited quantity of product.

13.    However, the Debtors believe there is a strong demand for PyBright™ going forward.  There is a strong demand for the Debtors' product as it allows its customers to incorporate into their manufacturing processes a product made from approximately 60% post-consumer plastic waste instead of virgin fossil fuels.  This strong customer demand allows the Debtors to achieve a premium on its PyBright™ as compared to virgin fossil fuels.

**B.    The Debtors' Corporate Structure and History**

14.    The Debtors are part of the Brightmark LLC ("Brightmark Parent") corporate family and are indirect subsidiaries of Brightmark Parent.  Brightmark Parent was born out of the idea that waste products hold economic value, and the renewal and modification of those waste products is environmentally beneficial.  Brightmark Ashley serves as the holding company for the other two Debtors.  A chart demonstrating the Debtors' corporate family structure is below:



15.     A Delaware limited liability company formed in January 2018 as BME Renewable Polyfuels LLC, Debtor Brightmark Ashley assumed its current name in December 2020. Brightmark Ashley was formed to serve as a holding company for other entities.  Brightmark Parent acquired a minority membership interest in Brightmark Ashley in October 2018 and subsequently increased its membership interest in October 2019.  In February 2022, Brightmark Parent acquired 100% of Brightmark Ashley's membership interests, which are held by non-debtor Brightmark Plastics Renewal Holdings LLC.

16.     An Indiana limited liability company formed in September 2016 as RES Polyflow Indiana LLC, Debtor Brightmark Indiana assumed its current name in December 2020. Brightmark Indiana is the operating company which owns the Circulatory Center and is the licensee of the Licensed IP.

17.     An Indiana limited liability company formed in October 2018 as BME Polyfuel Services LLC, Debtor Brightmark Services assumed its current name in December 2020.

Brightmark Services was formed to provide services to Brightmark Indiana necessary to the operation of the Circularity Center.  I am informed that primarily those services are the line level employees necessary to the operation of the Circularity Center as well as some senior management of the Debtors, including one officer.

18.     While the Debtors' local, line level employees are employed by Brightmark Services, as part of a larger corporate organization, the Debtors also heavily utilize Brightmark Parent's executive and management team as well as shared services provided by Brightmark Parent and other affiliates to perform selling, general, administrative, and other functions that are not provided by Brightmark Services (the "Allocated Costs").  The projected Allocated Costs are reflected in the Brightmark Direct Charged Costs line item in the budget attached to the DIP Financing Motion.

### C.     Business Operations

#### i.     The Debtors' Operational Vendors and Suppliers

19.     In operating the Circularity Center to produce pyrolysis oil, the Debtors require a steady supply of mixed plastic waste.  To source this raw material, the Debtors rely on third-party suppliers mostly from the mid-west.  Directly or indirectly, the Debtors' obtain mixed post-consumer and post-industrial plastic waste from numerous third-parties.

20.     The Debtors rely on a variety of vendors to maintain their operations.  Due to the unique and specialized nature of the Circularity Center, specialized spare parts are required on a regular basis.  Constant repairs and maintenance are required on the machinery and equipment within the Circulatory Center to keep the Circularity Center in good working order.  Further, the

Debtors' operations require compliance testing to ensure their products are meeting appropriate standards.

21.     The Debtors also rely on the typical goods and services required for the operation of any business.  These include, among others, IT and janitorial services, office supplies and equipment, and standard utilities.

## ii.     The Debtors' Capital Projects

22.     As noted above, achieving nameplate processing capacity has been challenging for the Debtors, and the current operational capacity of the Circularity Center cannot generate sufficient revenue to pay for operations.

23.     Specifically, the Debtors require approximately $800,000 per week to maintain operations and fund capital improvements exclusive of any repayment to secured creditors. Despite achieving mechanical completion over three years ago and producing the product for approximately two years, the Debtors have been unable to generate substantial revenue. Consequently, there is no viable option currently to raise additional funds to sustain operations, make capital improvements, and ramp up production with $172 million of senior debt in place.

