# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BRIGHTMARK PLASTICS RENEWAL LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10472 (LSS)<br><br>(Joint Administration Requested) |

**COMBINED INITIAL RESPONSE AND RESERVATION OF RIGHTS OF
UMB BANK. N.A., AS TRUSTEE, TO DEBTORS' FIRST DAY PLEADINGS**

UMB Bank, N.A., not in its individual capacity but solely in its capacity as trustee and collateral agent (the "Trustee") for the tax exempt facility revenue bonds (the "Bonds") issued under that certain Trust Indenture, dated as of March 1, 2019 (as amended or supplemented, including by the First Supplemental and Amendatory Trust Indenture, dated as of February 1, 2024, the "Indenture"), by and between the Indiana Finance Authority (the "Authority") and the Trustee and made in connection with that certain Loan Agreement, dated as of March 1, 2019 (as the same may be amended or supplemented, the "Loan Agreement"), by and between the Authority and Brightmark Plastics Renewal Indiana LLC, formerly known as RES Polyflow Indiana, LLC (the "Borrower"), hereby files this *Combined Initial Response and Reservation of Rights to Debtors' First Day Pleadings* (the "Response") and in support thereof states as follows:

## INITIAL RESPONSE STATEMENT

1.      There is no dispute that the Debtors are obligated for the $185 million they borrowed to finance the construction and operation of their plastics recovery and recycling facility (the "Plant"). And, there is no dispute the Bonds are the fulcrum debt and secured by first priority

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Brightmark Plastics Renewal LLC (7907); Brightmark Plastics Renewal Indiana LLC (7118); and Brightmark Plastics Renewal Services LLC (3789). The Debtors' headquarters are located at 1725 Montgomery St, Floor 3, San Francisco, CA 94111.

liens on substantially all of the Debtors' assets.  Yet, the Debtors elected to wait until days before filing Chapter 11 to reveal their initial gameplan for these Chapter 11 cases: engineer a sale of the Debtors' assets to their non-debtor insider parent (the "Parent") by obtaining an insider priming loan from the Parent so it could credit bid the priming debt for all of the Debtors' assets and extinguish the Trustee's liens for no value.  The Debtors did not offer (and in fact, could not offer) any tangible adequate protection to the Trustee as part of the insider priming loan.

2. The Debtors and the Debtors' Parent "requested" the Trustee consent to this insider priming DIP loan by threatening that a non-Debtor affiliate controlled by the Parent would revoke a license for intellectual property the Debtors allegedly use to operate the Plant.  The Debtors and Parent threatened that given this risk to the value of the collateral, the Trustee and Bondholders should consent to priming.

3. For obvious reasons, the Trustee and Bondholders could not consent to a priming loan under these circumstances, particularly given that no tangible adequate protection exists.  The relief would have failed as a matter of law in any event.  The Trustee sought information from the Debtors about their liquidity needs in order to consider providing alternative interim financing but was rebuffed by the Debtors.

4. The Debtors having now recognized their inability to obtain approval of a priming postpetition facility, let alone an insider priming loan, they have now stated in the various first day pleadings[2] that they have pivoted from seeking an insider priming DIP loan to seeking an insider junior DIP loan.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the *Declaration of Craig R. Jalbert in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 25].

5.  The Trustee agrees that expending time and resources litigating an insider priming loan with no ability to provide any adequate protection would have been a wasteful and futile exercise. And, based on an initial review of the first day pleadings, the Debtors' decision to pivot to an entirely junior insider loan under these circumstances was a more prudent, cost-effective, and commercially reasonable course of action. Certainly this turn of events is the first positive development during the initial stages of these cases.

6.  It is still nonetheless important that the proposed DIP Facility comply with the Bankruptcy Code, that the DIP Order ensure that the Debtors' pivot is not illusory and that the rights of the Trustee and Bondholders are not impeded or altered, whether inadvertently or otherwise. It is also important than the parties clarify and resolve any misunderstandings about the proposed relief and the prepetition and postpetition state of affairs. To that end, prior to filing this Response, the Trustee sent the Debtors and the Parent/DIP Lender a markup of the proposed DIP Order with proposed changes to address its concerns. As of the filing of this Response, the Trustee is continuing to work with the Debtors and the insider DIP Lender to address the Trustee's comments. That redlined proposed DIP Order is also attached as Exhibit A (the "**Revised DIP Order**") for the Court's review to consider in advance of the hearing.

7.  In addition, the status quo should be maintained on a number of less urgent issues pending a hearing on a properly developed factual record.

8.  The primary concerns the Trustee has attempted to address and clarify are as follows:

- The DIP Claims and DIP Liens granted to the DIP Lender are subject and junior to the liens and claims of the Prepetition Secured Parties, including any adequate protection provided to the Prepetition Secured Parties, with respect to the Prepetition Bond Collateral.

- As further adequate protection, the fees of the Prepetition Secured Parties' professionals, including but not limited to ArentFox Schiff LLP, Womble, Bond Dickinson LLP and FTI Consulting, Inc. should be paid on a monthly basis during the pendency of these cases.

- DIP Superpriority Claims should not have recourse against Prepetition Bond Collateral. *See* Revised DIP Order, ¶ 8. Otherwise, the relief sought would be tantamount to a priming DIP, but without requiring the Debtors to meet their burdens under Section 364(d), which they could not do.

- The Prepetition Secured Parties' right to credit bid under section 363(k) of the Bankruptcy Code should be explicitly preserved and protected. *See* Revised DIP Order, ¶ 21.

- Upon an Event of Default, the Trustee should also have the opportunity to contest whether a default occurred during the Waiting Period. Following a Termination Date, the stay should also be lifted as to the Trustee with respect to the Prepetition Bond Collateral and the Parent/DIP Lender shall not have the ability to take possession or control of the Prepetition Bond Collateral. *See* Revised DIP Order, ¶ 22.

