**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BRIGHTMARK PLASTICS RENEWAL LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10472 (LSS)<br><br>(Joint Administration Requested)<br><br>RE: Docket Nos. 26, 52 |

**PRELIMINARY AND LIMITED OBJECTION AND RESERVATION OF RIGHTS OF UMB BANK. N.A., AS TRUSTEE, TO DEBTORS' DIP FINANCING MOTION**

UMB Bank, N.A., not in its individual capacity but solely in its capacity as trustee and collateral agent (the "Trustee"), hereby files this Preliminary and Limited Objection and Reservation of Rights to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims Subject to Certain Permitted Liens; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 26] (the "DIP Motion")[2] and in support thereof states as follows:

**PRELIMINARY STATEMENT**

1.   The Debtors insist, in no uncertain terms, that because the DIP facility is junior, the Trustee will be unaffected by the DIP Facility. Accordingly, the Debtors claim that the Trustee has no right to provide input or have oversight or approval rights over any of Debtors' choices for

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Brightmark Plastics Renewal LLC (7907); Brightmark Plastics Renewal Indiana LLC (7118); and Brightmark Plastics Renewal Services LLC (3789). The Debtors' headquarters are located at 1725 Montgomery1 St, Floor 3, San Francisco, CA 94111.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion, or the First Day Declaration, as applicable.

AFSDOCS:302125982.3

its expenditures in the DIP Budget, the timeline or the terms of the DIP facility.[3] The Debtors' position ignores the fact that the Trustee's rights in its collateral are affected by these proceedings and are being impaired by them, including due to the automatic stay.

2. The Trustee did not pressure the Debtors to commence chapter 11. It did not ask the Debtors to incur any DIP facility to run a sale process for the "sole purpose" of valuing its collateral. The only party directing this strategy, and the only party that stands to benefit from the DIP Motion and the bankruptcy process overall, is the Debtors' parent Brightmark LLC (the "Insider Parent").

3. While the Trustee may not benefit from this process, it must not be harmed by it either. A junior loan does not excuse the Debtors from satisfying the applicable requirements of the Bankruptcy Code. Accordingly, any Final DIP Order should provide the Trustee with the adequate protection it is entitled to in these Chapter 11 Cases. In particular, the Trustee requires that at a minimum (i) its fees and expenses (including for professionals) be paid through the DIP Budget, (ii) the Trustee be provided with the same or similar information rights with respect to its collateral as the DIP Lender, and (iii) assurances the Debtors have a gameplan post-maturity date should the sale process fail given the nature of the Plant and the product on the site. As noted below, ample resources are available to the Debtors from the DIP facility to meet their statutory obligation to provide adequate protection to the Trustee despite the Debtors' current plans to commit those resources instead to making extra-contractual payments to the Insider Parent and funding other non-essential initiatives.

---

[3] Over the weekend, the Debtors provided some information on the DIP Budget items, including on capital expenditures and non-contractual payments to the Debtors' Insider Parent and its executives under an alleged "allocation." The Trustee however, has received no information on the purported mechanic liens the Debtors claim to be satisfying, despite the Trustee's express request and Debtors' representation to this Court at the first day hearing that the information would be forthcoming. The Trustee reserves all rights to supplement this Objection once it has the information it requested after the first day hearings.

2

4.      The Debtors do not currently propose providing *any* adequate protection to the Trustee.  As adequate protection, the Debtors offered only (i) payment of certain alleged prepetition mechanic and vendor liens (of which there is no evidence, and which may be junior to the Trustee's own liens in any event), (ii) certain cash receipts (which are already the Trustee's existing collateral) and (iii) adequate protection liens (which are all junior to the carveout and the DIP Lender's liens).  Such "adequate protection" is illusory.  Meanwhile, the Trustee is being prevented from exercising its broad contractual and state law remedies as a secured creditor while it is the sole target of the Debtors' and Insider Parent's impairment strategy as the holder of 95% of the Debtors' debt.  The fees incurred by the Trustee to protect its position alone are automatically diminishing the value of the Trustee's collateral.

