## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BRIGHTMARK PLASTICS RENEWAL LLC, et al.,[1] | Case No. 25-10472 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: May 9, 2025 at 10:00 a.m. (ET)**<br>**Objection Deadline: May 2, 2025 at 4:00 p.m. (ET)** |

## MOTION OF UMB BANK. N.A., AS TRUSTEE AND COLLATERAL AGENT, FOR ENTRY OF AN ORDER (I) DISMISSING THE CHAPTER 11 CASES FOR CAUSE PURSUANT TO 11 U.S.C. § 1112 OR (II) IN THE ALTERNATIVE, GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362

UMB Bank, N.A., not in its individual capacity but solely in its capacity as trustee and collateral agent (the "Trustee"), hereby files this Motion (this "Motion") for Entry of an Order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order") (I) Dismissing the Chapter 11 Cases for Cause Pursuant to 11 U.S.C. § 1112 or (II) In the Alternative, Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 and in support thereof states as follows:

## PRELIMINARY STATEMENT

1.    The Debtors stated unequivocally that they filed these Chapter 11 Cases for the "sole purpose of valuing the [Trustee's] collateral." More recently this past week through the Debtors' 506(c) Motion, the Debtors assert that the bankruptcy process they unilaterally decided to pursue is actually for the sole benefit of the Trustee's collateral, so that the collateral should be charged to pay for every single component of the junior DIP loan. This position is the latest pivot after the Debtors failed to mount any challenge to the Trustee's liens and failed to procure a

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Brightmark Plastics Renewal LLC (7907); Brightmark Plastics Renewal Indiana LLC (7118); and Brightmark Plastics Renewal Services LLC (3789). The Debtors' headquarters are located at 1725 Montgomery1 St, Floor 3, San Francisco, CA 94111.

priming DIP loan.  What is consistent though, is that the Debtors continue to pursue the clear goal of the Insider Parent/DIP Lender to prevent any exercise of remedies by the Trustee and impair its (and no other party's) claim.  In its latest iteration of the Insider Parent's strategy, the Debtors seek to preclude the Trustee from exercising its rights with respect to the collateral, including through a credit bid.  Having failed to directly prime the Trustee's liens, the Debtors seek to do so indirectly using Section 506(c).  The Debtors essentially threaten that if the Trustee successfully credit bids on its own collateral, the Trustee should pay the entire $13 million junior DIP loan *in cash*.[2]  The Debtors' 506(c) Motion creates another cloud over this sale process and puts it in jeopardy.

2.      The Trustee never asked for these cases.  It never imposed pressure on the Debtors to file these cases. And it sees no reason for the Debtors to be in chapter 11, especially if it is not going to result in a fair and open process.

3.      It is time for the charade to end.  From the start these Chapter 11 Cases have been run directly adversely to the Trustee's interests.  The Trustee is the Debtors' sole meaningful creditor and has a blanket lien on the Debtors' sole meaningful asset.  This is a quintessential two-party dispute that the Bankruptcy Code was not intended to be used to adjudicate.  These Chapter 11 Cases were therefore not filed in good faith and must be dismissed.  The fact that the Debtors assert that they can charge the Trustee for a process the Trustee never requested or consented to, designed and run solely to deprive the Trustee of its bargained-for collateral, is proof positive of that.  The Trustee has been left with no choice but to file this Motion.

4.      The effort to surcharge the collateral independently weighs in favor of the relief requested.  Even taking the Debtors at their own word and believing that the cases are being run

---

[2] As set forth on the record in the hearing to consider the Final DIP Order, in response to the Trustee's concerns raised about expenditures under the DIP Loan such as non-contractual insider payments without historical precedent, capital expenditures inconsistent with prior practices, and unsubstantiated lien payments, the Debtors repeatedly told the Trustee that it has no say in the expenditures under the DIP Loan because it is an entirely junior facility.

for the sole benefit of the Trustee, this is plainly not a valid reorganizational purpose and thus dismissal is still required.  The Trustee intends to oppose the effort to surcharge its collateral and show that the Debtors have not met and cannot meet that high burden.  The Debtors' assertions that the Trustee benefitted from these cases are specious.  However, if there is any truth to those assertions, then the cases should be dismissed for that reason alone.

5.    In the alternative, if the Court is not prepared to dismiss the Chapter 11 Cases as required under Section 1112(b), then the Trustee is entitled to relief from the automatic stay under Section 362(d) in order to exercise its contractual and state law remedies with respect to its collateral.  The Trustee is not and has never been adequately protected as required under Section 362, and the longer these Chapter 11 Cases persist the less protected the Trustee will become.  To date, the Debtors have failed to prove they are providing adequate protection.  They refuse to provide even the basic requested information about the purported adequate protection they claim to provide or the condition of its collateral.  The Debtors may not use these Chapter 11 Cases to deprive the Trustee of any visibility into the status of its collateral and also prevent it from taking any remedies with respect to the same.  Because that is exactly what the Debtors are doing, the Trustee is entitled to relief from the stay.

