## **EXHIBIT B**

## **PROOF OF CLAIM**

COPY

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Brightmark Plastics Renewal Indiana LLC, f/k/a RES Polyflow Indiana LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | District of Delaware |
| Case Number | 25-10473-LSS |

**FILED**

APR 11 2025

By Omni Agent Solutions, Claims Agent
For U.S. Bankruptcy Court
District of Delaware

Official Form 410

# Proof of Claim

12/24

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

UMB Bank, N.A., as trustee and collateral agent
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

UMB Bank, N.A., as trustee and collateral agent
Name
See Attached Rider
Number      Street
See Attached Rider
City          State          ZIP Code

Contact phone _____
Contact email _____

Uniform claim identifier (if you use one):
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Where should payments to the creditor be sent? (if different)
See Attached Rider
Name
See Attached Rider
Number      Street
See Attached Rider
City          State          ZIP Code

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

| | |
|---|---|
| 7. **How much is the claim?** | $ ___See Attached Rider___ . **Does this amount include interest or other charges?**<br>☐ No<br>☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>See Attached Rider |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☐ No<br>☒ Yes.  The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☒ Other. Describe:  ___See Attached Rider___<br><br>**Basis for perfection:**  ___See Attached Rider___<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**  $ ___See Attached Rider___<br>**Amount of the claim that is secured:**  $ ___See Attached Rider___<br><br>**Amount of the claim that is unsecured:** $ ___See Attached Rider___ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**  $ ___See Attached Rider___<br><br>**Annual Interest Rate** (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☒ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☒ No<br>☐ Yes. Identify the property: _____ |

| | | | |
|---|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | | |
| | ☒ Yes. *Check one:* | | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☒ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $ See Attached Rider |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/04/2025
                   MM / DD / YYYY

*Michael G Slade*
Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Michael G. Slade | | |
| | First name | Middle name | Last name |
| Title | Senior Vice President | | |
| Company | UMB Bank, N.A. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 120 South Sixth Street, Suite 1400 | | |
| | Number        Street | | |
| | Mineeapolis | MN | 55402 |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | Michael.Slade@UMB.com |

*In re Brightmark Plastics Renewal LLC,* **Case No. 25-10472 (LSS)**

**Rider to the Proof of Claim of UMB Bank, N.A., not in its individual capacity but solely in its capacity as Trustee and Collateral Agent under the Indenture (defined herein)**

This addendum (the "Addendum") to this master proof of claim (the "Proof of Claim") is made and filed by UMB Bank, N.A., not in its individual capacity but solely in its capacity as trustee and collateral agent (the "Trustee"), on behalf of its and the Bondholders (as defined below) against Brightmark Plastics Renewal Indiana LLC f/k/a RES Polyflow Indiana LLC (the "Borrower"), Brightmark Plastics Renewal LLC f/k/a BME Renewable Polyfuels LLC (the "Debtor Parent"), and Brightmark Plastics Renewal Services LLC f/k/a BME Polyfuel Services LLC ("Services Debtor" and together with Borrower and Debtor Parent, the "Debtors").[1] This Addendum and any attachments hereto are an integral part of the Proof of Claim and are incorporated by reference into the Proof of Claim for all purposes. Capitalized terms shall have the meanings ascribed herein.

## SUMMARY OF CLAIM

1.      The Claimants. UMB Bank, N.A., is the trustee and collateral agent for the tax exempt facility revenue bonds (the "Bonds", and the holders of such Bonds, the "Bondholders") issued in the original principal amount of $185,000,000 under that certain Trust Indenture, dated as of March 1, 2019 (as amended or supplemented, including by the First Supplemental and Amendatory Trust Indenture, dated as of February 1, 2024, the "Indenture"), by and between the Indiana Finance Authority (the "Authority") and the Trustee and made in connection with that certain Loan Agreement, dated as of March 1, 2019 (as the same may be amended or supplemented, the "Loan Agreement"), by and between the Authority and Brightmark Plastics

---

[1] Upon the request of the Trustee, the Debtors agreed the Trustee could file a consolidated Proof of Claim for administrative convenience.

Renewal Indiana LLC, formerly known as RES Polyflow Indiana, LLC.   For administrative convenience, this master Proof of Claim is filed against each of the Borrower, the Debtor Parent and the Services Debtor, as applicable, on account of the Obligations (as defined in the Indenture and Security Document) as applicable (the "Pre-petition Obligations").

2.      In connection with the Bonds, the Borrower and the Authority entered into the Loan Agreement, pursuant to which the proceeds of the Bonds were loaned to the Borrower.

3.      Pursuant to the Indenture, UMB was appointed Trustee with respect to the Bonds and, in its capacity as Collateral Agent, was assigned all of the Authority's rights in and to the Pre-Petition Obligations.

4.      Pursuant to the Indenture and that certain Mortgage and Security Agreement dated March 1, 2019 (the "Mortgage"), the Assignment of Leases, Rents, Contracts, Income, Proceeds, and Permits dated March 1, 2019 (the "Assignment of Leases and Rents"), the Pledge and Security Agreement dated March 1, 2019 (the "Pledge Agreement"), the Membership Interest Pledge Agreement dated March 1, 2019 by and between Debtor Parent and the Trustee (the "Parent Pledge Agreement"), the Collateral Assignment of Project Documents dated March 1, 2019 (the "Collateral Assignment," and together with the Indenture, the Loan Agreement, the Bonds, the Mortgage, the Assignment of Leases and Rents, the Pledge Agreement, the Parent Pledge Agreement, the Direct Agreement (as defined below) and any and all other security agreements, pledges, collateral assignments, mortgages, security deeds, deeds of trust, collateral trust agreements, trust deeds, and other instruments executed and/or delivered in connection therewith

or related thereto, collectively, the "Indenture and Bond Documents"),[2] and as security for the Pre-Petition Obligations, the Borrower and the Debtor Parent, as applicable, granted the Trustee a first priority lien and security interest in substantially all of the Borrower's assets and certain other collateral, as described in the Indenture and Security Documents, including but not limited to (i) a first priority mortgage on that certain plastics recovery and recycling facility in Ashley, Indiana (the "Plant"), (ii) a pledge of the Borrower's gross revenues, (iii) a pledge of the membership interests of the Borrower by its direct parent, Debtor Parent, (iv) an authorization for the Trustee to enforce the Borrower's rights under certain agreements entered into with respect to the Plant, (v) a first priority lien on substantially all of the Borrower's personal property, and (vi) certain agreements of the Borrower (collectively, the "Collateral").