24.     The Debtors' capital expenditures fall into two broad categories.

   a.  Those designed to improve the existing equipment that has been placed in service.
       More specifically, these projects are designed to keep the plant operational,
       address health, safety, and environmental issues, and bring the plant up to
       nameplate capacity.

   b.  Those designed to increase the value of the finished product.

25.     Delays in executing the capital projects will have a corresponding impact on the Debtors' ability to achieve nameplate capacity and increased value of the finished product.  In short, any delay in these projects will have a direct impact to the value of the business.  As with any manufacturing or processing business, capital projects require significant investments.  I am

8

informed that the Debtors have projected capital investment needs in excess of $100 million over the next several years to achieve sustainable operational profitability.

26.     The Debtors' capital projects necessarily require the provision of goods and services from, among others, contractors for repair and mechanical services for the Debtors' Circularity Center and equipment therein, as well as shippers and warehouse service providers (the "Lien Claimants").  I am informed that many of the Lien Claimants, if not paid, would have priority over all other creditors, including the Debtors' secured creditors.

### iii.    The Debtors' Customers

27.     Currently, the Debtors have sold PyBright™ to three petrochemical companies which use the product in their manufacturing processes.  As noted above, the Debtors are able to achieve pricing at a premium to the virgin fossil fuels that their customers would otherwise be using.  There is strong demand for the Debtors' PyBright™, and the Debtors believe that demand exceeds present and projected operating capacity.

### iv.    The Debtors' Employees

28.     The Debtors maintain a workforce at Brightmark Services (the "Workforce") consisting of approximately 113 individuals, including salaried and hourly employees and independent contractors.

29.     The Workforce provides a variety of essential functions, including, among other things, mechanical, construction, and operational services, as well as services related to human resources, finance, engineering, health and safety, and quality assurance.  The Workforce includes personnel that are intimately familiar with the Debtors' business, many of whom have developed relationships with the Debtors' customers, suppliers, and key constituents essential to the Debtors' business.  Thus, the Workforce is essential to the effective operation of the Debtors' business and

their ability to maximize value during the pendency of these Chapter 11 Cases, as the Debtors work toward a sale of all or substantially all of their assets.

## II.   The Debtors' Prepetition Capital Structure

30.      As of the Petition Date, the Debtors have approximately $178 million in total funded debt.  The following table depicts the Debtors' prepetition capital structure:

| Funded Debt | Approximate Amount Outstanding |
|---|---|
| Statutory Liens | Up to $1,810,000 |
| Bonds | $172,500,000 |
| Bridge Loan | $5,847,681 |

### A.      Statutory Lienholders

31.      As noted above, the Debtors require goods and services from the Lien Claimants. As a result of the Lien Claimants' provision of these goods and services—including warehousing, storage, transportation, and repair services—the Lien Claimants may have statutory or possessory liens with priority over all other creditors.  Given the nature of the goods and services provided by the Debtors' creditors, the Debtors believe that most, if not all, of their creditors could constitute Lien Claimants, meaning the potential statutory liens that could be asserted against the Debtors if they are not paid could approach the entire $1.8 million owed to the Debtors' unsecured creditors.

### B.      The Bonds

#### i.      The Indenture

32.      In 2019, the Debtors requested that the Indiana Finance Authority, a corporation exercising public functions duly organized and existing under the provisions of the Indiana Code 5-12 *et seq.*, as amended, issue bonds and loan to Brightmark Indiana to assist the Debtors with financing the costs of the acquisition, construction, installation, and equipping of the Circularity Center.  Per that certain Trust Indenture (as amended, the "Indenture"), dated March 1, 2019, by and between UMB Bank, N.A., in its capacities as trustee and collateral agent  (the "Indenture

Trustee"), and the Indiana Finance Authority, as issuer ("IFA"), IFA authorized the issuance of the Series 2019 Bonds (the "Bonds") in an aggregate principal amount of $185,000,000.