- Any DIP Liens proposed on claims or causes of action against insiders should not be considered until the final hearing. *See* Revised DIP Order ¶ 5. Otherwise, the insider DIP Lender would effectively control and foreclose claims and causes of action against the Debtor's insiders through an interested-party transaction without giving parties like the Trustee an opportunity to investigate and object if necessary.

- Adequate Protection Liens and Adequate Protection Superpriority Claims should include replacement liens on proceeds of the Prepetition Bond Collateral and will be senior to the DIP Liens and DIP Lender Superpriority Claims. *See* Revised Order, ¶ 13. .[3]

- The Trustee reserves the right to investigate the Bridge Loan, including with respect to any liens granted on the Bridge Loan Collateral and whether the transaction complied with the Indenture and Loan Agreement related to the Bonds.

---

[3] It appears the Debtors are taking the position that the restricted cash receipts will be deposited into the Trustee's accounts and that the Debtors will not seek to access that cash and use it as cash collateral. The Trustee takes no issue with that approach. The Trustee does however, dispute the Debtors' contention that such receipts constitute adequate protection. The reason is because prepetition accounts receivable and insurance refunds already constitute the Trustee's prepetition collateral. No new net revenues are expected during budgeted period. Further, prior to the Petition Date, upon acceleration of the Bonds, the Trustee exercised remedies against the UMB accounts and therefore, there is no cash the Debtors can access as cash collateral. Given the timing of the First Day Hearings, the Trustee is prepared to wait and address this issue at the final hearing.

9. In addition, the Cash Management Motion seeks to allow intercompany payments to insiders, including payments to the Parent. Intercompany payments to non-Debtor insiders should not be approved, or at least not approved until a final hearing. It is not clear from the Cash Management Motion what those payments are for and why they are urgent. It is equally unclear what basis exists to warrant such favorable treatment to an insider and the need and justification to elevate the claims of the insider parent. Under the DIP Budget, it appears those payments could be more than $1.1 million.

10. The Trustee remains concerned about the Parent's control over the Debtors and any transactions involving the insider Parent. The Trustee understands that the Debtors' board members until a few weeks ago mirrored the board members of the Parent. The alleged "Independent Director" who was selected by the same Parent/Debtor board has been in place for a short time and is advised by the same counsel that advises the Debtor.

11. The Critical Vendor Motion and DIP Motion contain bald statements and conclusions about the priority of unknown mechanics liens on the Prepetition Bond Collateral. The Trustee does not accept those statements, nor does it concede that making such payments under critical vendor satisfies priority liens against the Prepetition Bond Collateral or constitutes adequate protection. The Trustee will require information about those proposed payments and will work with the Debtors to understand the Debtors' assertions. The Trustee does reserve all rights regarding the priority of any alleged liens against the Prepetition Bond Collateral

12. Though the Debtors did not initially seek to work cooperatively with the Trustee and the Bondholders prior to the commencement of the Chapter 11 Cases, the Trustee and Bondholders remain hopeful that the Debtors will be transparent and forthcoming as these cases move forward.

13. The Trustee is also still evaluating the Debtors' proposed sale process and the adequacy of the budget to run a fulsome value maximizing process. The Trustee remains committed to a value maximizing transaction and intends to work constructively going forward.

14. The relief sought in First Day Motions should only constitute the Debtors' urgent relief. The Trustee has not had an opportunity to review all of the pleadings and filed this Response to address the more urgent issues. The Trustee reserves all rights to raise these and additional issues and concerns prior to any final hearing.

## RESERVATION OF RIGHTS

15. The Trustee reserves and preserves all of its rights, including but not limited to the right to file such further or supplemental objections or responses to any of the First Day Motions, including but not limited to the DIP Motion and the relief requested therein, and including but not limited to the right to adequate notice and a hearing with respect to all of the First Day Motions, and to appear at and be heard at any hearings thereon, including but not limited to the DIP Motion.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court (i) enter the Interim DIP Order subject to incorporating the comments set forth in the Revised DIP Order and (ii) grant such other and further relief as the Court deems proper.

WBD (US) 4932-2076-9835v2

<table>
<tr><td>Dated: March 18, 2025<br>Wilmington, Delaware</td><td>**WOMBLE BOND DICKINSON (US) LLP**<br><br>*/s/ Matthew P. Ward*<br>Matthew P. Ward, Esq. (Del. Bar No. 4471)<br>1313 North Market Street, Suite 1200<br>Wilmington, Delaware 19801<br>Telephone: (302) 252-4320<br>Facsimile: (302) 252-4330<br>Email: matthew.ward@wbd-us.com<br><br>-and-<br><br>Andrew I. Silfen, Esq.<br>Beth M. Brownstein, Esq.<br>Mark Angelov, Esq.<br>**ARENTFOX SCHIFF LLP**<br>1301 Avenue of the Americas, Floor 42<br>New York, New York 10019<br>Telephone:  (212) 484-3900<br>Facsimile:   (212) 484-3990<br>Email:  andrew.silfen@afslaw.com<br>            beth.brownstein@afslaw.com<br>            mark.angelov@afslaw.com<br><br>-and-<br><br>James E. Britton, Esq.<br>**ARENTFOX SCHIFF LLP**<br>800 Boylston Street, 32nd Floor<br>Boston, Massachusetts 02199<br>Telephone: (617) 973-6100<br>Facsimile: (617) 367-2315<br>Email: james.britton@afslaw.com<br><br>*Counsel for UMB Bank, as Trustee*</td></tr>
</table>

WBD (US) 4932-2076-9835v2