5.      The information that the Debtors have provided to date has not resolved the Trustee's concerns.  The Debtors have provided little on the $1.1 million of non-contractual payments to the Insider Parent.  The information that has been provided fails to justify why the Debtors are making extra-contractual payments, ostensibly on account of the Insider Parent's executives and other management during the nine-week budgeted period.[4]  Similarly, at least $1.6 million contemplated for "HSE and Maintenance" (which the Debtors admit includes non-essential capital expenditures) appears able to be deferred.[5]  The Debtors have provided *no information* concerning the alleged "mechanics' liens" payments which were raised at the first day hearing as

---

[4] The Debtors acknowledge the payments are not being made based upon any contractual obligation.  But the Debtors have also failed to show that the current level of payments are based on historical precedent.

[5] The DIP Budget includes $2.4 million in total payments for HSE and Maintenance.  Based on the descriptions provided, at least $1.6 million in spend does not appear critical and instead relates to improving operations and proving out the technology.

they are core to the relief sought.[6] Moreover, the Debtors' DIP financing only proposes to fund the case through May 18, with no roadmap or plan for how the cases will resolve other than potentially through a sale of the Trustee's collateral to the Insider Parent. What protection is there should the sale process fail? If the goal was to monetize the Trustee's collateral for the Trustee's benefit, as the Debtors allege, the Trustee could have more easily done that itself through its exercise of its remedies outside of bankruptcy. To the extent the Debtors have chosen to proceed through this bankruptcy and the DIP Motion, the Trustee must be provided adequate protection for its Bond Collateral.

## LIMITED OBJECTION

### A. The Trustee Must Be Provided With Adequate Protection

6. The Trustee is entitled to, and must be provided with, adequate protection in order for the Debtors to continue with these Chapter 11 Cases, which is the DIP Motion's sole purpose. The Debtors recognize this in their own motion. *See* DIP Motion at ¶¶ 49-51. But the Debtors fail to demonstrate they are providing the required adequate protection, or any protection for that matter. Because the Trustee is not currently adequately protected with respect to its Bond Collateral, and is prevented from exercising its contractual and state law remedies while costs to the Trustee continue to mount, the Trustee must be provided the following:

- **Payment of the Trustee's professional fees through the DIP Budget.** There is already a line item in the DIP Budget for these fees, though its amount is left blank. The Trustee is being forced to incur fees as a result of the Debtors' choice to file bankruptcy, and subsequent unilateral strategy to encumber and sell the Trustee's Bond Collateral and to impede its rights under the Bankruptcy Code. If the Debtors want to go that route and use the DIP facility to fund it, they must also provide for payment of the Trustee's professional fees in order to "do no harm" to the Trustee as secured creditor. Every dollar that the Trustee is forced to incur in connection with these Chapter 11 Cases is a dollar's worth

---

[6] *See* DIP Motion ¶ 50, describing the proposed adequate protection, including the payment of "$1.81 million to creditors who would otherwise have Statutory Liens senior to the Bond Liens…"

4

of diminution of the Trustee's collateral and therefore the Trustee is entitled to adequate protection through payment of its fees as long as the Debtors are in these cases.

- **Reasonable information rights with respect to the Bond Collateral.** The Trustee is almost certainly already entitled to all of the information that it has requested from the Debtors under the Prepetition Credit Documents. Nonetheless, the Debtors have only been producing a trickle of information thus far, and what has been produced does not alleviate the Trustee's concerns. The Trustee's financial advisor, FTI, sent a list of information requests to the Debtors on or around March 27, including information about the DIP Budget and the Vendor Claims (as defined below), which the Debtors had previously committed to providing.[7] In response, the Debtors stated that the requests were overbroad and requested that more tailored requests be provided before they would send any information. The Debtors began producing information to the Trustee on April 4, but what was produced with respect to the capital expenditures and related party transactions with its Insider Parent did not show why such expenses are necessary or beneficial to the Debtors. The Debtors still have not produced any information concerning the alleged liens on the Plant. The Trustee must be afforded regular and fulsome information updates about the status of its Bond Collateral if the Debtors are seeking to use it and prevent the Trustee from exercising its rights with respect to it in these Chapter 11 Cases.