## I.    JURISDICTION

6.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012 (the "Amended Standing Order"). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3

7.     The statutory predicates for the relief sought herein are sections 105(a), 362, and 1112(b) of the Bankruptcy Code and Bankruptcy Rules 1017(a) and 4001.

## II.    RELEVANT BACKGROUND

### A.  The Indenture and Security Documents and Bond Collateral

8.     UMB Bank, N.A., is the trustee and collateral agent for the tax exempt facility revenue bonds (the "Bonds", and the holders of such Bonds, the "Bondholders") issued in the original principal amount of $185,000,000 under that certain Trust Indenture, dated as of March 1, 2019 (as amended or supplemented, including by the First Supplemental and Amendatory Trust Indenture, dated as of February 1, 2024, the "Indenture"), by and between the Indiana Finance Authority (the "Authority") and the Trustee and made in connection with that certain Loan Agreement, dated as of March 1, 2019 (as the same may be amended or supplemented, the "Loan Agreement," and together with the Indenture and each related or ancillary document entered into in connection therewith, the "Indenture and Security Documents"), by and between the Authority and Brightmark Plastics Renewal Indiana LLC, formerly known as RES Polyflow Indiana, LLC (the "Borrower").  In connection with the Bonds, the Borrower and the Authority entered into the Loan Agreement, pursuant to which the proceeds of the Bonds were loaned to the Borrower.

9.     Pursuant to the Indenture, UMB was appointed Trustee with respect to the Bonds and, in its capacity as Collateral Agent, was assigned all of the Authority's rights under the Indenture and Security Documents, including but not limited to the Indenture and Loan Agreement.

10.     The Bonds are public Green Bonds issued to raise funds to enable the Borrower's construction of a recycling center in Ashley, Indiana (the "Plant").  However, the Plant has never

4

functioned as intended and has never been more than approximately 5% operational at any given time.

11.    The Bonds are secured by first priority liens in favor of the Trustee, as collateral agent, on substantially all of the Debtors' assets (collectively, the "Bond Collateral").  A more fulsome description of the Trustee's Bond Collateral and the Indenture and Security Documents is set forth in the Trustee's proof of claim (the "Proof of Claim"),[3] a true and correct copy of which is attached hereto as **Exhibit B** and incorporated by reference as if fully set forth herein.  Notably, the Bond Collateral includes (but is not limited to) the Plant and assignments of agreements and/or direct agreements for substantially all products and services necessary for the operation of the Plant.  As noted below, the Debtors and the Insider Parent do not dispute the scope, validity, or priority of the Trustee's liens.

12.    The Plant and its operations were previously funded by the Debtors' parent Brightmark LLC (the "Insider Parent"), with the Insider Parent allegedly funding over $200,000,000 to the Debtors through equity contributions prior to February 2025.  On or around March 5, 2025, the Insider Parent decided to pivot from providing equity financing to debt financing, and to that effect caused the Debtors to enter into a bridge loan (the "Bridge Loan") with Brightmark Plastics Ashley Holdco LLC (the "DIP Lender"), an affiliate of the Insider Parent, for up to $6,500,000.  The Bridge Loan is and has always been junior to the obligations under the Indenture and Security Documents.

### B.    The Notice of Default and Insider-Parent's Priming Attempt

---

[3] Though the Trustee's Proof of Claim has been stamped and acknowledged as received by the Debtors' claims and noticing agent as of April 11, 2025, the Proof of Claim does not appear to be included on the noticing agent's electronic claims register.  The Proof of Claim was actually submitted to the Debtors and the claims and noticing agent on April 4, 2025.  The Debtors' claims and noticing agent's website was not (and apparently still is not) set up for filing electronic claims, meaning that the Trustee had to simultaneously e-mail the Proof of Claim and physically mail it to the claims and noticing agent.

13. On or around March 1, 2025, the Borrower failed to make payment of its Debt Service Requirement (as defined in the Indenture) on account of principal and interest then due on the Bonds, resulting in failure to pay principal and interest due on the Bonds on March 1, 2025.

14. On or around March 7, 2025, the Trustee sent the Borrower a Declaration and Notice of Default and Notice of Acceleration dated March 7, 2024 (the "Notice of Default"), advising the Borrower that as a result of its failure to make the Debt Service Requirement payment, the Trustee was declaring events of default under the Loan Agreement and the Indenture and accelerating all amounts due under the Loan Agreement and the Indenture.

15. Following the Notice of Default, the Debtors informed the Trustee (on March 8, a Saturday) that they would be filing bankruptcy petitions the following Monday and would be seeking approval of a priming DIP loan from the Insider Parent or an affiliate thereof.

16. The Debtors and the Insider Parent "requested" the Trustee consent to this insider priming DIP loan by threatening that a non-Debtor affiliate controlled by the Insider Parent would revoke a license for intellectual property the Debtors allegedly required to operate the Plant. The Debtors and Insider Parent threatened that given this risk to the value of the collateral if the license were revoked, the Trustee and Bondholders should consent to priming. No offer of settlement was communicated by the Debtors contemporaneously with their threats and unilateral demands.