5.        The liens on and security interests in the Collateral are and remain duly perfected pursuant to such filings, registrations, recordings and control (as to Collateral with respect to which liens may be perfected by possession or control by a secured party or its agent) as is required and permitted under the Uniform Commercial Code or other applicable law or as otherwise perfected as provided under the Uniform Commercial Code or applicable law.

6.        Pursuant to and as set forth in the Collateral Assignment, among other things, the Trustee was assigned all of the Borrower's rights, powers, and interests in that certain Master Operation and Maintenance Agreement dated March 12, 2018 by and between Borrower and

---

[2] In addition to the Indenture there are other documents, instruments, certificates, ancillary and related agreements or other writings executed or delivered in connection with the Indenture and the issuance of the Bonds that support this Proof of Claim, including but not limited to documents identified on Appendix 1 and Appendix 2 attached hereto (the "Supplemental Documents" and, together with the Indenture and Bond Documents, the "Indenture and Security Documents"). Copies of the Indenture and Security Documents and other related and ancillary agreements, documents and instruments which relate to this Proof of Claim are incorporated by reference and too voluminous to attach, and the Trustee believes the Debtors have, or should have, copies of all such documents. This Proof of Claim contains only a summary of the Indenture and Security Documents and other related and ancillary agreements, documents and instruments. Should any party in interest desire to receive copies of the documents which relate to this Proof of Claim, they are available upon written request to the Trustee or its counsel, as provided herein.

Services Debtor. The Trustee and the Services Debtor are also party to that certain Master Operation and Maintenance Agreement Direct Agreement dated as of March 1, 2019 by and among UMB Bank, N.A., as Collateral Agent, BME Polyfuel Services LLC, and RES Polyflow Indiana LLC, as Borrower (the "Direct Agreement").

7.      The Trustee holds all rights and powers as are provided and set forth in the Indenture and Security Documents.

8.      Michael G. Slade is a Senior Vice President of UMB Bank, N.A. ("UMB"). UMB's business address is UMB Bank, N.A., 120 South Sixth Street, Suite 1400, Minneapolis, MN 55402. Mr. Slade is duly authorized and empowered to file a proof of claim on behalf of UMB in its capacity as Trustee.

9.      Background of Claim. The Proof of Claim consists of all amounts due and owing to the Trustee and/or the Bondholders under the Indenture and Security Documents. The amounts represented in the Proof of Claim are secured by valid, continuing, and perfected security interests in and continuing liens on the Collateral.

10.     On or around March 1, 2025, the Borrower failed to make payment of its Debt Service Requirement (as defined in the Indenture) on account of principal and interest then due on the Bonds, resulting in failure to pay principal and interest due on the Bonds on March 1, 2025.

11.     On or around March 7, 2025, the Trustee sent the Borrower that certain Declaration and Notice of Default and Notice of Acceleration dated March 7, 2024, advising the Borrower that as a result of its failure to make the Debt service Requirement payment, the Trustee was declaring events of default under the Loan Agreement and the Indenture and accelerating all amounts due under the Loan Agreement and the Indenture.

12.    On March 16, 2025 (the "Petition Date"), the Borrower together with the Debtor Parent and Services Debtor each filed petitions for protection under chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), initiating the cases jointly administered under Case No. 25-10472 (the "Bankruptcy Cases").

13.    Amount of Claim.   This Proof of Claim asserts a claim against each of the Borrower, the Debtor Parent, and the Services Debtor, as applicable, for all amounts owed, arising under or related to the Indenture and Security Documents, whether contingent or non-contingent, due or owing, currently or in the future, wherever arising including, but not limited to, principal, interest, prepayment premiums, default interest, charges, fees, costs, expenses, disbursements, indemnifications, damages and any other claim or obligation of any kind.

14.    Claim Against Borrower.   As of the Petition Date, the Borrower was indebted to the Trustee pursuant, inter alia, the Indenture and Security Documents, in the aggregate amount of no less than $172,600,000.00 in principal, accrued and unpaid interest in the amount of $6,544,416.67, plus costs, expenses, charges, premiums, penalties, indemnities and other claims as provided for under the Indenture and Security Documents.   These amounts are secured by valid, perfected and continuing liens in the Collateral as set forth in the Indenture and Security Documents.

15.    Claim Against Debtor-Parent.   As of the Petition Date, the Debtor-Parent is or may be indebted to the Trustee pursuant to the Indenture and Security Documents, including but not limited to the Parent Pledge Agreement pursuant to which the Debtor-Parent pledged its equity interests in the Borrower to the Trustee.

16.    <u>Claim Against Services Debtor</u>.  As of the Petition Date, the Services Debtor is or may be indebted to the Trustee pursuant to the Indenture and Security Documents, including but not limited to the Collateral Assignment, that certain Master Operation and Maintenance Agreement dated March 12, 2018 by and between Borrower and Services Debtor, and the Direct Agreement.