### ii.    The Indenture Loan Agreement

33.    In conjunction with the issuance of the Bonds under the Indenture, IFA, Brightmark Indiana, and Brightmark Ashley (collectively, the "Borrowers") entered into that certain Loan Agreement (the "Indenture Loan Agreement"), dated March 1, 2019.   The Indenture Loan Agreement was funded with the proceeds of the Bonds.

34.    The proceeds of the Bonds were used by the Debtors to (i) finance a portion of the costs of the acquisition, construction, installation, and equipping of the Circularity Center; (ii) fund capitalized interest; and (iii) pay the costs of issuing the Bonds.

35.    To secure the performance and observance of all of the covenants, agreements, obligations, and conditions contained in the Bonds, the Indenture, and the Indenture Loan Agreement (the "Prepetition Obligations"), Brightmark Indiana, as debtor, and UMB Bank, N.A. ("UMB") as secured party, entered into that certain Pledge and Security Agreement (the "Pledge and Security Agreement").   Pursuant to the Pledge and Security Agreement, Brightmark Indiana granted a security interest, assigned, conveyed, mortgaged, pledged, hypothecated and transferred to UMB as secured party, a lien upon and security interest (the "Bond Liens") in all of its right, title and interest in, to and under the following property, whether now owned by or existing, or hereafter acquired by or arising in favor of Brightmark Indiana, and regardless of where located: (i) all accounts; (ii) all chattel paper; (iii) all documents; (iv) all general intangibles; (v) all goods; (vi) all instruments; (vii) all investment property; (viii) all deposit accounts; (ix) all money, cash, or cash equivalents; (x) all letter of credit rights; (xi) all commercial tort claims; and (xii) to the extent not otherwise included, all proceeds including all tort claims, insurance claims, and other

rights to payments not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing (collectively, the "Bond Collateral").

### iii.    The Mortgage and Security Agreement

36.    Additionally, in conjunction with the issuance of the Bonds and the Indenture Loan Agreement, Brightmark Indiana, as grantor, and UMB, as beneficiary (and together, with UMB in its capacities as secured party under the Pledge and Security Agreement and Indenture Trustee under the Indenture, and IFA, the "Prepetition Secured Parties"), entered into that certain Mortgage and Security Agreement (the "Mortgage and Security Agreement," and together, with the Indenture,  Indenture Loan Agreement, Pledge and Security Agreement, and any other ancillary, collateral, or related documents and agreements, the "Prepetition Credit Documents"), dated March 1, 2019.  The Mortgage and Security Agreement encumbered the Circularity Center, and certain other rights and interests (together with the Bond Collateral, the "Prepetition Collateral"), to provide further security for the Prepetition Obligations.

37.    While UMB was granted a security interest in cash, UMB is only perfected in certain accounts of the Debtors.  As set forth more fully in the Debtors' *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Perform Intercompany Transactions, and (D) Maintain Exiting Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (III) Granting Related Relief* (the "Cash Management Motion"), the Debtors maintain fifteen (15) bank accounts, of which twelve (12) are with UMB which are all restricted accounts established pursuant to the Prepetition

Credit Documents.  The other three (3) accounts are with Bank of America, N.A. (the "BofA Accounts"), all of which are checking accounts.

38.    UMB does not have Deposit Account Control Agreements in place for the BofA Accounts and, thus, UMB does not have a perfected security interest in those accounts.

39.    The Debtors did not make a scheduled principal and interest payment on their Prepetition Obligations that was due on March 1, 2025 in the amount of $12,941,000 (the "March 2025 Payment").  On March 7, 2025, the Indenture Trustee issued a notice of default related to the failure to make the March 1, 2025 payment.

### C.    The Bridge Loan

40.    Historically, the cost of the Debtors' operations and capital expenditures have been funded by Brightmark Parent as equity contributions.  In 2024 alone, Brightmark Parent funded over $44,600,000 in the form of equity contributions and, to date, has funded a total of $211,364,101 in the form of equity contributions.  In the beginning of February 2025, knowing that the March 2025 Payment was coming due and a restructuring was likely necessary, Brightmark Parent determined that it could not continue to make equity contributions to fund operations and capital expenditures, and the significant debt service payments required under the Prepetition Credit Documents.