- **Waiver of 506(c) Rights.** The Debtors currently do not propose to waive their rights under Section 506(c) of the Bankruptcy Code. While a debtor may have a right to attempt to surcharge collateral in certain situations and try to meet that significant burden, the Trustee submits that here, the Debtors could not possibly show a "benefit" to the Trustee through their use or sale of the Bond Collateral, particularly as the Debtors are not providing the Trustee adequate protection with respect to the same. Moreover, in the event a credit bid is the winning bid, it would be impossible to argue that a sale of the Trustee's own collateral to itself through a credit bid would constitute a "benefit" to the Trustee, as the only reason the process would be necessitated in the first place would be because the Trustee was prevented from exercising its state law remedies against the same collateral as a result of the bankruptcy filing and the automatic stay.

- **Meaningful Winddown Plans.** The Debtors should also articulate precisely what their plan is for these Chapter 11 Cases post-sale. For example, the Trustee is concerned about what the Debtors intend to do about the large quantity of caustic pyrolysis oil currently stored at the Plant. The Debtors must show that they have some plan in place for disposing of the pyrolysis oil in the event that the sale is unsuccessful. The Debtors must have concrete steps in

---

[7] UMB first sent an informal set of information requests to the Debtors' counsel prior to the Petition Date on March 13, 2025, followed by a modified and narrowly tailored list on March 27 and a further modified list on April 2.

5

place to deal with these and potentially other contingencies, rather than rely on simply handing the keys to the Trustee after weeks of automatic stay-induced delay in the event things do not turn out the way the Debtors hope and attempt to leave the Trustee holding the bag.

      **i.**    **Standard for Adequate Protection**

7. A secured party's rights in collateral are constitutionally protected interests, and the Bankruptcy Code mandates that a debtor provide adequate protection of these interests under Section 363. *See In re Molycorp, Inc.*, 562 B.R. 67, 75 (Bankr. D. Del. 2017) ("A secured creditor's interest in its collateral is a substantive property right created by non-bankruptcy law, which may not be substantially impaired when bankruptcy intervenes."); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (stating that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment"). The Bankruptcy Code requires that, upon the request of a creditor with an interest in the property used, the court "***shall*** prohibit or condition" the debtor's use of its property "as is necessary to provide adequate protection" of the creditors' interests. 11 U.S.C. § 363(e) (emphasis added). Section 363(e) is not a discretionary provision, but rather requires the court to grant relief. *See U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) ("At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor.").

8. When determining adequate protection for a secured party's interests, the secured party has the burden of proof only as to the "validity, priority, or extent of such interest." 11 U.S.C. § 363(p)(2). Upon a prima facie showing of the validity of the secured lender's liens, the burden shifts to the Debtors or the other entities seeking to use the secured parties' collateral to show that they are adequately protected. *See, e.g., In re Radnor Holdings Corp.*, 363 B.R. 820, 846 (Bankr. D. Del. 2006) ("A claim's presumptive validity is not altered unless an objection is

supported by *substantial evidence*.") (emphasis in original) (citations omitted); *In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570, 2021 WL 2828916 at *10–11 (Bankr. D. Del. July 7, 2021) (secured party adequately demonstrated validity and extent of secured status which other parties were unable to rebut).

      **ii.**    **The Validity and Extent of the Trustee's Liens Is Not In Reasonable Dispute**

9.     Here, the Trustee submitted its proof of claim (the "Proof of Claim") to the Debtors on April 4, 2025,[8] which sufficiently presents its claim. *See* 11 U.S.C. § 502(a); Bankruptcy Rule 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *Radnor*, 353 B.R. at 846 ("Once a secured creditor shows its properly filed financing statements, it has established a prima facie secured claim; and a secured creditor is not required to show that its security interests are not voidable in order to establish its secured status.") (citing *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991).

10.    As of the date of this Objection, the Debtors have not challenged the validity of the Trustee's liens on the Bond Collateral, nor does the Trustee have any reason to believe that its liens on the Bond Collateral are subject to any challenge.[9] Accordingly, the Trustee has a secured claim against the Debtors of not less than $179,144,416.67, secured by the Bond Collateral.