17. The Trustee and Bondholders could not and would not consent to a priming loan under those circumstances, particularly given that (as outlined below) no tangible adequate protection exists for the Bond Collateral securing the Bondholders' $185 million loan. The Trustee sought information from the Debtors about their liquidity needs in order to consider providing alternative interim financing but was rebuffed by the Debtors. Despite originally attempting to rush the priming DIP agreement through on the basis of an alleged liquidity crisis, the Debtors

6

ultimately waited over another week before finally filing for chapter 11, again without informing the Trustee or the Bondholders that they were ever considering moving off of the priming stance.

### C.  The Chapter 11 Cases

18.    On March 16, 2025 (the "Petition Date"), the Borrower together with Brightmark Plastics Renewal LLC and Brightmark Plastics Renewal Services LLC (collectively, the "Debtors") each filed petitions for protection under chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), initiating the cases jointly administered under Case No. 25-10472 (the "Chapter 11 Cases").

### i.    The DIP Motion and Bid Procedures Motion

19.    On that same date, the Debtors filed their *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims Subject to Certain Permitted Liens; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 26] (the "DIP Motion").[4]  Unable to secure priming liens, the Debtor and the Insider Parent instead pivoted to a junior DIP facility, with a shortened timeline (9 weeks, versus the more typical 13 weeks that was originally proposed when the facility would prime the Trustee on the Bond Collateral) and a smaller loan (approximately $13 million, versus the original proposal of approximately $21 million) from the DIP Lender (the same entity that made the subordinated Bridge Loan to the Debtors less than two weeks before).  The Trustee learned of these developments upon reading the DIP Motion.

---

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

WBD (US) 4919-1939-4872v2

20.     The Debtors also filed their *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 22] (the "Bid Procedures Motion"), which sought to approve certain Bid Procedures (as defined therein) with respect to a sale of the Debtors' assets to be concluded on or before May 16, 2025, though the Debtors later changed this date to May 9, 2025—less than 60 days from the Petition Date to the date of proposed consummation.

### ii.    The Trustee's Initial Objections and the Proof of Claim

21.     On March 18, 2025, the Trustee filed its *Combined Initial Response and Reservation of Rights to Debtors' First Day Pleadings* [Docket No. 31], which articulated the Trustee's preliminary concerns with respect to, among other things, the Critical Vendors Motion, the DIP Motion, and the Debtors' Cash Management Motion [Docket No. 16], which among other things sought permission to continue "Intercompany Transactions" (i.e. transactions with the Insider Parent) in the ordinary course of business.

22.     The Trustee worked collaboratively with the Debtors to attempt to bridge certain of the Trustee's concerns while reserving others for determination at the hearing on the Final DIP Order.  As a result, the Bankruptcy Court entered the Interim DIP Order [Docket No. 52] on March 21, 2025.  Among other things, the Debtors committed to providing the Trustee (a) information

8

about the nature and extent of liens purportedly affecting the Bond Collateral and how paying them would constitute adequate protection, and (b) information concerning the amounts set forth in the DIP Budget and what the Debtors' liquidity needs were.  The Debtors did not waive any 506(c) surcharge rights with respect to the Bond Collateral.

23.     On April 1, 2025, the Trustee filed its (i) *Initial Objection, Request for Adjournment and Reservation of Rights to Debtors' Bidding Procedures Motion* [Docket No. 74], which, among other things, pointed out that the Debtors were attempting to prevent the Trustee from exercising its credit bidding rights under Section 363(k) by refusing to stipulate to or challenge the validity of the Trustee's liens prior to the contemplated auction. The Debtors and Insider Parent were simultaneously arguing that an accelerated timeline was necessary under the terms of the DIP facility but that the Debtors needed more time to investigate the Trustee's liens and claims.

24.     The Court entered an Order [Docket No. 85] granting the Bid Procedures Motion on April 4, 2025.  In response to the issues raised by the Trustee, the Court ordered the Trustee to file its Proof of Claim on or before April 4, 2025, which the Trustee did by e-mail and physical mail to the Debtors and the Debtors' claims and noticing agent.  The Court ordered the Debtors to indicate any challenge to the Proof of Claim on or before April 14, 2025.  The Debtors did not and have not raised any challenged to the Proof of Claim, including but not limited to any challenge to the validity or extent of the Trustee's liens in the Bond Collateral.