17.    The Borrower, Debtor Parent and Services Debtor are and will be indebted to Trustee for (i) Trustee's fees and expenses in an unliquidated amount, including reasonable fees and disbursements of counsel and other agents and professionals, in accordance with the Indenture and Security Documents; and (ii) other costs, charges, expenses, disbursements, indemnifications, penalties, reimbursements, damages and other liabilities and obligations payable under the Indenture and Security Documents.

18.    The Trustee submits this Proof of Claim for compensation, reimbursement of expenses and indemnity pursuant to the Indenture and Security Documents and all ancillary and related agreements, documents and interests.  The Borrower, Debtor Parent and Services Debtor are also obligated to the Trustee in an unliquidated amount for the costs, charges, expenses, disbursements and indemnification claims of the Trustee in defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties as Trustee under the Indenture or related to the Indenture and Security Documents.  The Trustee is also submitting this Proof of Claim for its fees, expenses, indemnity, disbursements and other charges for acting as Trustee under the Indenture and Security Documents, including but not limited to Section 8.03 of the Indenture.

19.    The amounts due for compensation, expenses and indemnity consist of the following:

| | |
|---|---|
| Fees, Expenses, Disbursements and Costs of UMB Bank, N.A., in its capacity as Trustee and Collateral Agent | Presently contingent and unliquidated |
| Fees, Expenses, Disbursements, Advances and Costs of ArentFox Schiff LLP | Presently contingent and unliquidated |
| Fees, Expenses, Disbursements, Advances and Costs of Womble Bond Dickinson  LLP | Presently contingent and unliquidated |
| Fees, Expenses, Disbursements, Advances and Costs of FTI Consulting, Inc. | Presently contingent and unliquidated |
| Indemnities | Presently contingent and unliquidated |
| Total | Presently contingent and unliquidated |

20.     The Trustee, on behalf of the Bondholders, has or may have claims against the Borrower, Debtor Parent, and/or Services Debtor that arose pre-petition under or related to the Indenture and Security Documents and any related and ancillary agreement, document or instrument and under state, federal and common law including, but not limited to, tort, contract or securities laws.  The claims also include claims against the Borrower, the Debtor Parent and/or the Services Debtor for any damages resulting from the breach or violations of the Indenture and Security Documents and any and all claims arising under common law, securities law, state law or federal law, including, but not limited to, claims arising under applicable fraudulent conveyance laws and those claims set out herein, which claims are not currently liquidated or determined.  For the avoidance of doubt, this Proof of Claim includes any claims that have been, may be or could be asserted against or related to the Debtors in any lawsuit, action, proceeding, contested matter or adversary proceeding.

21.     This Proof of Claim is filed as a secured claim against the Borrower and Debtor Parent pursuant to the Indenture and Security Documents, and if applicable, as an administrative

expense, pursuant to the Indenture and/or applicable law.[3]  Nothing set forth herein is, or shall be deemed to be a waiver or relinquishment, in whole or in part, of any claim, administrative, secured, unsecured, or otherwise and any deficiency claim is hereby preserved and included as part of this Proof of Claim.  Any and all claims provided or granted under any order entered in this proceeding are hereby preserved and included or part of this Proof of Claim.

22.     Failure to comply with the requirements of the Indenture and Security Documents and the occurrence of certain events specified in the Indenture and Security Documents, including but not limited to the filing by the Debtors of petitions seeking relief under chapter 11 of the Bankruptcy Code, constitutes Events of Default under the Indenture and Security Documents.  The Trustee expressly reserves its right to assert that any additional Events of Default have occurred and the filing of this Proof of Claim shall not constitute a waiver thereof.

23.     Pursuant to, among other things, Section 7.07 of the Indenture, the Trustee is expressly authorized to file this Proof of Claim on behalf of the Bondholders.

24.     No judgment has been rendered on this Proof of Claim or any of the claims provided herein.

25.     To the best of the Trustee's knowledge, the claims set forth in this Proof of Claim are not subject to any setoff or counterclaim by the Debtors; *provided, however*, the Trustee expressly reserves and does not waive any setoff or recoupment rights it may possess.

26.     Pursuant to, among other things, Section 8.03 of the Indenture, the Trustee has a contractual charging lien and priority on all distributions made on account of this claim.  Trustee hereby demands that any distributions on account of the Pre-Petition Obligations and/or the

---

[3] The Trustee reserves the right to claim priority in payment for all or part of its fees, expenses and indemnities, including attorneys' fees and expenses and other professional fees and expenses, as an administrative expense pursuant to 11 U.S.C. §§ 105, 507(a)(1) and (3) and 503(b)(5).

Collateral be made through (or at the direction of) the Trustee pursuant to the Indenture and Federal Rule of Bankruptcy Procedure 3021 so that Trustee can assert its lien and priority rights.

27.    The Trustee specifically reserves its rights to amend, modify, supplement or update at any time in the future for any proper purpose this Proof of Claim if the Trustee should deem it necessary and appropriate for any reason, including without limitation, to reflect any additional claims or premiums set forth in the Indenture and Security Documents, including but not limited to any make-whole amount, against the Debtors, to specify additional costs, expenses or other charges, disbursements, indemnities or claims incurred by the Trustee, to fix or liquidate any contingent or unliquidated amounts, to assert a claim or claims for additional amounts due and/or claims based on alternative theories or liabilities, or to assert any claims for damages arising from events or conduct by the Debtors.  The Trustee further reserves the right to file additional proofs of claims for claims which may be based on the same or additional documents, including without limitation, claims for interest, fees, and related expenses that are not ascertainable at this time and for administrative expense claims or other priority claims.  The Trustee does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