41.    Instead, Brightmark Parent determined that continued intermediate funding of operational and capital expenses would need to be made as loans, not further equity investments. Further, Brightmark Parent determined that the Debtors required a financial restructuring and deleveraging of their balance sheet to allow continued funding by Brightmark Parent.

42.    On March 5, 2025, the Debtors and Brightmark Plastics Ashley Holdco LLC, a subsidiary of Brightmark Parent (collectively, the "Bridge Lender"), entered into that certain Security Agreement (as amended, the "Bridge Loan Security Agreement"), whereby, pursuant to

that certain Secured Promissory Note, also dated March 5, 2025 (as amended, the "Secured Promissory Note," and together with the Bridge Loan Security Agreement, and any other ancillary, collateral, or related documents and agreements, the "Bridge Loan Documents"), the Bridge Lender agreed to make loans to the Debtors in the aggregate original principal amount of up to $6.5 million, including approximately $5,847,681 in amounts advanced to the Debtors since February 1, 2025 (the "Bridge Loan").

43.     Pursuant to the Bridge Loan Documents, the Debtors granted to the Bridge Lender a security interest in and liens on (the "Bridge Loan Liens") certain collateral of each Debtor, as more fully detailed in the Bridge Loan Documents (the "Bridge Loan Collateral") in order to secure the prompt and complete payment and performance of all of the Debtors' obligations under the Bridge Loan Documents (the "Bridge Loan Obligations").   In summary, the Bridge Lender received a first priority security interest in all previously unencumbered assets of the Debtors and a junior priority security interest in previously encumbered assets.

44.     The Bridge Lender does not have Deposit Account Control Agreements in place for the BofA Accounts and, thus, does not have a perfected security interest in those accounts.

45.     As of the Petition Date, the Debtors were indebted and liable to the Bridge Lender in respect of the Bridge Loan Obligations in the approximate aggregate principal amount of not less than $5,847,681.

**D.      The Unsecured Obligations**

46.     As of the Petition Date, the Debtors' unsecured trade claims are estimated to be approximately $1,810,000.  Prior to the Petition Date the Debtors' were current with all known trade claims and had satisfied all amounts that were due.  The Debtors' estimate is based on an expectation of amounts that may have accrued but have not yet been invoiced to the Debtors.  As

noted above, most if not all of these amounts could be subject to statutory or other possessory liens if not paid by the Debtors.

### III.   Anticipated Trajectory for These Chapter 11 Cases

47.    After facing financial challenges, the Debtors began a study of strategic transactions under the oversight of Timothy J. Bernlohr, as independent manager (the "Independent Manager") of Debtor Brightmark Ashley, and myself, as CRO of the Debtors. To that end, the Debtors retained SSG Advisors, LLC ("SSG") to provide investment banking services to the Debtors and to run a comprehensive sale process.  After carefully considering alternatives, the Debtors, in an exercise of their reasonable business judgment and as authorized by the Independent Manager, have determined that pursuit of a sale under section 363 of the Bankruptcy Code provides the best opportunity to maximize the value of their assets for the benefit of their estates and creditors.  Accordingly, the Debtors will be seeking authority to conduct a marketing process for the sale of all or substantially all of their assets.

### A.    Access to Postpetition Liquidity

48.    To get to the conclusion of a value-maximizing sale, the Debtors require immediate access to the additional liquidity; without it, the Debtors will be unable to continue operating. Accordingly, the Debtors will be seeking approval of a DIP financing package (the "DIP Facility") to fund operations through the conclusion of the sale process.

49.    The Debtors, with the assistance of SSG, solicited indications of interest from six alternative third-party sources of asset-based financing (including specialty lenders and those that routinely provide debtor in possession financing), to gauge their interest in providing debtor in possession financing to the Debtors on a junior or senior secured basis.  No party contacted expressed a willingness to provide financing on a junior secured basis.