      **iii.**   **The Trustee's Interest In the Bond Collateral Is Not Adequately Protected**

---

[8] The Trustee provided the Debtors with an unsigned but complete proof of claim on April 3, while awaiting a signature. The Trustee attempted to electronically file its Proof of Claim on April 4, but Omni, the Debtors' claims and noticing agent, was not accepting electronic claims at that time (presumably because no bar date has been established, though the Trustee has not been able to confirm). The Trustee provided the signed Proof of Claim to the Debtors on April 4 and submitted it for physical filing with Omni on the same date.

[9] Following a hearing on the Bid Procedures Motion on April 3, 2025, the Court set a deadline for the Debtors to object to the Trustee' Proof of Claim on or before April 14, 2025.

11. It is incumbent on the Debtors to provide the Trustee with adequate protection for their use of the Trustee's collateral. Their proposal falls woefully short.

12. It is undisputed that no equity cushion exists with respect to the Bond Collateral, and the Debtors have made no showing to the contrary. *See, e.g., In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 304–06 (Bankr. D. Del. 2011) (even where de minimis equity cushion did exist, secured lender was not adequately protected because cash collections were not being used to pay secured creditor and administrative claims could not be paid from its collateral without its consent). It is also undisputed that the Debtors are not making regular cash payments to the Trustee. What the Debtors have offered as adequate protection is illusory, not tangible.

### a. *Paying Off Unproven Liens Is Not Adequate Protection*

13. The Debtors have proposed that paying off certain alleged vendor claims subject to liens held by "providers of repair and mechanic services for the Debtors' [Plant] and equipment therein, as well as shippers and warehouse service providers," (such liens, the "Vendor Claims") constitutes adequate protection. *See* Critical Vendor Motion at ¶ 18; DIP Motion at ¶ 50.

14. First, the Debtors' offer to pay off the Vendor Claims in no way benefits the Trustee. The Debtors have indicated their "belief" that if left unpaid, the Vendor Claims would give rise to liens that prime the Trustee's own liens in the Bond Collateral and thus by paying them off, the Trustee is being provided adequate protection. But they have provided no evidentiary or legal support for that assertion. The Trustee requested information from the Debtors about the nature and extent of the Vendor Claims, and the Debtors' analysis thereof, and has received nothing.[10] The Debtors therefore failed to carry their burden.

---

[10] Counsel to the Trustee made this request at the First Day Hearing. It is unfortunate that the Trustee is therefore not even in a position to determine the nature and extent of the Vendor Claims or to perform an analysis.

8

15. The Trustee has reason to doubt that the Vendor Claims (whatever they actually are) would prime the Trustee's liens in the Bond Collateral in any event. The Plant is located in Indiana, so Indiana law would govern the creation and enforcement of, for example, any mechanics' lien or similar lien. Indiana is a "first in time, first in right" state with respect to lien priority. *See* Ind. Code § 32-21-4-1(c). In general, if a mortgage was properly recorded before any work that may become the subject of a mechanics' lien was started and the materials furnished, the mortgage has priority over such lien with respect to the land and buildings. The Indiana mechanics' lien statute, Ind. Code § 32-28-3-2, provides an exception for mechanics' liens with respect to improvements (not land or buildings).

16. There is, however, an "exception to the exception" provided by Ind. Code § 32-28-3-5(d), which provides that "the mortgage of a lender has priority over all liens created under this chapter that are recorded after the date the mortgage was recorded, to the extent of the funds actually owed to the lender for the specific project to which the lien rights relate." No evidentiary basis exists here to show that the Trustee's liens would be primed.

17. Accordingly, the Trustee does not appear to directly benefit at all from paying off the Vendor Claims, and certainly has not been provided any information about the nature or extent of the Vendor Claims that would allow it to determine otherwise. While the Trustee does not object to the Debtors paying off the Vendor Claims, as established there is no record that the Trustee's interests in the Bond Collateral would be diminished by the existence of Vendor Claims. Therefore, payment of claims related to the Vendor Claims does not constitute adequate protection to the Trustee.[11]

b. ***The Cash Receipts Are Not Adequate Protection***

---

[11] Of course, it must also be clear from the DIP Budget that the Debtors are not incurring any new potentially senior mechanic's liens that it cannot pay during the DIP period.