### iii.    The Final DIP Order and the 506(c) Motion

25.     Following entry of the Interim DIP Order, the Debtors did not provide the Trustee with the information that they had committed to providing or any adequate protection. Accordingly, the Trustee filed its *Preliminary and Limited Objection and Reservation of Rights to Debtors' DIP Financing Motion* [Docket No. 90] on April 7, 2025, which argued that the Trustee's

9

interest in the Bond Collateral was not adequately protected because, among other things, the Debtors had not provided any information necessary to make such a determination about any alleged adequate protection.  Moreover, because the DIP Lender's lien was junior to the Trustee's, the Debtors had taken the position that the Trustee was not entitled to any rights or input with respect to the DIP facility, ignoring the fact that the Chapter 11 Cases were filed without the Trustee's request or consent and were preventing the Trustee from exercising its contractual and state law rights with respect to the Bond Collateral — for which the Trustee was not being compensated.  To date the Trustee has not been provided any payments or any other form of adequate protection in connection with the Bond Collateral.

26.    On April 11, 2025, the Debtors filed their *Preliminary Motion for Entry of an Order Authorizing the Debtors to Surcharge Collateral of the Indenture Trustee Pursuant to 11 U.S.C. § 506(c)* [Docket No. 123] (the "506(c) Motion").  The 506(c) Motion seeks to surcharge the Trustee's Bond Collateral for each of the following categories of fees:

(a) Property taxes;

(b) Property insurance;

(c) Investment banker fees and expenses (including any sale transaction fee, despite *being provided for in the DIP Budget*);

(d) Debtors' counsel fees and expenses;

(e) Debtors' CRO fees and expenses;

(f) Debtors' claims and noticing agent fees and expenses;

(g) Alleged HSE and maintenance costs, again despite being provided for in the DIP Budget (and allegedly being part of the purported adequate protection being provided to the Trustee, which the Trustee disputes);

(h) Employee retention and incentive awards (despite the Debtors having neither sought nor been permitted to offer any such compensation);

10

     (i) Payroll and workers' compensation claims;

     (j) Storage costs; and

     (k) Utilities.

27.     The Court held a hearing on final approval of the DIP Motion on April 14, 2025, during which the Debtors represented to the Court that they had consensually resolved the Trustee's objection.  Counsel to the Trustee clarified that while it was no longer objecting to the DIP Motion, any order granting the DIP Motion on a final basis must be clear that it had no preclusive or determinative effect on the Debtors' 506(c) Motion.  The Debtors agreed with this statement at the hearing, and the Court asked for a proposed form of order.  Following the hearing, the Trustee proposed language to this effect.  The Debtors' counsel denied that any such language was necessary, and also rejected that it had agreed to any representations about the effect any final DIP Order may have on the 506(c) Motion.  Competing versions of proposed Final DIP Orders were filed with the Court on April 16, 2025.  [Docket No. 133].

### III.    **RELIEF REQUESTED**

28.     By this Motion, the Trustee requests entry of the Proposed Order (a) dismissing the Debtors' Chapter 11 Cases, or (b) in the alternative, granting the Trustee relief from the automatic stay with respect to the Prepetition Bond Collateral, and (c) granting such other relief as the Court may deem appropriate.

### IV.    **BASIS FOR RELIEF**

**A.  The Court Must Dismiss the Chapter 11 Cases for "Cause" Under § 1112(b)(4)**

   **i.    Legal Standard.**

29.     Pursuant to section 1112(b)(1) of the Bankruptcy Code, absent unusual circumstances, a court shall dismiss a bankruptcy case "for cause."  Section 1112(b)(1) states, in pertinent part:

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 changed the statutory language with respect to conversion and dismissal from permissive to mandatory.[5]  *See* H.R. Rep. 109-31 (I), 2005 U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances."); *see also In re Gateway Access Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to section 1112 limit the court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal such that this Court has no choice, and no discretion in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4).") (emphasis added).

---

[5] Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a bankruptcy court had wide discretion to use its equitable powers to dispose of a debtor's case but was not mandated to dismiss a case if cause were shown.  H.R.Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; *see also Small Business Admin. v. Preferred Door Co. (In re Preferred Door Co.)*, 990 F.2d 547, 549 (10th Cir. 1993) (a court has broad discretion to dismiss a bankruptcy case); *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991) (determination of whether cause exists under § 1112(b) "rests in the sound discretion" of the bankruptcy court); *In re Koerner*, 800 F.2d 1358, 1367 & n. 7 (5th Cir. 1986) (bankruptcy court is afforded "wide discretion" under section 1112(b)).

30.     The amendments to section 1112 thus limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause. *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D.Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or convert unless special circumstances exist that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate."); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D. S.C. 2007).

31.     "A lack of good faith constitutes 'cause,' though it does not fall into one of the examples specifically listed in the statute." *In re LTL Management, LLC*, 64 F.4th 84, 100 (3d Cir. 2023).  "The determination of good faith is a fact-intensive inquiry in which the court must examine the totality of facts and circumstances."  *In re AIG Financial Products Corp.*, 651 B.R. 463, 473 (Bankr. D. Del. 2023) (citing *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999)). To determine good faith, courts frequently look for evidence of the following factors:

> (a) single asset case;
>
> (b) few unsecured creditors;
>
> (c) no ongoing business or employees;
>
> (d) petition filed on eve of foreclosure;
>
> (e) two party dispute which could be resolved in pending state court action;
>
> (f) no cash or income;
>
> (g) no pressure from non-moving creditors;
>
> (h) previous bankruptcy petition;
>
> (i) prepetition conduct was improper;
>
> (j) no possibility of reorganization;
>
> (k) debtor formed immediately prepetition;

13

(l) debtor filed solely to create automatic stay; and

(m) subjective intent of the debtor.