28.    This Proof of Claim also expressly includes any and all rights to assert a constructive trust against assets or cash held by the Debtors, and also includes any and all amounts owed, for damages or otherwise, on account of any and all claims the Trustee has or may have, whether known or unknown, against the Debtors and all those purporting to act on their behalf, whether presently asserted or to be asserted, including, without limitation, claims based upon (a) common law fraud; (b) misrepresentation; (c) subrogation; (d) indemnity; (e) contribution; (f) unjust enrichment; (g) constructive trust; (h) fraudulent conveyance; (i) failure to fulfill contractual and fiduciary obligations; (j) breach of implied covenant of good faith and fair dealing; (k) making,

causing, or permitting to be made misleading statements regarding the business of the Debtors; (l) failure to take prudent and appropriate action regarding adverse business conditions affecting the business operations of the Debtors; (m) tortious interference; and (n) *quantum meruit*, all of which singularly or collectively may be applicable to damages or other claims incurred by the Trustee.

29.    The filing of this Proof of Claim is not, nor shall it be deemed to be, (a) a waiver or release of the Trustee's rights against any person, entity or property; (b) a waiver of the Trustee's rights to any security held by the Trustee with respect to the Bondholders; (c) a consent by the Trustee to the jurisdiction of the Bankruptcy Court with respect to the subject matter of these claims or any objection or other proceeding commenced in the Bankruptcy Cases against or otherwise involving the Trustee; (d) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court; (e) a waiver of any right to a jury trial; (f) an election of a remedy; (g) a waiver of any past, present or future defaults or events of default; (h) a waiver of any rights under  section 1111(b) of the Bankruptcy Code; (i) a waiver of any rights and claims against the Debtors and their respective present and former creditors, agents, representatives, officers, directors, employees and professionals under Bankruptcy Code section 510, including claims of subrogation, equitable subordination and the right and benefit at law or in equity to all rights and interests with respect to the Indenture and Security Documents; (j) a waiver of any right to assert that all or any portion of the Proof of Claim constitutes an administrative expense claim in the Bankruptcy Cases; (k) a waiver or release of the right of the Trustee or any Bondholder to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court Judge; (l) a waiver or release of the right of the Trustee or any Bondholder to have any unliquidated portions of their claims determined by applicable state courts; or (m) a waiver or release of any other rights, claims,

actions, setoffs, or recoupments to which the Trustee or any Bondholder may be entitled under agreements, documents, or instruments, in law or at equity, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly preserved. This Proof of Claim shall not be deemed or construed as a waiver or release of the terms and provisions of the Indenture and Security Documents or related documents or applicable law.

30.    This Proof of Claim is based upon information presently available to the Trustee. The Trustee may hold additional claims or interests against the Debtors. Information supporting such additional claims or interests, however, is presently unavailable to the Trustee.

31.    The address to which all notices and other communications should be sent with respect to this Proof of Claim are as follows:

> UMB Bank National Association
> Attention: Michael G. Slade
> 120 South Sixth Street, Suite 1400
> Minneapolis, MN 55402
> Michael.Slade@UMB.com

with a copy to:

> ArentFox Schiff LLP
> 1301 Avenue of the Americas
> Floor 42
> New York, NY 10019
> Attention: Mark Angelov, Esq.; Beth Brownstein, Esq.
> Tel.: (212) 484-3900
> Mark.Angelov@afslaw.com
> Beth.Brownstein@afslaw.com

## Appendix 1[4]

## BASIS FOR CLAIM

### A. Indenture and Security Documents

1. Trust Indenture, dated as of March 1, 2019, by and between Indiana Finance Authority and UMB Bank, N.A., as Trustee and Collateral Agent, relating to $185,000,000 Indiana Finance Authority Exempt Facility Revenue Bonds, Series 2019 (RES Polyflow Indiana Project) (Green Bonds).

2. Loan Agreement, dated as of March 1, 2019, by and among Indiana Finance Authority, RES Polyflow Indiana LLC, and BME Renewable Polyfuels LLC.

3. First Amendatory Trust Indenture, dated as of February 1, 2024, by and between Indiana Finance Authority, as Issuer, and UMB Bank, N.A., as trustee.

4. Mortgage and Security Agreement, dated as of March 1, 2019, given by RES Polyflow Indiana LLC, as grantor, in favor of UMB Bank, N.A., as beneficiary.
   - Recorded on April 19, 2019 in Steuben County, IN at Document No. 19040421 MTG

5. Assignment of Leases, Rents, Contracts, Income, Proceeds, and Permits, dated as of March 1, 2019, by RES Polyflow Indiana LLC, as assignor, in favor of UMB Bank, N.A., as trustee and collateral agent.
   - Recorded on April 19, 2019 in Steuben County, IN at Document No. 19040422 MISC

6. Pledge and Security Agreement, dated as of March 1, 2019, by and between RES Polyflow Indiana LLC, as debtor, and UMB Bank, N.A., as collateral agent, as secured party

7. Member Interest Pledge Agreement, dated as of March 1, 2019, by and between BME Renewable Polyfuels LLC, as grantor, and UMB Bank, N.A., as collateral agent.

8. Collateral Assignment of Project Documents, dated as of March 1, 2019, by and between RES Polyflow Indiana LLC, as assignor, and UMB Bank, N.A., as trustee and collateral agent, as assignee.

---

[4] UMB reserves all rights with respect to the documents including in this appendix, including but not limited to the right to further supplement or amend this appendix. The documents included in this appendix are voluminous and upon information and belief are already in the Debtors' possession (including having been provided directly to the Debtors by the Trustee on March 27, 2025) and therefore are not attached here. Copies of the documents referenced in this appendix may be available upon request to the Trustee. The descriptions of the Indenture and Security Documents set forth in this Proof of Claim are a summary only and are qualified in their entirety by reference to the applicable Indenture and Security Documents. In the event of any inconsistency between this Proof of Claim and any such document, the relevant document will control. Nothing in this Proof of Claim will limit or qualify the rights granted to the Trustee under the Indenture and Security Documents.