50.    The Bridge Lender initially proposed to provide postpetition financing on a senior secured basis.   That proposal would have primed the Prepetition Secured Parties and also contemplated a roll-up of the Bridge Loan.

51.    The Debtors were informed by the Prepetition Secured Parties that they would not consent to any financing by the Bridge Lender which sought to prime the Prepetition Secured Parties.  Further, the Prepetition Secured Parties informed the Debtors that the Prepetition Secured Parties would vigorously contest any such priming DIP loan and would insist on a valuation of their collateral in connection with any offer of adequate protection the Debtors might offer.  To that end, the Prepetition Secured Parties made a series of demands for documents and information, essentially seeking discovery in aid of their planned litigation strategy.  Only after issuing those requests did the Prepetition Secured Parties indicate that there might be interest on their part to provide their own senior secured DIP loan.

52.    While SSG and myself engaged with the Prepetition Lenders on such a possibility, there was not sufficient time prior to the need to file these Chapter 11 Cases to fully explore such a possibility.  To be clear, the Prepetition Secured Lenders did not make any financing proposal, only a generalized indication of potential interest.  To the extent that the Prepetition Secured Lenders wish to continue legitimate discussions postpetition, in earnest, I personally will engage with them and will direct the Debtors' professionals to do the same.

53.    In light of the vehemence of the reaction of the Prepetition Secured Lenders to a priming DIP loan, the Debtors requested that the Bridge Lender consider loaning on a junior basis

to the existing liens of the Prepetition Secured Lenders and only receiving a first lien on assets in which the Prepetition Secured Lenders did not have a perfected security interest.[3]

54.    The Debtors made the request as they believed junior DIP financing would eliminate unnecessary and wasteful litigation at the outset of these Chapter 11 Cases and ensure that there would be no doubt that these Chapter 11 Cases are being run for the benefit of the Prepetition Secured Parties so that there can be a market test of the value of their collateral.

55.    To their credit, Brightmark Parent and the Bridge Lender agreed to provide junior DIP financing.  In order to maximize value and to give the Debtors the greatest opportunity to remain as a going concern and avoid an unnecessary liquidation and the loss of over 100 jobs of innocent employees, Brightmark Parent will fund these cases junior to over $170 million of the Prepetition Secured Lenders' debt.

56.    They will do so for a sale process in which there are no strings – no stalking horse bidder, no DIP loan hurdle for bidding, no impediments to any potential interested party coming forward to bid on the Debtors' assets.

57.    As noted above, I have been involved in hundreds and hundreds of restructuring engagements in my 40 plus years as a restructuring professional.  I believe the willingness of a parent company, or any company, to make such an offer and fund an open process is, if not entirely unprecedented, extraordinarily rare.

58.    Accordingly, myself and Mr. Bernlohr as the Independent Manager on behalf of the Debtors and with our advisors have determined that the best and only source of sufficient postpetition liquidity is the DIP Facility offered by the Bridge Lender (also, the "DIP Lender").

---

[3]    To the best of my knowledge the only such assets are the Debtors' cash held with Bank of America, N.A., the assets of Brightmark Services (and I am informed there are likely none as it is a services company) and causes of action.

59.    The Debtors, their legal and financial advisors, and the DIP Lender engaged in arm's length negotiations regarding the terms offered by the DIP Lender.  Over the course of multiple weeks, the Debtors and the DIP Lender, with the assistance of their respective legal and financial advisors, worked to negotiate the most favorable terms and provisions of the DIP Facility available to the Debtors given the Debtors' lack of alternative third-party financing and the litigation posture taken by the Prepetition Secured Lenders.