18. The Debtors have also argued that the Trustee is adequately protected because its cash collateral will "through the collection of receipts . . . increase from approximately $914,000 to over $1.85 million." DIP Motion at ¶ 50. These receipts (the "Cash Receipts") are likewise not adequate protection. The Bond Collateral extends to nearly all of the Debtors' assets, including general intangibles and accounts.

19. Looking at the DIP Budget, the Cash Receipts actually consist of "A/R Collections" and "Insurance Refunds," to be paid in installments between March 31 and May 11. *See* DIP Budget (A/R Collections and Insurance Refund). Both prepetition accounts receivable and insurance refunds constitute general intangibles and/or accounts ***already subject to the Trustee's liens and constituting Bond Collateral***. The Debtors confirmed expressly to the Trustee's financial advisor that the Cash Receipts do not consist of new operating receipts but rather prepetition receivables collateral on which the Trustee already has a lien.

20. The Debtors therefore have no cash collateral that they could have used to provide periodic payments to the Trustee, nor do they have any operating receipts that they propose to use for such purpose. Rather, the Cash Receipts consist of funds that the Trustee already has an existing lien on. Offering the Cash Receipts as adequate protection is simply attempting to pay the Trustee with its own coin, and thus is plainly not any adequate protection. The Trustee's own collateral may not be used as adequate protection for its collateral.

    **iv. The Debtors Can Make Adequate Protection Payments to the Trustee**

21. Based on the information that the Debtors have provided to the Trustee, it appears clear that the Debtors have the capacity to provide actual adequate protection to the Trustee. The Debtors are instead using those dollars for other purposes that do not appear to be necessary or beneficial to the estates.

22. First, approximately $800K in monthly costs are being pushed down and allocated from the Insider Parent to the Debtors as compared to approximately just $230K pre-filing for the month of February. Fifty percent of the incremental monthly allocation included in the DIP Budget is attributable to the "Executive" department of the Insider Parent, which is derived purportedly from the Insider Parent's assumption that its executives are spending half of their time working on the Debtors. Another 32% of the incremental allocation is attributable to "Finance" which assumes this department spends close to 40% of its time on the Debtors.

23. These costs are being asserted at the Insider Parent level despite the Debtors appointing (and budgeting for) a CRO to run these cases.

24. While the Debtors have provided a high-level breakdown by department, the Trustee and its professionals have asked for, but have not received, any detail behind these estimates.

25. Second, the timing of the capital expenditure payments raises questions about whether the Debtors are front-loading costs into the 9-week budget period financed by the DIP. The Debtors' capital expenditures schedule supporting the HSE and Maintenance line shows a ramp up in spending during the post-filing period, followed by a significant reduction in spend beginning in August 2025. These trends suggest that these payments could be deferred to a later period.

26. In short, the Debtors are required to provide the Trustee with adequate protection, which they have not done. The Debtors have not shown why any of these other expenditures are required to be made. The amounts allocated for these line items could be used to provide the Trustee with its required adequate protection without necessitating the expenditure of any additional funds.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court (i) order that the Debtors provide adequate protection to the Trustee in accordance with the terms set forth above in connection with any order granting the DIP Motion on a final basis and (ii) grant such other and further relief as the Court deems proper.

April 7, 2025
Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Matthew P. Ward*
Matthew P. Ward, Esq. (Del. Bar No. 4471)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: matthew.ward@wbd-us.com

Andrew I. Silfen, Esq.
Beth M. Brownstein, Esq.
Mark Angelov, Esq.
**ARENTFOX SCHIFF LLP**
1301 Avenue of the Americas, Floor 42
New York, New York 10019
Telephone: (212) 484-3900
Facsimile:  (212) 484-3990
Email: andrew.silfen@afslaw.com
           beth.brownstein@afslaw.com
           mark.angelov@afslaw.com

-and-

James E. Britton, Esq.
**ARENTFOX SCHIFF LLP**
800 Boylston Street, 32nd Floor
Boston, Massachusetts 02199
Telephone: (617) 973-6100
Facsimile: (617) 367-2315
Email: james.britton@afslaw.com

*Counsel for UMB Bank, as Trustee*