*In re Primestone Investment Partners, L.P.*, 272 B.R. 554, 557 (D. Del. 2002) (citations omitted). "The focus of the inquiry is whether the petition sought to achieve objectives outside the legitimate scope of the bankruptcy laws . . . [and] no single factor is determinative of a lack of good faith in filing a petition." *Id.* at 557–58 (finding that debtor filed petition in bad faith when it only had one meaningful asset which was subject to sole secured creditor's lien and debtor "was adequately protected by its bargained for contractual rights under state law [such] that it would be inappropriate to arm [it] with the powers of chapter 11 to disadvantage its sole secured creditor").

  ii. **"Cause" Exists Because the Chapter 11 Cases Were Not Filed in Good Faith.**

   a. *This Is a Two-Party Dispute*

32. The Court must dismiss these Chapter 11 Cases because they were not filed in good faith. Rather, the Chapter 11 Cases were filed for the sole purpose of "valuing the Trustee's collateral," and impairing the Trustee. There are no other significant creditors alleged to exist in these cases, other than arguably the insider DIP Lender (whose debt was incurred solely to avoid paying the amounts owed to the Trustee under the Bonds).[6] There was insufficient interest to form a creditors' committee. The only non-debtor parties who have filed notice of appearances in these cases are the Trustee and the DIP Lender. This is a quintessential two-party dispute between the Debtors and the Trustee and therefore must be dismissed.

33. "Courts routinely dismiss two-party disputes in chapter 11, characterizing them as having been filed in bad faith." *See, e.g. In re Traxcell Technologies, LLC*, 657 B.R. 453, 461

---

[6] It also appears that the Bridge Loan may have been used to pay trade creditors in full, meaning that the Trustee is the only party that the Debtors seek to impair through these Chapter 11 Cases.

(Bankr. W.D. Tex. 2024) ("[T]he characterization of a case as a two-party dispute is given greater weight relative to the other factors.  The existence of a two-party dispute can be independent grounds for dismissing a case.") (citations and quotations omitted).  "If a debtor faces no threat from any of its other purported creditors, its financial problems are a two-party dispute suitable for resolution which supports a finding of bad faith." *Matter of Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C.*, 651 B.R. 1, 10 (Bankr. S.D. Iowa 2023) (quoting *In re State Street Houses, Inc.*, 305 B.R. 738, 742 (S.D. Fla. 2003).

**b.  *Debtors Have No Cash or Income.***

34.    A number of the other *Primestone* factors are clearly satisfied here as well.  For example, if not for the DIP loan, the Debtors would have no cash.  The Debtors' Plant has never worked as intended, at no time operating at more than 5% capacity to the extent it is capable of operating at all and producing the intended products.  The Debtors were entirely dependent on equity financing from the Insider Parent in order to keep their operations afloat, and then needed to incur the Bridge Loan just to have liquidity to file these Chapter 11 Cases.  It is clear that the Debtors do not and will not have any meaningful cash or income.

**c.  *No Pressure from Other Creditors.***

35.    The Trustee is the Debtors' sole meaningful creditor; indeed, no committee of unsecured creditors has even been appointed in these chapter 11 cases and there is no activity, much less pressure, from any creditor besides the Trustee.  In fact, given that the Debtors sought and were granted authority to pay critical vendor claims, it is currently unclear whether any unsecured creditors actually even exist as of this time.  In any event, it is undisputed that the Trustee is the only creditor who has taken any active role in these Chapter 11 Cases, with no other creditors even having entered a notice of appearance thus far.

WBD (US) 4919-1939-4872v2

### d. *No Possibility of Successful Reorganization.*

36.     There is no meaningful possibility of reorganization, as the Trustee is owed over $170,000,000 secured by liens on all of the Debtors' assets, and by even the most generous valuation is grossly undersecured.  There is no prospect of the sale generating anything close to the amount necessary to pay off the Trustee, and the Debtors will have nothing to reorganize around following the sale regardless. There is no plan or prospect of a plan.  Indeed, the Debtors themselves have said that the "sole purpose" of these Chapter 11 Cases was to "value" the Trustee's Bond Collateral.  No attempt is even being made at any reorganization because none is possible.