9.  Intercreditor Agreement, dated as of April 10, 2019, by and among RES Polyflow Indiana LLC, BME Renewable Polyfuels, LLC, UMB Bank, N.A., as trustee and collateral agent, Indiana Finance Authority, and J. Aron & Company LLC.

10. Design-Build Agreement Direct Agreement, dated March 1, 2019, by and among IPS Engineering Services, LLC, UMB Bank, N.A. as collateral agent, and RES Polyflow Indiana LLC, as borrower.

11. Master Operation and Maintenance Agreement, dated March 12, 2018, by and between BME Polyfuel Services LLC and RES Polyflow Indiana, LLC.

12. Master Operation & Maintenance Agreement Direct Agreement, dated March 1, 2019, by and among BME Polyfuel Services LLC, UMB Bank, N.A., as Collateral Agent, and RES Polyflow Indiana LLC, as Borrower.

13. Naptha Blendstock and Distillate Blendstock Sale and Purchase Agreement, dated as of February 22, 2018, by and between RES Polyflow Indiana LLC, as seller, and BP Products North America Inc., as buyer.

14. Wax Sale and Purchase Agreement, dated as of November 9, 2017, by and between RES Polyflow Indiana LLC, as seller, and A M Wax, as buyer.

15. Limited Agency Agreement, dated as of January 22, 2018, by and between RES Polyflow Indiana LLC, and Plastico LLC.

16. Equipment Supply Agreement, dated July 20, 2018, by and between RES Polyflow Indiana, LLC, as buyer, and Vecoplan, LLC, as seller.

17. Supply Agreement, dated as of July 25, 2017, by and between RES Polyflow Indiana LLC and Wilmington Paper Company.

18. Intellectual Property License Agreement, dated as of April 10, 2019, by and between RES Polyflow LLC and Indian Harbor Insurance Company.

**B.  Trustee's Perfected Security Interests**

Collateral.  Pursuant to the Indenture and Security Documents, the Trustee, on behalf of itself and the Bondholders, was granted security interests in, and continuing first-priority liens on, the "Collateral" (as defined in the Indenture and Security Documents) that constitutes, among other things: (i) a first priority mortgage on that certain plastics recovery and recycling facility in Ashley,

Indiana (the "Plant"), (ii) a pledge of the Borrower's gross revenues, (iii) a pledge of the membership interests of the Borrower by its direct parent, BME Renewable Polyfuels, LLC, (iv) an authorization for the Trustee to enforce the Borrower's rights under certain agreements entered into with respect to the Plant, (v) a first priority lien on substantially all of the Borrower's personal property, and (vi) certain agreements of the Borrower. The Collateral includes, without limitation:

1. Mortgage.[5]

A first priority mortgage on the recycling facility in Ashley, Indiana, as described more particularly in the Mortgage, together with all right, title and interest of the Borrower, including any after-acquired right, title or reversion, in and to the beds of the ways, streets, avenues and alleys adjoining the Project and the Project Site, together with all and singular the rights, alleys, ways, tenements, heredilaments, easements, appurtenances, passages, waters, water rights, water courses, riparian rights, liberties, advantages, accessions and privileges now or hereafter appertaining to the Project and the Project Site or any part thereof; including, but not limited to, any homestead or other claim at law or in equity, the reversion or reversions, remainder or remainders thereof: and also all the estate, property, claim, right, title or interest now owned or hereafter acquired by the Borrower in or to the Project and the Project Site or any part thereof; together with all of the improvements to the Project and the Project Site, together with all of the equipment (which equipment, so far as permitted by law, shall be deemed to be fixtures and part of the Project and the Project Site and of the improvements, and as to any part of the equipment not deemed or permitted by law to be fixtures, the Mortgage shall also constitute a security agreement under the Uniform Commercial Code, and pursuant thereto, and in order to secure the repayment of the Secured Obligations and the performance of the Secured Obligations, the Borrower grants to Trustee a continuing security interest under the Uniform Commercial Code in and to such part of the equipment not deemed or permitted by law to be fixtures, and the proceeds thereof and with respect to which equipment, the Trustee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code); together with all receivables, licenses, and records; together with any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of: in connection with, or in lieu of (a) any condemnation of the Project or the Project Site or improvements, either temporarily or permanently, (b) any change or alteration of the grade of any street, and (c) any other damage to, or decrease in value of the Project, the Project Site or any part thereof, including interest on any such judgment, award of damages, payment,

---

[5] Capitalized terms used but not otherwise defined in this section shall have the meanings given to them in the Mortgage.

proceeds, settlement or other compensation, and of the reasonable counsel fees, costs and disbursements, if any, incurred by the Trustee in connection with the collection of such judgment, award of damages, payment, proceeds, settlement or other compensation, including interest thereon; together with any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same, from any and all insurance policies covering the Project, the Project Site, the equipment or any portion thereof; together with all rents; together with all right, title, and interests of the Borrower in and to, and remedies under, any and all leases and subleases of the Project, the Project Site or any part thereof, both now in existence or hereafter entered into, and all contract rights, accounts receivable and general intangibles growing out of or in connection with such leases and subleases, together with all proceeds thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such leases or arc to be applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms; reserving in the Borrower a license, terminable upon the occurrence of an Event of Default, to enforce, administer, collect and receive the same, together with all right, title, and interest of the Borrower (i) to the funds on deposit in the Funds established in connection with the Bonds and Parity Indebtedness, (ii) in the reserves established under the Indenture, (iii) in any debt service reserve established under the Indenture, (iv) in any of the other funds or accounts established under the Indenture (except the Rebate Fund) or in connection with any Parity Indebtedness, and (v) to any other funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of or in the possession of the Issuer, the Trustee, any Bondholder, or any of their agents, including all Accounts; together with any and all future advances, together with any interest thereon, which are made by the Issuer or any Secured Hedge Provider to or for the benefit of the Borrower up to an aggregate maximum principal amount outstanding at any point in time of Two Hundred Percent (200%) of the Original Principal Amount (provided, that Issuer shall not be required to .make any future advances except as expressly provided herein or in the Loan Agreement and no Secured Hedge Provider shall be required to make any future advances except as expressly provided in the relevant Secured Hedge Contract), together with all substitutions, replacements, extensions, renewals, additions, accessories, proceeds and products of the foregoing.