### B.    The Marketing and Sale Process

60.    On February 26, 2025, the Debtors retained SSG as investment banker to, among other things: (i) identify and evaluate potential counterparties for a potential sale process, (ii) prepare a marketing plan and information materials to distribute to potential buyers on a confidential basis, (iii) solicit third-party interest in an acquisition of the Debtors' assets, (iv) review the debtor in possession financing facility for reasonableness, and investigate alternative sources of funding, and (v) assist the Debtors in contacting potential buyers, arranging meetings with potential buyers, and coordinating due diligence.  During its engagement, SSG has worked closely with the Debtors' management and other restructuring professionals and has become knowledgeable and familiar with the Debtors' capital structure, liquidity needs, and business operations.

61.    Since the engagement, the professionals at SSG have worked with the Debtors and their other advisors to prepare for the sale process.  This includes, among other things, drafting a teaser and other marketing materials, establishing a virtual data room, and preparing a form non-disclosure agreement to be ready to immediately commence the postpetition marketing of the assets, while the Debtors seek approval of the Bidding Procedures in parallel.  SSG is poised to immediately commence its postpetition marketing efforts.  In addition, SSG has begun an initial outreach to potential strategic and financial buyers and intends to contact at least 287 parties,

including strategic buyers, private equity funds, and other financial institutions, that are reasonably likely to be interested in consummating a proposed Sale.

62.     Brightmark Parent had originally contemplated making a stalking horse offer to support the sales process and give comfort to all constituents that there would be a continuity of operations post-petition.

63.     However, given the reaction of the Prepetition Secured Lenders to the originally proposed sale and funding strategy for these Chapter 11 Cases, the Debtors deemed it advisable to request that Brightmark Parent not serve as a stalking horse purchaser.

64.     The rationale is simple.  I, Mr. Bernlohr and the Debtors want there to be no misapprehension that the Debtors are conducting an open and unimpeded sale process.  A process whose principal purpose is to be a market driven valuation of the Prepetition Secured Lenders' collateral.

### C.     The Need for a Timely Process

65.     The facts and circumstances of these Chapter 11 Cases require that the Debtors run an expedited, but robust, sale process.  Having made the decision to fund these Chapter 11 Cases on a junior basis, and at tremendous financial exposure, the DIP Lender reasonably has requested an expedited timeline to limit that exposure.

66.     Speed and certainty are critical here, especially because the Debtors' ability to access the DIP Facility and cash collateral (which will provide the Debtors with the necessary liquidity to fund continued operations and these Chapter 11 Cases) are both conditioned upon adherence to strict sale milestones.  The Debtors simply do not have liquidity to support a protracted sale process.

67.     More importantly, the Debtors believe that the Court's approval of Bidding Procedures sooner rather than later will generate more interest in the assets and increase the

likelihood that the Debtors receive one or more Qualified Bids for their assets. This, in turn, is more likely to lead to a Sale transaction that maximizes the value of the assets for the benefit of the Debtors, their estates, and their creditors.

68.     Accordingly, the Bidding Procedures propose the following timeline to comply with a proposed schedule established by the Debtors to ensure that the sale process is completed before the Debtors deplete the liquidity conferred under the DIP Facility:

| Deadline | Event |
| --- | --- |
| **Three business days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice and Assumption and Assignment Notice |
| **Five business days after entry of the Bidding Procedures Order** | Deadline for Debtors to publish Publication Notice |
| **Wednesday, April 16, 2025** | Deadline for Debtors to designate Stalking Horse and enter into Stalking Horse Agreement |
| **Monday, April 21, 2025 at 4:00 p.m. (ET)** | Deadline to object to Cure Costs |
| **Monday, April 28, 2025 at 4:00 p.m. (ET)** | Sale Objection Deadline |
| **Monday, May 5, 2025 at 5:00 p.m. (ET)** | Bid Deadline |
| **Tuesday, May 6, 2025** | Deadline to designate Qualified Bids or to cancel the Auction, as applicable |
| **Wednesday, May 7, 2025 at 10:00 a.m. (ET)** | Auction (if needed) |
| **One day after the conclusion of the Auction** | Deadline for Debtors to file and serve Notice of Auction Results |
| **Friday, May 9, 2025 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |
| **12:00 p.m. (ET) two business days before Sale Hearing** | Debtors' Deadline to Reply to any Sale Objections or Supplemental Sale Objections |
| **Tuesday, May 13, 2025 at [●] (ET), subject to Court's availability** | *Proposed* Sale Hearing and entry of Sale Order |
| **Friday, May 16, 2025** | Deadline to Consummate Sale |