### e. *Cases Filed Solely for Automatic Stay.*

37.     The Debtors only own one meaningful asset—the Plant—which the Trustee has a blanket lien on, which the Debtors have not, and cannot, contest the validity of.  The petition was filed very shortly after the Debtors failed to make the scheduled Debt Service Requirement payment to the Trustee.  Chapter 11 cases filed on the eve of foreclosure are a hallmark of bad faith. *See, e.g., In re Myers*, 491 F.3d 120, 126 (3d Cir. 2007) (affirming dismissal because "suspicious timing of a bankruptcy petition is an appropriate factor for a court to consider in the bad faith analysis.").  The fact that the Debtors filed these Chapter 11 Cases almost immediately after failing to make the regularly-scheduled Debt Service Requirement payment to their sole meaningful creditor who holds a lien on their sole meaningful asset strongly implies the presence of bad faith.

### f. *Subjective Intent of the Debtors.*

16

38.     Lastly, the subjective intent of the Debtors is clearly indicative of bad faith.  The Debtors borrowed over $5,000,000 from the DIP Lender through the Bridge Loan prepetition.[7] Rather than use that money to pay the Debt Service Requirement to the Trustee, the Debtors apparently used it to prepare for filing the Chapter 11 Cases.  At the time, the Debtors also informed the Trustee that their intent was to prime the Trustee's liens with a loan from the DIP Lender.  The Debtors' original intent was clearly to use these Chapter 11 Cases as a means of extinguishing the Trustee's liens on the Bond Collateral and letting the DIP Lender and Insider Parent to take over, cutting out the Trustee from its investment.

39.     When this failed, the Debtors instead pivoted to a new strategy: attempting to hold the Trustee's credit bid rights in limbo by slow-walking any purported investigation of its valid liens while rushing through a remarkably accelerated sale timeline (35 days from entry of an order approving the Bid Procedures Motion to the proposed sale hearing) on the basis that the DIP Lender was unwilling to fund the case any longer on a junior basis.  When the Trustee raised this issue, the Court ordered the Debtors to complete their investigation and file any challenge by April 14.  The Debtors did not file any challenge.  Instead, they filed the 506(c) Motion, which alleges that *every single cost* of the Chapter 11 Cases is "for the benefit of the Trustee" and thus should be surcharged from any sale of the Trustee's Bond Collateral.  This is a transparent attempt to prime the Trustee's liens and punish the Trustee for merely participating in these cases by threatening to require it to pay cash for the Debtors' bankruptcy costs.

40.     Taken together, the Debtors' subjective intent is clear: these Chapter 11 Cases were filed for the sole purpose of impairing the Trustee's—and no other party's—claims.  The Debtors

---

[7] Both the Bridge Loan and the junior lien purportedly securing it are impermissible under the Indenture and Security Documents.

have not even attempted to pretend that these Chapter 11 Cases serve any valid reorganizational purpose, instead repeatedly stating that they are selling substantially all of their assets "for the sole purpose of valuing the [Trustee's] collateral."[8]  There is no plan of reorganization afterwards. There is no provision for payment or restructuring of the obligations owed to the Trustee.  There are no other meaningful creditors whose claims needs to be administered.  In short, there is no reason for these cases to be in chapter 11.

41.     It is important to note again that the Trustee *did not* request that the Debtors file chapter 11, nor did the Trustee initiate any kind of foreclosure proceedings after sending the Notice of Default or threaten the Debtors.  The Trustee in fact applied no pressure for a filing.  Rather, the Debtors incurred the Bridge Loan and the DIP facility entirely of their own volition, and initiated these Chapter 11 Cases without the Trustee's consent or request.  None of the alleged costs in the 506(c) Motion "benefit" the Trustee because the Trustee could have done all of the same things that the Debtors chose to do, but outside of bankruptcy and at far less cost pursuant to the Indenture and Security Documents.

42.     The Debtors made the unilateral decision to proceed otherwise, because they viewed bankruptcy as the best vehicle to deprive the Trustee of its Bond Collateral.  This is not a valid reorganization purpose and is not good faith.  Therefore, "cause" exists to dismiss these cases within the meaning of Section 1112(b).  Moreover, even taking the Debtors at their word that the whole process is for the Trustee's "sole benefit" (which the Trustee disputes) would not change this outcome.  Chapter 11 cases are not filed in good faith when they are run for the sole benefit of a prepetition secured party. *See, e.g., In re 1121 Pier Village LLC*, 635 B.R. 127 (Bankr. E.D. Pa. 2022) (dismissing case because "the bankruptcy court does not serve as an expedited

---

[8] The chilling effect this explicit statement has on third-party bidding is clear.

WBD (US) 4919-1939-4872v2

foreclosure court for the sole benefit of secured creditors"); *Matter of 3868-70 White Plains Road, Inc.*, 28 B.R. 515 (Bankr. S.D.N.Y. 1983) (dismissing case because under Section 1112(b) because only party who would benefit from it was prepetition secured party).

43.     Accordingly, "cause" exists within the meaning of Section 1112(b) to dismiss the Chapter 11 Cases.

### iii.     The Court Should Dismiss Rather than Convert the Chapter 11 Cases

44.     Section 1112(b) states that upon a showing of "cause," the court must "convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate . . . ."  The Court should dismiss the Chapter 11 Cases rather than convert them to cases under Chapter 7.