2.    Pledge and Security Agreement.[6]

In order to secure the prompt and complete payment and performance of the Obligations, Borrower hereby grants a security interest, assigns, conveys, mortgages, pledges, hypothecates and transfers to Trustee, for the benefit of the Bondholders, a Lien upon and security interest in all of its right title and interest in, to and under the following property, whether now owned by or existing. or hereafter

---

[6] Capitalized terms used but not defined in this section shall have the meanings given to them in the Pledge and Security Agreement.

acquired by or arising in favor of Borrower, and regardless of where located (all of the following being hereinafter collectively referred to as the "Collateral"):

(a) (i) all Accounts; (ii) all Chattel Paper; (iii) all Documents; (iv) all General Intangibles; (v) all Goods (including, without limitation, Inventory, Equipment, and Fixtures); (vi) all Instruments; (vii) all Investment Property; (viii) all Deposit Accounts of Borrower, including, without limitation, all blocked accounts, concentration accounts, disbursement accounts and all other bank accounts and all deposits therein; (ix) all money, cash or cash equivalents of Borrower; (x) all Letter-of Credit Rights of Borrower; (xi) all commercial tort claims, which may be listed on supplements to this Agreement from time to time; and (xii) to the extent not otherwise included, all Proceeds including all tort claims, insurance claims and other rights to payments not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing.

(b) In addition, to secure the prompt and complete payment and performance of the Obligations, Borrower hereby grants Trustee a right of setoff against the Collateral of Borrower held by Trustee, consisting of Collateral now or hereafter in the possession or custody of or in transit to Secured Party, for any purpose, including safekeeping, collection or pledge, for the account of Borrower, or as to which Borrower may have any right or power, subject to the terms of the Intercreditor Agreement.

"Accounts" means all "accounts," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, including, without limitation, (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments), including any such obligations that may be characterized as an account or contract right under the UCC, (b) all of Borrower's rights in, to and under all purchase orders or invoices for sale of goods or performance of services, (c) all amounts now or hereafter payable to Borrower under any of the Project Documents, whether characterized as payments for the sale of goods, performance of services, termination payments, cancellation payments, indemnification payments, damages, liquidated damages, claims for interests, costs or otherwise, (d) all of Borrower's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (e) all rights to payment due to Borrower for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by Borrower or in connection with any other transaction (whether or not yet earned by performance on the part of Borrower), and (f) all collateral security or any kind given by any Account Debtor or any other Person with respect to any of the foregoing.

"Chattel Paper" means any "chattel paper," as such term is defined in the UCC including electronic chattel paper, now owned or hereafter acquired by Borrower.

"Commodity Accounts" means all "commodity accounts," as such term is defined in the UCC, now or hereafter held or maintained in the name of Borrower.

"Copyright License" means rights under any written agreement now or hereafter acquired by Borrower granting any right to use any Copyright.

"Copyrights" means all or the following owned or hereafter adopted or acquired by Borrower: (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"Deposit Accounts" means all "deposit accounts" as such term is defined in the UCC, now or hereafter held in the name of Borrower.

"Documents" means all "documents," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located.

"Equipment" means "equipment," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located and, in any event, including, without limitation, all of Borrower's machinery and equipment, including pulp and paper making equipment, processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, material handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures (including pulp and paper making equipment to the extent a court determines they do not constitute Fixtures or Real Property) not forming a part of the Real Property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"Fixtures" means all "fixtures", as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located.

"General Intangibles" means all "general intangibles," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, including,

without limitation all right, title and interest that Borrower may now or hereafter have in or under any contract, including, without limitation, to the extent the same is not an Account, all or Borrower's right, title and interest in the Project Documents and all amounts payable to or receivable by Borrower thereunder, whether characterized as payments for the sale of goods, performance of services, termination payments, cancellation payments, indemnification, payments, damages, liquidated damages, claims for interests, costs or otherwise, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including without limitation all tapes, cards, computer runs and other papers and documents in the possession or under the control of Borrower or any computer bureau or service company from time to time acting for Borrower.

"Goods" means all "goods," as defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, including, without limitation, embedded software to the extent included in "goods" as defined in the UCC.

"Instruments" means all "instruments," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and, in any event, including, without limitation, all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Inventory" means all "inventory," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and in any event including, without limitation, inventory, merchandise, goods and other personal property that are held by or on behalf of Borrower for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such

Borrower's business or in the processing, production, packaging, production, delivery or shipping of the same, including all supplies and embedded software.

"Investment Property" means all "investment property" as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, including, without limitation, (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of Borrower, including the rights of Borrower to any Securities Account and the financial assets held by a securities intermediary in such Securities Account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all Securities Accounts of Borrower; (iv) all commodity contracts of Borrower; and (v) all Commodity Accounts held by Borrower.