69.     The expedited timeline proposed by the Debtors will minimize the adverse impact on the Debtors' operations, vendors, and employees, and provides adequate opportunity to secure

executable bids for the Debtors' assets for the highest or best value. Given the Debtors' financial condition, an orderly but expeditious sale of the assets is critical to maximizing recoveries for all creditors. Moreover, the proposed timeline of the sale process is required under the DIP Facility, without which, the Debtors would not be able to fund the sale process or these Chapter 11 Cases.

## IV.    First Day Motions

70.    The Debtors have filed the First Day Motions to facilitate a smooth transition into chapter 11 and minimize disruptions to the Debtors' business operations.

71.    A list of the First Day Motions is set forth below:

   i.    *Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases;*

   ii.    *Debtors' Application for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief;*

   iii.    *Debtors' Motion for Entry of an Order (I) Authorizing Redaction of Certain Personally Identifiable Information Within the Consolidated List of Creditors and Other Filings and (II) Granting Related Relief;*

   iv.    *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief;*

   v.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Programs and Pay All Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, or Enter into New Insurance Programs; (II) Authorizing All Banks to Honor Payment of Insurance Obligations; and (III) Granting Related Relief;*

   vi.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests, and (III) Granting Related Relief;*

   vii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Trade Claimants, Lienholder Claims, and 503(b)(9) Claims; (II) Authorizing Banks to Honor and*

*Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief;*

viii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Wages, Compensation, Employe Benefits, and Other Employee Obligations and (B) Continue Certain Employee Benefit Programs in the Ordinary Course; (II) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations; and (III) Granting Related Relief;*

ix.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Perform Intercompany Transactions, and (D) Maintain Exiting Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (III) Granting Related Relief;*

x.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims Subject to Certain Permitted Liens; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief; and*

xi.    *Debtors' Motion for an Order Shortening and Limiting Notice with Respect to the Debtors' Bid Procedures Motion.*

72.    The above First Day Motions seek authority to, among other things, honor work-force related compensation and benefit obligations, pay certain prepetition claims, continue using the Debtors' bank accounts, and continue other operations in the ordinary course of business.

73.    The Debtors have narrowly tailored the First Day Motions to (i) continue their operations in chapter 11 to preserve value for the Debtors' estates and their stakeholders; (ii) provide an adequate runway for the Debtors to effectuate a successful sale process; and (iii) establish procedures for the efficient administration of the Chapter 11 Cases.

74.    I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  I incorporate by reference the factual statements set forth in each of

the First Day Motions as though set forth herein.  Based on my personal knowledge, information supplied to me by and discussions with other members of the Debtors' management, Debtors' counsel, professionals, and representatives, my review of relevant documents, my opinion based upon my experience and the aforementioned review and discussions, and as set forth in more detail below, I believe that the relief sought in each First Day Motion is (a) necessary for the Debtors to (i) minimize disruption and loss of productivity to their business; (ii) effectuate a smooth transition into and operate within, these Chapter 11 Cases, and (iii) avoid immediate and irreparable harm; (b) in the best interests of the Debtors' creditors, estates, and other stakeholders; and (c) constitutes a critical element in preserving value during these Chapter 11 Cases until a successful sale can occur.

75.    Additionally, several of the First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "[u]nless relief is needed to avoid immediate and irreparable harm."  Given this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors' estates.  Other relief will be deferred for consideration at a later hearing.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: March 17, 2025

By:     */s/ Craig R. Jalbert*
Name:  Craig R. Jalbert
Title:   Chief Restructuring Officer