45.     In this case, the Trustee has a valid and unchallenged first priority lien on substantially all of the Debtors' assets, securing over $170,000,000 in valid and outstanding obligations in connection with the Indenture and Security Documents.  Behind the Trustee is the DIP Lender, who has approximately $12 million in debt under the DIP facility and then another approximately $5 million in obligations under the Bridge Loan.  The Debtors' professionals would come next with administrative claims, except that conversion to Chapter 7 would also add additional fees and costs in the form of Chapter 7 trustee fees and related professional costs.  None of these amounts will be paid because the Bond Collateral is far less than is what is necessary to satisfy the Trustee's obligations.

46.     Therefore, no benefit whatsoever would result from converting the cases, and doing so would not be in the best interests of the Debtors or the estates.  *See, e.g., 1121 Pier Village*, 635 B.R. at 141–42 (discussing factors and holding that dismissal better served interests to creditors where conversion would very likely only result in payments to secured creditor and unsecured

claims were negligible); *Matter of NuGelt, Inc.*, 142 B.R. 661 (Bankr. D. Del. 1992) (finding that dismissal, not conversion, was warranted when case was "essentially a two-party dispute" between debtor and prepetition secured lender and unsecureds were unquestionably out of the money and "the entire estate will go to the major secured creditor").

**B.** **In the Alternative, the Trustee Is Entitled to Relief from the Automatic Stay Because It Is Not Adequately Protected**

47.     In the alternative, if the Court does not dismiss the Chapter 11 Cases, then the Court should grant the Trustee relief from the automatic stay "for cause" so it can exercise its contractual and state law remedies with respect to its Bond Collateral.

**i.** **Legal Standard.**

48.     Section 362(d)(1) provides, in pertinent part, that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay…for cause." *See* 11 U.S.C. § 362(d)(1).  Section 362(d)(1) does not define what "cause" means, except to include that it expressly does include "a lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).  The burden for showing adequate protection is on the debtor. *Matter of 1025 Associates, Inc.*, 106 B.R. 805, 810 (Bankr. D. Del. 1989).

49.     A secured party's rights in collateral are constitutionally protected interests, and the Bankruptcy Code mandates that a debtor provide adequate protection of these interests under Section 363. *See In re Molycorp, Inc.*, 562 B.R. 67, 75 (Bankr. D. Del. 2017) ("A secured creditor's interest in its collateral is a substantive property right created by non-bankruptcy law, which may not be substantially impaired when bankruptcy intervenes."); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (stating that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment"). The Bankruptcy

20

Code requires that, upon the request of a creditor with an interest in the property used, the court "***shall*** prohibit or condition" the debtor's use of its property "as is necessary to provide adequate protection" of the creditors' interests. 11 U.S.C. § 363(e) (emphasis added).  Section 363(e) is not a discretionary provision, but rather requires the court to grant relief. *See U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) ("At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor.").

50.    When determining adequate protection for a secured party's interests, the secured party has the burden of proof only as to the "validity, priority, or extent of such interest." 11 U.S.C.  § 363(p)(2).    Upon a prima facie showing of the validity of the secured lender's liens, the burden shifts to the Debtors or the other entities seeking to use the secured parties' collateral to show that they are adequately protected.  *See, e.g., In re Radnor Holdings Corp.*, 363 B.R. 820, 846 (Bankr. D. Del. 2006) ("A claim's presumptive validity is not altered unless an objection is supported by *substantial evidence*.") (emphasis in original) (citations omitted); *In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570, 2021 WL 2828916 at *10–11 (Bankr. D. Del. July 7, 2021) (secured party adequately demonstrated validity and extent of secured status which other parties were unable to rebut).

51.    Upon a lack of showing by the debtor that the creditor is adequately protected, the court must lift the automatic stay under Section 362(d)(1) in order to allow such creditor to exercise its rights with respect to such collateral as it would be entitled to outside of bankruptcy.  *See, e.g,, Rocco v. J.P. Morgan Chase Bank*, 255 Fed App'x 638 (3d Cir. 2007) (bankruptcy court did not abuse discretion by lifting automatic stay when debtor failed to show existence of adequate protection).

21

ii.     **The Validity and Extent of the Trustee's Liens Are Not In Reasonable Dispute**

52.     Here, the Trustee submitted its Proof of Claim to the Debtors on April 4, 2025, which sufficiently presents its claim. *See* 11 U.S.C. § 502(a); Bankruptcy Rule 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *Radnor*, 353 B.R. at 846 ("Once a secured creditor shows its properly filed financing statements, it has established a prima facie secured claim; and a secured creditor is not required to show that its security interests are not voidable in order to establish its secured status.") (citing *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991).