"Letter-of-Credit Rights" means all ·'letter-of-credit rights" as such term is defined in the UCC, now owned or hereafter acquired by Borrower.

"License" means any Copyright License, Patent License, Trademark License or other similar license of intellectual property now held or hereafter acquired by Borrower. "Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, or other priority or preferential arrangement of any kind or nature whatsoever. to secure payment of a debt or performance of an obligation. "Patent License" means rights under any written agreement now or hereafter acquired by Borrower granting any right to use any Patent.

"Patents" means all of the following in which Borrower now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States Patent and Trademark Office or in any similar office or agency of the United States, any State, or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"Proceeds" means "proceeds," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, including, without limitation, (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person under the color of governmental authority), (c) any claim of Borrower against third parties for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, (d) any recoveries by Borrower against third parties with

respect to any litigation or dispute concerning any of the Collateral including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral, (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"Securities Accounts" means all "securities accounts," as such term is defined in the UCC, now or hereafter held or maintained in the name of Borrower.

"Software" means all "software" as such term is defined by the UCC, now owned or hereafter acquired by Borrower, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"'Trademark License" means rights under any written agreement now or hereafter acquired by Borrower granting any right to use any Trademark.

"Trademarks" means all of the following now owned or hereafter existing or adopted or acquired by Borrower: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"UCC" means the Uniform Commercial Code in effect in the State of Indiana.

3.  Parent Pledge Agreement.[7]

As security for the prompt and complete payment and performance when due of the Obligations, BME Renewable Polyfuels LLC ("Grantor") hereby grants to Trustee, for the benefit of the Bondholders, a security interest in and pledges to Trustee, for the benefit of the Bondholders, all of the following property, whether now owned by or existing, or hereafter acquired by or arising in favor of, Grantor, and regardless of where located (all of the following being herein collectively referred to as the "Collateral"):

---

[7] Capitalized terms used but not defined in this section shall have the meanings given to them in the Parent Pledge Agreement.

(a) all of Grantor's right, title and interest as the member in the Borrower, including without limitation, all of the Membership Interests, all of Grantor's right derived from its Membership Interests to receive distributions at any time or from time to time of cash and other property, real, personal or mixed, from the Borrower upon complete or partial liquidation or otherwise;

(b) all of Grantor's right, title, and interest derived from its Membership Interests in specific property of the Borrower;

(c) all of Grantor's right. title and interest derived from its Membership Interests, if any, to participate in the management and voting of the Borrower; and

(d) all of Grantor's right, title and interest derived from its Membership Interests in and to:

(i) all rights, privileges, authority and power of Grantor as owner and holder of the items specified in (a), (b), and (c) above, including but not limited to, all contract rights related thereto;

(ii) all options and other agreements for the purchase or acquisition of any interests in the Borrower;

(iii) any document or certificate representing or evidencing Grantor's rights and interests in the Borrower;

(iv) all commercial tort claims, contracts, documents, general intangibles, investment property and supporting obligations related to or in respect of any of the foregoing; and

(v) to the extent not otherwise included, all Proceeds and products of any of the foregoing.

"Proceeds" shall mean "proceeds," as such term is defined in the UCC, and, in any event, shall include, without limitation, (a) any and all accounts, instruments. cash or other forms of money or currency or other proceeds payable to Grantor from time to time in respect of the Collateral, (b) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Grantor from time to time with respect to any of the Collateral, (c) any and all payments (in any form whatsoever) made or due and payable to Grantor from time to time in connection with any requisition, confiscation. condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority), ( d) any claim of Grantor against third parties in respect of the Collateral, (d) all certificates, dividends, distributions, cash, instruments and other property received or distributed in respect of or in exchange for any Collateral and (f) any

and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"UCC" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of Indiana; provided, however. in the event that by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Trustee's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Indiana, the term "UCC' shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection of priority and for purposes of definitions related to such provisions.

4.   Collateral Assignment.[8]

As collateral security for all debts, liabilities and obligations of Borrower now existing or hereafter arising under the Loan Agreement, the Indenture and the Secured Hedge Contracts, Borrower hereby assigns, transfers and sets over to Trustee all of its rights, but not its obligations, under (i) the Design Build Agreement, JICI Agreement, Blendstock Agreement, Wax Agreement, Feedstock Supply Agreements, Performance Insurance Policy, the License Agreement, (ii) all of the other documents, agreements or instruments contemplated thereby or executed in connection therewith and (iii) any and all other existing and future contracts, agreements, permits, licenses, third party reports, surveys architectural plans or hereafter entered into or obtained by Assignor in connection with the ownership, use, operation and management of the Project (all such documents together with the documents contemplated in (i) and (ii) above, collectively, the "Project Documents").

Trustee shall have no obligation or duty to perform any of the obligations of Borrower under the Project Documents, all of which shall remain the sole and exclusive duty and obligation of Assignor.

In connection with the construction of the Project (as defined in the BPA) to be undertaken by or on behalf of the Borrower, the Borrower has entered into or will enter into the following: (i) a Design Build Agreement between the Borrower and JPS Engineering Services, LLC (as amended, restated or otherwise modified from time to time, the "Design Build Agreement"); (ii) a construction contract for portions of the Project between the Borrower and Jim Ingledue Construction, Inc. (as amended, restated or otherwise modified from time to time, the "JICI Agreement"); (iii) a purchase agreement between the Borrower and BP Products North America, Inc. (as amended, restated or otherwise modified from time to time, the "Blendstock Agreement"); (iv) a purchase agreement between the Borrower and AM Wax Inc. (the '"Wax Agreement"); (v) six feedstock supply agreements

---

[8] Capitalized terms used but not defined in this section shall have the meanings given to them in the Collateral Assignment

between the Borrower and regional and national waste recycling companies (as amended, restated or otherwise modified from time to time, the "Feedstock Supply Agreements"); (vi) a performance insurance policy from Indian Harbor Insurance Company (the "Performance Insurance Policy"); and (vii) a technology license agreements relating to certain technology components or the Project between Assignor and RES Polyflow LLC (the "License Agreement").