53.     The Court ordered the Debtors to initiate any challenge to the Trustee's Proof of Claim on or before April 14, 2025.  The Debtors did not file or communicate any challenge to the Proof of Claim.  Accordingly, the Trustee has a secured claim against the Debtors of not less than $179,144,416.67, secured by the Bond Collateral.

iii.     **The Trustee Is Entitled to Relief from Stay Because Its Interest In the Bond Collateral Is Not Adequately Protected**

54.     It is incumbent on the Debtors to provide the Trustee with adequate protection for their use of the Trustee's collateral.  The Debtors have failed to do so.

55.     It is undisputed that no equity cushion exists with respect to the Bond Collateral, and the Debtors have made no showing to the contrary.  *See, e.g., In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 304–06 (Bankr. D. Del. 2011) (even where *de minimis* equity cushion did exist, secured lender was not adequately protected because cash collections were not being used to pay secured creditor and administrative claims could not be paid from its collateral without its consent).  It is also undisputed that the Debtors are not making regular cash payments

22

to the Trustee. What the Debtors have previously offered as adequate protection is illusory, not tangible.

### a.  *Paying Off Unsubstantiated Lien Claims Is Not Adequate Protection*

56.     The Debtors have proposed that paying off certain alleged undisclosed vendor claims subject to liens held by "providers of repair and mechanic services for the Debtors' [Plant] and equipment therein, as well as shippers and warehouse service providers," (such liens, the "<u>Vendor Claims</u>") constitutes adequate protection.

57.     First, the Debtors' offer to pay off the Vendor Claims in no way benefits the Trustee. The Debtors have indicated their "belief" that if left unpaid, the Vendor Claims would give rise to liens that prime the Trustee's own liens in the Bond Collateral and thus by paying them off, the Trustee is being provided adequate protection. But they have provided no evidentiary or legal support for that assertion. The Trustee requested information from the Debtors about the nature and extent of the Vendor Claims, and the Debtors' analysis thereof (including after the Trustee filed its objection to the Final DIP Order), and has still received nothing. The Debtors therefore failed to carry their burden.

### b.  *The Cash Receipts Are Not Adequate Protection*

58.     The Debtors have also argued that the Trustee is adequately protected because its cash collateral will "through the collection of receipts . . . increase from approximately $914,000 to over $1.85 million." These receipts (the "<u>Cash Receipts</u>") are likewise not adequate protection. The Bond Collateral extends to nearly all of the Debtors' assets, including general intangibles and accounts.

59.     Looking at the DIP Budget, the Cash Receipts actually consist of "A/R Collections" and "Insurance Refunds," to be paid in installments between March 31 and May 11. *See* DIP

Budget (A/R Collections and Insurance Refund).  Both prepetition accounts receivable and insurance refunds constitute general intangibles and/or accounts *already subject to the Trustee's liens and constituting Bond Collateral.*  The Debtors confirmed expressly to the Trustee's financial advisor that the Cash Receipts do not consist of new operating receipts but rather prepetition receivables collateral on which the Trustee already has a lien.

60.    The Debtors therefore have no unencumbered cash that they could have used to provide periodic payments to the Trustee, nor do they have any operating receipts that they propose to use for such purpose.  Rather, the Cash Receipts consist of funds that the Trustee already has an existing lien on.  Offering the Cash Receipts as adequate protection is simply attempting to pay the Trustee with its own coin, and thus is plainly not any adequate protection.

61.    In short, the Debtors are required to provide the Trustee with adequate protection, which they have not done.  The Trustee's valid and perfected (and unchallenged) interests in the Bond Collateral are constantly being eroded by, among other things, the continued imposition of the automatic stay.  Accordingly, cause exists within the meaning of Section 362(d) to grant the Trustee relief from the automatic stay with respect to the Bond Collateral, so the Trustee may exercise its bargained-for contractual and state law rights under the Indenture and Security Documents.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, (i) dismissing the Chapter 11 Cases for "cause" under Section 1112(b), or (ii) in the alternative, granting the Trustee relief from the automatic stay under Section 362(d) with respect to the Bond Collateral, and (iii) granting such other and further relief as the Court deems proper.

24

April 18, 2025
Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Matthew P. Ward*
Matthew P. Ward, Esq. (Del. Bar No. 4471)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: matthew.ward@wbd-us.com

Andrew I. Silfen, Esq.
Beth M. Brownstein, Esq.
Mark Angelov, Esq.
**ARENTFOX SCHIFF LLP**
1301 Avenue of the Americas, Floor 42
New York, New York 10019
Telephone:  (212) 484-3900
Facsimile:   (212) 484-3990
Email:  andrew.silfen@afslaw.com
        beth.brownstein@afslaw.com
        mark.angelov@afslaw.com

-and-

James E. Britton, Esq.
**ARENTFOX SCHIFF LLP**
800 Boylston Street, 32nd Floor
Boston, Massachusetts 02199
Telephone: (617) 973-6100
Facsimile: (617) 367-2315
Email: james.britton@afslaw.com

*Counsel for UMB Bank, as Trustee*

25

WBD (US) 4919-1939-4872v2