5. Assignment of Leases and Rents.[9]

Borrower, pursuant to the terms of this Assignment, hereby absolutely and irrevocably assigns, conveys and transfers to Trustee, all of Borrower's right, title, interest and estate (1) in and to all of the rents, income and profits of and from certain real property located in the Town of Ashley, Steuben County, Indiana, which is more particularly described in Exhibit A attached hereto and made a part hereof, or of and from all improvements at any time constructed thereon or any personal property or fixtures at any time installed or used therein (collectively, the "Property"), (2) in and to all Leases (as hereinafter defined), now existing or hereafter made and affecting the Property or any part thereof, as the same may be extended, amended and renewed, with all rent, income and profits due and becoming due therefrom, (3) in and to all Rents (as hereinafter defined) and Income (as hereinafter defined) from the operation of any business of Borrower located on the Property, and (4) in, to and under all Contracts (as hereinafter defined) and, to the extent permitted by law, all Permits (as hereinafter defined).

"Contracts" means all present and future agreements and contracts made by Borrower, whether written or oral, relating to (i) the operation of any business on the Property or the sale of any portion thereof, including without limitation any and all management agreements and agreements for the sale, purchase or conveyance of any portion of the Property, (ii) the design, construction, operation, management, maintenance, or repair of the Property, and (iii) any and all guaranties of any of the foregoing and any extensions, amendments, restatements or modifications thereof or thereto.

"Income" means all income, cash, accounts, accounts receivable, proceeds and profits due or becoming due to Borrower pursuant to any Contract or Lease.

"Leases" means (i) all present and future leases covering all or any portion of the Property, (ii) all agreements for use or occupancy of any portion of the Property, (iii) all present and future ground leases covering any portion of the Property, (iv) any and all guaranties of the performance of any lessee under any lease of all or any part of the property, and (v) any extensions, amendments, modifications, supplements or replacements of or to any lease of all or any part of the Property and any and all further leases and subleases, lettings or agreements

---

[9] Capitalized terms used but not defined in this section shall have the meanings given to them in the Assignment of Leases and Rents.

(including rights in respect of tenants holding over and tenancies following attornment) of all or any part of the Property.

"Permits" means all licenses, rights and privileges granted to Borrower or in which Borrower has any rights required for or useful in connection with the operation of any business located on the Property.

"Proceeds" means all amounts, sums of money or things of value derived from or arising from any Lease, Contract or Permit.

"Rents" means all rentals, income, security deposits and other sums of money due or becoming due to Borrower under any Lease or any Contract; all monies due and to become due Borrower under any Lease or Contract for services, materials, or installations supplied, whether or not the same were supplied under the terms of any Lease or Contract, and the proceeds of all such Rents, both cash and non-cash, including but not limited to, any minimum rents, additional rents, percentage rents, lease termination payments, parking, maintenance, insurance and tax contributions, any damages following default by a tenant under any lease, any penalties or premiums payable by a tenant under any Lease and the proceeds of any policy of insurance covering loss of rents resulting from destruction or damage to any portion of the Property.

## Appendix 2

### Lien Perfection Documents[10]

| Document | Reference No. | Date Recorded | Place Recorded |
|---|---|---|---|
| Mortgage and Security Agreement, dated as of March 1, 2019, given by RES Polyflow Indiana LLC, as grantor, in favor of UMB Bank, N.A., as beneficiary. | Document No. 19040421 MTG | April 19, 2019 | Steuben County, IN recorder |
| Assignment of Leases, Rents, Contracts, Income, Proceeds, and Permits, dated as of March 1, 2019, by RES Polyflow Indiana LLC, as assignor, in favor of UMB Bank, N.A., as trustee and collateral agent | Document No. 19040422 MISC | April 19, 2019 | Steuben County, IN recorder |
| UCC-1 Financing Statement | U19000018 UCC | April 19, 2019 | Steuben County, IN recorder |
| UCC-1 Financing Statement | 20193474264 | May 20, 2019 | Delaware Secretary of State |
| UCC-1 Financing Statement | 201900004483960 | May 24, 2019 | Indiana Secretary of State |
| UCC-1 Amendment | 202101072725608 | January 7, 2021 | Indiana Secretary of State |
| UCC-1 Amendment | 20210183351 | January 7, 2021 | Delaware Secretary of State |

[10] UMB reserves all rights with respect to the documents including in this appendix, including but not limited to the right to further supplement or amend this appendix. The documents included in this appendix are voluminous and upon information and belief are already in the Debtors' possession (including having been provided directly to the Debtors by the Trustee on March 27, 2025) and therefore are not attached here. Copies of the documents referenced in this appendix may be available upon request to the Trustee. The descriptions of the Indenture and Security Documents set forth in this Proof of Claim are a summary only and are qualified in their entirety by reference to the applicable Indenture and Security Documents. In the event of any inconsistency between this Proof of Claim and any such document, the relevant document will control. Nothing in this Proof of Claim will limit or qualify the rights granted to the Trustee under the Indenture and Security Documents.

| UCC-1 Continuation | 202312083136235 | December 8, 2023 | Indiana Secretary of State |
| UCC-1 Continuation | 20238320698 | December 8, 2023 | Delaware Secretary of State |
| UCC-1 Amendment | 202502133291239 | February 13, 2025 | Indiana Secretary of State |
| UCC-1 Amendment | 20251000733 | February 13, 2025 | Delaware Secretary of State |