# EXHIBIT A

# LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "**Agreement**") is made and entered into on this 10th day of April 2019 ("**Effective Date**"), by and between RES Polyflow LLC, an Ohio limited liability company with a principal place of business at 8584 E. Washington Street #304, Chagrin Falls, OH 44023 ("**RESP**") and RES Polyflow Indiana LLC, an Indiana limited liability company with a principal place of business at 235 Pine Street, Suite 1100, San Francisco, CA 94104 ("**Licensee**"). Licensee and RESP are referred to individually herein as a "**Party**" and collectively as the "**Parties**."

## <u>RECITALS</u>:

**WHEREAS**, RESP owns or licenses specific intellectual property (including trade secrets, know-how and knowledge) regarding the design, engineering, installation and operation of its proprietary processing technology described on Schedule A attached hereto and incorporated herein;

**WHEREAS**, RESP and the Licensee's parent company, BME Renewable Polyfuels LLC ("**BMERP**"), will be parties to a Master Technology Agreement to be entered into in or around April 2018 ("**Master Agreement**"), which contemplates BME subsidiary companies, such as Licensee, entering into this Agreement with RESP;

**WHEREAS**, pursuant to the Master Agreement, RESP desires to grant Licensee a limited license to the RESP Technology pursuant to this Agreement; and

**WHEREAS**, Licensee desires to receive a limited license to the RESP Technology from RESP pursuant to this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Licensee and RESP agree as follows:

## <u>SECTION 1 -- DEFINITIONS</u>

1.1.   "**Affiliate**" shall mean any company or entity which, directly or indirectly, controls or is controlled by or under common control with, a Party, but only for as long as such control exists. For the purposes of this definition, "control" (and its correlative meanings "controlled by" or "under common control with") means, with respect to a company or entity, the ownership or possession of (a) at least fifty percent (50%) of the share capital having ordinary voting power, (b) the right to elect a majority of the members then-comprising the board of directors or equivalent corporate governance body of such company or entity, or (c) the operational management of the controlled company or entity by contract or otherwise.

1.2.   "**Affiliate Operator**" is defined in Section 3.5.

1.3.   "**Applicable Law**" means any (a) law, statute, regulation, ordinance, or subordinate legislation in force from time to time; (b) common law; (c) order, writ, judgment, injunction, decree, stipulation, award or determination entered by or with any Governmental Authority; (d) directive, policy, guideline, rule, or order made or given by a Governmental Authority, of, in the case of items (a) through (d) above, any country, or other national, federal, commonwealth, state, provincial, or local jurisdiction.

1.4.   "**Authorized Persons**" is defined in Section 11.2.

1.5. "**Bankruptcy Code**" is defined in Section 8.5.3.

1.6. "**Business**" shall mean the business activities of the Projects.

1.7. "**Commercial Operation**" shall mean the date on which the Licensee Production Facility achieves Final Completion as defined in the Master Agreement.

1.8. "**Commercial Operation Date**" shall mean the date on which the Licensee Production Facility achieves Commercial Operation.

1.9. "**Confidential Information**" shall mean information as defined in Section 11.1.

1.10. "**Contractor(s)**" shall mean the Affiliates, agents, contractors, subcontractors, service providers and other representatives of RESP (through any level of subcontracting) performing or permitted to perform under this Agreement on behalf of RESP, or any obligations hereunder, in each case who are not employees of RESP.

1.11. "**Disclosing Party**" is defined in Section 11.1.

1.12. "**Documentation**" shall mean all printed material, documentation, designs, abstracts and summaries of the RESP Technology, including derivatives thereof, system specifications, and all proprietary rights related to RESP Technology, which have been developed or obtained by RESP or is developed or obtained by RESP.

1.13. "**DTSA**" is defined in Section 11.9.

1.14. "**Excluded Taxes**" is defined in Section 10.3.

1.15. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of Applicable Law), or any arbitrator, court, or tribunal of competent jurisdiction.

1.16. "**Grispin**" is defined in Section 13.5.

1.17. "**Improvement**" shall mean any and all enhancements, additions, modifications, extensions, updates, new versions, translations, improvements, and derivative works.

1.18. "**Intellectual Property Registrations**" shall mean all Intellectual Property Rights that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued patents, registered Trademarks, domain names, and copyrights, and pending applications for any of the foregoing.

1.19. "**Intellectual Property Rights**" shall mean all intellectual property rights arising anywhere in the world, whether registered, unregistered, registerable, or unregisterable, and all rights associated therewith such as the right to apply for their registration and bring proceedings for their infringement, including (a) patents, reissues of and, re-examined patents, and patent applications (wherever filed and wherever issued, including continuations, continuations-in-part, substitutes, and divisions of such applications and all priority rights resulting from such applications) now existing and hereafter filed, issued or acquired; (b) rights to inventions, Improvements,

2

developments, and ideas (in each case, whether patentable or unpatentable); (c) rights associated with works of authorship, including copyrights, moral rights, copyright applications, copyright registrations, synchronization rights, mask work rights, mask work applications and mask work registrations; (d) trademarks, service marks, trade names, domain names, logos, trade dress, and the applications for registration and the registrations thereof and rights in goodwill; (e) rights in undisclosed or confidential information (such as know-how, trade secrets and inventions (whether patentable or not)), and other similar or equivalent rights or forms of protection (whether registered or unregistered) and (f) other proprietary rights arising under statutory or common law, contract, or otherwise, and whether or not perfected and all applications (or rights to apply) for, and for renewals and extensions of, such rights as may now or in the future exist anywhere in the world, in all media, for all versions and elements, in all languages, and for the entire duration of such rights.

1.20.    "**Knowledge**" shall mean the actual knowledge after reasonable inquiry.

1.21.    "**License**" is defined in Section 3.1.

1.22.    "**License Fee**" shall mean the fee paid to RESP by Licensee or an Affiliate of Licensee for a License.

1.23.    "**Licensee Intellectual Property**" shall mean all Intellectual Property Rights independently developed or licensed by or behalf of Licensee during the Term.  For the avoidance of doubt, Licensee Intellectual Property shall not include the RESP Intellectual Property.

1.24.    "**Licensee Personnel**" shall mean the employees of (a) Licensee and (b) Licensee's Contractors, in each case, who perform Licensee's obligations hereunder.

1.25.    "**Licensee Production Facility**" is defined in Section 3.1.

1.26.    "**Licensee Technology**" shall mean all Technology owned or controlled by Licensee.  For the avoidance of doubt, Licensee Technology shall not include the RESP Technology.

1.27.    "**Location**" is defined in Section 2.1.

1.28.    "**Marketing Materials**" is defined in Section 3.6.

1.29.    "**New Licensee Technology**" is defined in Section 12.4.

1.30.    "**ProFab**" is defined in Section 7.1.1.

1.31.    "**Receiving Party**" is defined in Section 11.1.

1.32.    "**RESP Intellectual Property**" shall mean all Intellectual Property Rights comprising or embodied in (a) the RESP Technology, including those required by Licensee for the Licensee Production Facility, and those with regard to the development, design, construction, engineering, installation, operation, maintenance and any use of the RESP Technology, and (b) any RESP Technology Modifications.

1.33.    "**RESP Licensed Trademarks**" shall mean those Trademarks (defined below) owned and controlled by RESP and set forth on **Schedule B**, as such Schedule may be amended by the Parties from time to time in accordance with this Agreement.

1.34.    "**RESP Materials**" shall mean the RESP Intellectual Property, RESP Technology, information, tools, content, samples, prototypes, specifications, instructions, documents, files, scripts, programs,

3

graphics, images, designs and other materials provided or made available by or on behalf of RESP, its Affiliates, or its or their agents in connection with this Agreement.

1.35. "**RESP Patents**" shall mean United States Patent Nos. 7,344,622, 7,883,605, 8,137,508, and 8,641,871.

1.36. "**RESP Personnel**" shall mean the employees of (a) RESP and (b) Contractors, in each case, who perform RESP's obligations hereunder.

1.37. "**RESP Services**" is defined in Section 17.1.

1.38. "**RESP Technology**" shall mean (a) the Technology, including the Units, as further described in **Schedule A** attached hereto, (b) RESP Trade Secrets, and (c) any Improvements to any of the foregoing provided by or on behalf of RESP or its licensors.

1.39. "**RESP Technology Modification**" shall mean any and all enhancements, Improvements, updates, new versions, adaptations, or modifications of any kind of the RESP Technology or RESP Intellectual Property created, invented, or developed in whole or in part, alone or jointly by RESP or by Licensee or any Affiliate of Licensee on or after the Effective Date of this Agreement.

1.40. "**RESP Trade Secrets**" shall mean the know-how and trade secrets required to maintain, repair, update, modify, enhance, improve or otherwise use the RESP Technology.

1.41. "**Rights**" is defined in Section 8.5.3.

1.42. "**Services Taxes**" is defined in Section 10.3.

1.43. "**Technical Specifications**" are set forth in the Master Agreement.

1.44. "**Technical Specifications Documentation**" are set forth in the Master Agreement.

1.45. "**Technology**" means information, know-how, data, and other technology, including works of authorship and other creations and ideas, computer programs (in source code, object code or any other format), documentation, developments, know-how, technical information, specifications, designs, plans, drawings, writings, schematics, documents, reports, methods, procedures, concepts, techniques, protocols, tooling, hardware and products, excluding Trademarks.

1.46. "**Third Party Operator**" is defined in Section 3.4.

1.47. "**Trademarks**" shall mean the trademarks, service marks, trade dress, logos and other rights in indicia of origin, including all registered and common law rights.

1.48. "**Unit**" shall mean a Vessel and ancillary subsystems used to form a pyrolysis processing system, including a feed unit, conversion vessel, stirrer conveyance system, SIR extraction system, thermal management system, support and load compensation system and control system.

1.49. "**Vessel**" shall mean a pyrolysis vessel machine and each of its parts, including a stainless reactor shell and any necessary ports or manways, and as further described on Schedule A.

## SECTION 2 -- UNITS

2.1. As of the Effective Date the Project will consist of six (6) Units and associated Licenses (defined below).  The Project will be located at the address first set forth above for Licensee ("**Location**").

The Parties hereby agree that they have agreed upon a development schedule for the Project.

## SECTION 3 -- THE LICENSE

3.1.   **Grant of License**.  Subject to the terms and conditions of this Agreement, RESP hereby grants Licensee six (6) limited, exclusive (as defined in Section 3.2), non-transferable, non-assignable (except as permitted herein), non-sublicensable, revocable licenses (each, a "**License**") to design, engineer, develop, install, construct, maintain, operate, update and otherwise use one (1) Unit in a production facility ("**Licensee Production Facility**") at the Location (each, a "**License**").  Each License shall include a license and right to operate one Unit, and a license and the right to use RESP Technology as strictly necessary for the operation of the licensed Unit.

3.2.   **Exclusivity**. The Exclusivity of Licensee's right under the License is limited to a three hundred (300) miles radius around Location.  In the event of an assignment of this Agreement pursuant to Section 18.3 below, the Parties agree that BMERP will have the right, in its sole and absolute discretion, to designate the Licenses granted in Section 3.1 as either exclusive or non-exclusive.

3.3.   **License Fee**.  The License Fee for the Licenses granted herein shall be as described in Section 2.2 of the Master Agreement.

3.4.   **Third Party Operators**.  Licensee shall have the right to contract with a third-party for that third-party to operate and maintain the Licensee Production Facility on behalf of the Licensee ("**Third Party Operator**"), provided that such Third-Party Operator is approved in advance by RESP in writing, which approval shall not be unreasonably withheld.  In the case of such a contractual relationship, the Licensee shall execute an agreement with the Third Party Operator that obligates the Third Party Operator to an agreement no less protective of the confidentiality of RESP's proprietary information and of RESP Intellectual Property than the Master Agreement, including specifically  but not limited to: (i) the terms and conditions of Section 11 of this Agreement regarding all RESP Confidential Information; and (ii) use the RESP Technology solely for the purpose of operating and maintaining the Licensee Production Facility.  Licensee shall be and remain responsible for the conduct of each Third-Party Operator.

3.5.   **Affiliate Operators**.  Licensee shall have the right to utilize an Affiliate of Licensee to design, engineer, construct, install, operate, maintain, and improve the Licensee Production Facility on behalf of the Licensee ("**Affiliate Operator**"), provided the Affiliate Operator is bound to all the terms, conditions, and obligations of this License Agreement.  Licensee shall be and remain responsible for the conduct of each Affiliate Operator.

3.6.   **Trademark License**.  Subject to the terms and conditions of this Agreement, RESP hereby grants to Licensee a limited, non-transferable, right and license in and to RESP Licensed Trademarks during the Term, to use, display, transmit, and reproduce RESP Licensed Trademarks in those mediums or formats preapproved in writing by RESP, for the sole purpose of (a) identifying RESP as the source of the Technology embodied in the Unit used or to be used in a Project or a potential Project, and (b) identifying an affiliation, association, or connection with and/or the sponsorship, approval or endorsement of RESP Technology in connection with a Project or a potential Project, including, in and on brochures and other print publications, electronic, magnetic, and optical media, advertising and promotional materials, press releases, the internet and other digital transmission or delivery methods, mobile and desktop applications and on any platform (collectively, "**Marketing Materials**").  In all Marketing Materials, when making reference to systems or methods that incorporate any of the RESP Technology, BMERP shall identify such systems and methods as "RES Polyflow Technology."  Provided, that RESP has given its written consent to the name and

5

look and feel (placement, color, design) of any logo pertaining to the RESP Licensed Trademarks, Licensor authorizes Licensee to exercise the rights granted to Licensee with regard to such use of the RESP Licensed Trademarks in Licensee's marketing materials for each Project or each potential Project.  All rights not expressly granted herein are expressly reserved by RESP.

3.7.    **License to RESP for Operational Data**.  Licensee hereby grants to RESP the non-exclusive, non-transferable, non-assignable, non-sublicensable, revocable, limited license to use information derived from the operation of the Licensee Production Facility ("**Licensee Operational Data**") solely for the purpose of: (i)  RESP's development of RESP Technology Modifications or RESP Intellectual Property; or (ii) providing information to potential third party licensees that is relevant to the potential sale of a license to such third parties.  The parameters of the Licensee Operational Data will be set forth on <u>Schedule C</u> hereto.  Licensee owns all right, title and interest in and to such Licensee Operational Data.


## SECTION 4 -- TAXES

4.1.    **Taxes**.  Licensee shall pay all appropriate state, local and federal taxes, levies and assessments related to this Agreement and the license granted hereunder.


## SECTION 5 -- RIGHTS AND LIMITATIONS

5.1.    **Restrictions on Use**.  Licensee shall not:

5.1.1    market, sell, distribute, sublicense, use, modify, translate, reproduce, create derivative works from, dispose of, rent, lease, or authorize or permit access or use of any portion of the RESP Technology, RESP Technology Modifications, or RESP Intellectual Property, except as expressly permitted in this Agreement;

5.1.2    reverse engineer, decompile, or disassemble the RESP Technology, RESP Technology Modifications, or RESP Intellectual Property, except and only to the extent that such activity is expressly permitted by applicable law;

5.1.3    remove any copyright and other proprietary notices contained in the RESP Technology, RESP Technology Modifications, or RESP Intellectual Property;

5.1.4    use the RESP Technology, RESP Technology Modifications, or RESP Intellectual Property in a manner which infringes or violates any of the intellectual property or other proprietary rights of any third party; or

5.1.5    install and operate the RESP Technology or RESP Technology Modifications in any manner that is inconsistent with RESP applicable recommendations and documentation, the terms of this Agreement or applicable law.

5.2.    **Additional Obligations**.

5.2.1    Licensee shall comply and cause its Licensee Personnel and any agent of Licensee to comply in full with all federal, state, local and foreign laws, rules and regulations in connection with its use of the License granted herein.

5.2.2    The RESP Technology, RESP Technology Modifications, or RESP Intellectual Property may be operated, accessed and used only in a form and manner approved by RESP in its

sole discretion, and only in accordance with the terms and conditions of this Agreement.

5.2.3    To the extent that the RESP Technology includes any RESP Intellectual Property, Licensee will use such RESP Intellectual Property strictly in accordance with RESP's standards, policies and procedures as specified in writing by RESP from time to time.

5.2.4    The right to install, operate, access and use the RESP Technology hereunder is limited to authorized employees of Licensee and Licensee's internal activities.

5.2.5    Licensee shall not remove RESP's copyright notices, patent notices, or other proprietary notices on the RESP Technology, and all copies thereof shall be subject to all terms, conditions, and obligations of this Agreement.

5.2.6    Provided, that, BMERP is not subject to a claim arising out of the RESP Patents, Licensee shall not challenge, cause any other person or entity to challenge, or assist any other person or entity in challenging: (i) RESP's ownership of the RESP Patents or (ii) the validity or enforceability of the RESP Patents.

5.2.7    In the event a third-party challenges: (i) RESP's ownership of any RESP Technology, RESP Technology Modifications, or RESP Intellectual Property or (ii) the validity or enforceability of the RESP Intellectual Property, Licensee shall assist RESP, at RESP's expense, in defending such a challenge by providing any relevant documentation and testimony or by taking other reasonable actions requested by RESP.

5.3.    **Misuse by Licensee**.  Notwithstanding anything to the contrary contained in this Agreement, Licensee shall not be entitled to any remedy, and RESP shall have no liability whatsoever, if any defect, deficiency, error or problem with the RESP Technology arises from or results from violation of this Agreement by Licensee or any employee, agent, Contractor, affiliate, representative, successor or assign of Licensee, or from accident, abuse, misapplication, abnormal or unauthorized installation, operation, access or use of the RESP Technology by Licensee or any employee, agent, Contractor, affiliate, representative, successor or assign of Licensee.

## SECTION 6 -- RESP TECHNOLOGY

6.1.    **Technical Specifications**.  The Technical Specifications for each Project are set forth in the Master Agreement. If this Agreement is assigned to a third party, the Schedule C of the Master Agreement (the Technical Specifications) shall be attached as an exhibit to this Agreement.

## SECTION 7 -- VESSELS

7.1.    **Project Vessels**.

7.1.1    **Manufacture**.  For the first six (6) Vessels of for the Licensee Production Facility, Licensee or BMERP shall purchase the Vessels from ProFab Energy System LLC, an Affiliate of RESP ("**ProFab**").  After the first six (6) such Vessels have been purchased from ProFab, BMERP will or will authorize Licensee, to decide, in consultation with RESP, from which equipment and manufacturing company(ies) it will procure the Vessels, including from any third parties.  Notwithstanding the foregoing, RESP shall approve the selection of any third-party provider, where such approval shall not be unreasonably withheld, and such third-party provider shall execute an intellectual property and confidentiality agreement with RESP in the form attached to the Master Agreement as

7

Exhibit 3.

7.1.2   RESP represents and warrants that upon proper installation and operation of six (6) Units implementing the RESP Technology pursuant to RESP's recommendations and specification, the six (6) Units constructed in the Licensee Production Facility collectively will be capable of converting mixed polymer waste to distributed hydrocarbon vapor at a rate of about 65,318 gallons per day.  For clarity, RESP does not represent and warrant the proper operation of the Units constructed in the Licensee Production Facility by an Affiliate Operator or a Third-Party Operator, and this representation and warranty is limited to the capability of the RESP Technology.

7.1.3   In the event of a breach of Section 7.1.2 of this Agreement, Licensee's sole and exclusive remedy is to receive the RESP Services provided for in Section 17 below.

## SECTION 8 -- TERM

8.1.    **Term**.  For each License granted, this Agreement shall remain in effect so long as Licensee is in compliance with the terms and conditions of this Agreement for a period commencing on the Effective Date and ending upon the date that the Licensee notifies RESP that it will no longer operate the Unit(s).

8.2.    **Termination for Breach**.  Either Party will have the right to terminate this Agreement if the other Party materially breaches or is in default of any material term of this Agreement respectively, and has failed to cure the default within thirty (30) days after receipt of written notice of the default from the non-defaulting Party; provided, that, in the event of a breach of this Agreement by RESP, if RESP has begun good faith efforts to cure a default within such thirty (30) day period, but such default is not reasonably curable within such thirty (30) day period, such thirty (30) day period shall be extended for an additional reasonable period sufficient to enable RESP to complete such cure.

8.3.    **Term and Termination of Exclusivity**.  The Exclusivity pursuant to each License begins upon the Effective Date and shall continue until the earliest of:  (i) this Agreement is terminated; (ii) the Licensee or BMERP fails to secure funding for the purpose of the License within three (3) years of the Effective Date; or (iii) after the Commercial Operation Date, if the Licensee fails to operate the Unit for six (6) consecutive months, for a reason other than (x) Force Majeure, (y) any event occurring not within the control of Licensee, or (z) a Performance Deficiency (as that term is defined in the Master Agreement).

8.4.    **Termination for Bankruptcy or Insolvency**.  If (a) a Party (i) shall admit in writing its inability to, or be generally unable to, pay its debts as such debts become due or (ii) shall (A) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner or liquidator of itself or of all or a substantial part of its property or assets, (B) make a general assignment for the benefit of its creditors, (C) commence a voluntary case under the U.S. Bankruptcy Code, (D) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding-up, or composition or readjustment of debts, (E) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under the Bankruptcy Code; or (F) take any corporate, partnership or other action for the purpose of effecting any of the foregoing, or if (b) (i) a proceeding or case shall be commenced, without the application or consent of a Party, in any court of competent jurisdiction seeking (A) its reorganization, liquidation, dissolution, arrangement or winding-up, or the composition or readjustment of its debts, (B) the

8

appointment of a receiver, custodian, trustee, examiner, liquidator or the like of the Party or of all or any substantial part of its property or assets or (C) similar relief with respect to the Party under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) or more days or (ii) an order for relief against the Party shall be entered in an involuntary case under the Bankruptcy Code, then the other Party may, by giving notice thereof to the Party, terminate this Agreement as of the date specified in such termination notice.

8.5.    **Effect of Termination**.

    8.5.1    **Survival**.  Sections 1, 4, 5, 8, 9, 11, 12, 13, 14, 15, 16, 17, and 18 shall survive the termination or expiration of the Agreement for any reason.

    8.5.2    **Return of RESP Materials**. In the event of a termination of this Agreement by RESP, Licensee will immediately return to RESP, and cease all further use of, all RESP Materials and all copies of any documents, magnetically encoded materials, any software, drawings, flow charts, structure charts, and recording media and other materials furnished to Licensee.

    8.5.3    **Bankruptcy**. RESP agrees that Licensee will retain and may fully exercise all licenses and other rights under this Agreement (collectively, the "**Rights**") in all circumstances, including any future bankruptcy or insolvency proceeding involving RESP, whether as licensee of intellectual property under the U.S. Bankruptcy Code (the "**Bankruptcy Code**"), applicable non-bankruptcy law, or otherwise. Without limiting the foregoing, RESP acknowledges and agrees that (a) neither this Agreement nor any of the Rights is vulnerable to rejection as an executory contract under Section 365 of the Bankruptcy Code; (b) if a court of competent jurisdiction nonetheless allows the rejection of this Agreement under Section 365 of the Bankruptcy Code, such rejection will not result in termination of any of the Rights; and (c) if a court of competent jurisdiction nonetheless allows the rejection of this Agreement and termination of any of the Rights, the Rights will continue to be treated as licenses of "intellectual property" for purposes of Section 365(n) of the Bankruptcy Code and, accordingly, Licensee will retain and may fully exercise all of its rights and elections under the Bankruptcy Code with respect to the Rights. RESP may (and RESP hereby irrevocably waives any right to) object to or challenge any assertion of and reliance on the matters described in the preceding sentence by Licensee.

## SECTION 9 -- RELATIONSHIP OF PARTIES

The relationship of RESP to Licensee established by this Agreement will at all times be that of a licensor and independent contractor.  Nothing in this Agreement will be construed to create any partnership, association, joint venture or employment between the Parties.  RESP will have the sole and exclusive control over its employees and agents that perform the RESP Services for RESP and over the labor and employee relations policies and policies relating to wages, hours, working conditions, benefits or other conditions of its employees and agents.

## SECTION 10 -- PAYMENT TERMS

10.1.    **License Fees**.  Licensee or its Affiliate shall pay to RESP all License Fees upon the Financial Notice to Proceed as defined in the Master Agreement.

10.2. **Direct Expenses**. All out-of-pocket expenses incurred by RESP in connection with this Agreement will be paid by Licensee only if such expenses were approved in advance by Licensee. All out-of-pocket expenses will be itemized when billed.

10.3. **Taxes**. The License Fee shall be exclusive of any applicable sales, use, excise, value-added, goods and services, gross receipts, services, consumption and other similar transaction taxes however designated that are properly levied by any taxing authority upon the provision of the License by RESP ("**Services Taxes**"), excluding, however, taxes based upon RESP's general business operations, capital, property, corporate franchise, existence, or income and any taxes or amounts in lieu thereof paid or payable by RESP ("**Excluded Taxes**"). Except to the extent Licensee has provided an exemption certificate or such other appropriate documentation or as otherwise provided herein, RESP shall add to each invoice any and all applicable Services Taxes that are legally required to be collected from Licensee under Applicable Law. RESP shall be responsible for remitting all such Services Taxes collected from Licensee to the appropriate governmental authority in compliance with Applicable Law. Licensee shall not in any way be responsible for Excluded Taxes, and RESP shall bear sole responsibility for all such Excluded Taxes.

## SECTION 11 -- CONFIDENTIAL INFORMATION

11.1. **Definition of Confidential Information**. "**Confidential Information**" as used herein means: any and all information disclosed by a Party or its Affiliates or their respective agents ("**Disclosing Party**") to the other Party, its Affiliates, or their respective agents ("**Receiving Party**"), whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," including: (a) the existence of this Agreement and the terms hereof; (b) all information concerning the Disclosing Party's business affairs, contracts, customer information, customer lists, sales manuals, price lists, supplier information, products, services, organizational structure, organizational charts and internal practices, employee information, employment policies, business plans, research and development, forecasts, sales and other financial results, financial information (including revenue and spend information and any and all information that can be used, directly or indirectly, to derive or estimate financial information), records and budgets, product roadmaps, offerings, markets, marketing, and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, confidential trade knowledge, know-how, unpublished patent applications and other Intellectual Property Rights, designs, specifications, documentation, components, source code, object code, technologies, computer programs, formulas, techniques, processes, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing; (c) any and all third party confidential information included with, or incorporated in, any of the foregoing; and (d) all summaries, reports and analyses prepared by or for the Receiving Party that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing. "Confidential Information" shall not include information: (i) that was publicly available, or that subsequently becomes publicly available, except by the wrongful disclosure hereunder by the Receiving Parry, and except for Personal Data, which shall remain "Confidential Information" even if publicly available; (ii) that was in the Receiving Party's possession prior to receipt of the same hereunder; (iii) that was received from a Person who was not under any obligation of confidentiality with respect to such information; (iv) that can be proven to have been independently developed by the Receiving Party without any use of or reference to the Disclosing Party's Confidential Information, as established by written documentation produced contemporaneously with the development of the information; (v) that is furnished by the Disclosing Party to a Person without restriction on the Person's right of disclosure; or (vi) that is approved by Disclosing Party in writing for release by the Receiving Party.

10

11.2.   **Confidentiality Obligations**.   Receiving Parry acknowledges that it may receive Confidential Information from Disclosing Party during the course of this Agreement.   Receiving Party shall use at least the same degree of care used to protect and maintain the security of its own confidential and proprietary information, but in no event less than a reasonable degree of care, to prevent the duplication or disclosure of the Confidential Information, other than to Authorized Persons, who are legally bound to protect such Confidential Information in accordance with this Section 11.2 (Confidentiality Obligations), only to the minimal extent necessary.   Furthermore, except as contemplated by this Agreement, neither Receiving Party nor any Authorized Person shall: (a) copy, distribute, transmit, share, or otherwise use or exploit the Confidential Information for any purpose other than in connection with its performance of its or their duties and obligations to Disclosing Party under this Agreement or as expressly authorized by this Agreement; (b) disclose the Confidential Information to any Third Party without Disclosing Party's prior written approval, except as otherwise provided in this Agreement; or (c) acquire any right in or assert any lien against the Confidential Information or permit any Third Party to do so. Receiving Party will immediately notify Disclosing Party, orally or in writing, in the event of any known impermissible use, disclosure, loss or destruction of the Confidential Information in violation of this Agreement and take all reasonable steps to mitigate any potential harm or further unauthorized and/or impermissible use, disclosure, loss or destruction of such Confidential Information.   "Authorized Persons" are only those Contractors, Receiving Party's Personnel or Receiving Party's employees that are on a need-to-know basis with regard to the subject matter of this Agreement.

11.3.   **Exceptions**.   Notwithstanding Section 11.2 (Confidentiality Obligations), Receiving Party may disclose Confidential Information to the extent required by Applicable Law.   However, Receiving Party must give Disclosing Party prompt notice and provide reasonable assistance to Disclosing Party in its efforts to quash the order, obtain a protective order, or otherwise protect the confidentiality of such Confidential Information.

11.4.   **Remedies**.   Great loss and immediate and irreparable injury would be suffered by Disclosing Party if Receiving Party should breach or violate this Section 11 (Confidentiality).   In addition to all of the remedies provided at law or in equity, Disclosing Party shall be entitled to a temporary restraining order and a permanent injunction to prevent a breach of this Section 11.4 (Remedies). If Disclosing Party should seek an injunction hereunder, Receiving Party hereby waives any requirement that Disclosing Party subject proof of the economic value of any Confidential Information or post a bond or any other form of security.

11.5.   **Return of Confidential Information**.   Upon expiration or termination of this Agreement, or as requested by Disclosing Party, Receiving Party shall either certify the destruction of, or return to Disclosing Party, all of the Confidential Information and all copies thereof, in any tangible form whatsoever, including but not limited to any copies stored electronically, magnetically, or in any other media, except to the extent Receiving Party is required by law to retain a copy, in which case it shall do so only for such time as may be required subject to the confidentiality obligations set forth above.

11.6.   **Contractors/Personnel**.   Receiving Party shall, in advance, require any and all Contractors and Receiving Party Personnel to execute a written agreement whereby he, she or it agrees to be bound by terms substantially equivalent to the terms of this Agreement, including the confidentiality provisions hereof.   Disclosing Party shall be named as a third-party beneficiary of the foregoing agreement.

11.7.   **Third Party Information**.   Receiving Party's agreements in this Section 11 (Confidentiality) are intended to be for the benefit of Disclosing Party and any Third Party that has entrusted information

or physical material to Disclosing Party in confidence. Receiving Party further agrees that, during the Term of this Agreement and thereafter, Receiving Party will not improperly use or disclose to Receiving Party any confidential, proprietary or secret information of Receiving Party's former clients or any Third Party, and Receiving Party will not to bring any such information onto Disclosing Party's property or place of business.

11.8. **Other Rights**. This Agreement is intended to supplement, and not to supersede, any rights Disclosing Party may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

11.9. **U.S. Defend Trade Secrets Act**. Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("**DTSA**") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (b) solely for the purpose of reporting or investigating a suspected violation of law; or (c) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

## SECTION 12 -- OWNERSHIP OF MATERIALS

12.1. **Intellectual Property Rights**,

12.1.1 All Intellectual Property Rights belonging to a Party prior to Effective Date of this Agreement, will be retained by such Party and all Intellectual Property Rights developed independently of RESP Technology by or for a Party after the Effective Date of this Agreement, will be retained by such Party. Notwithstanding the foregoing, nothing in this Section does or will give Licensee or any Affiliate of Licensee any right, title, or interest in or to RESP Technology, RESP Technology Modifications, or RESP Intellectual Property other than those rights specifically granted elsewhere in this Agreement.

12.1.2 Notwithstanding anything to the contrary contained in this Agreement, as between Licensee or any Affiliate of Licensee on the one hand and RESP on the other hand, RESP owns the RESP Technology, all documentation thereto, and all RESP Technology Modifications, whether developed in whole or in party, jointly or alone by RESP or Licensee or any Affiliate of Licensee, and all Intellectual Property Rights in and to any of the foregoing.

12.1.3 Subject to Sections 12.1.1 and 12.1.2 herein, as between Licensee and RESP, Licensee (or its licensors) is and shall remain the sole owner of all rights, title and interests in and to the Licensee Technology, Licensee Intellectual Property and the Confidential Information of Licensee.

12.2. **RESP Technology Modifications**

12.2.1 **Developed by RESP**. RESP does and shall own all RESP Technology Modifications and Intellectual Property Rights in and to the foregoing as set forth in Section 12.1.2.

12.2.2   Subject to the terms and conditions of this Agreement, upon becoming aware of any RESP Technology Modification created, invented, developed, reduced to practice in whole or in part by Licensee or any Affiliate of Licensee, Licensee or Affiliate of Licensee shall promptly notify RESP in writing of such RESP Technology Modification together with documentation describing the RESP Technology Modification and its functionality in such detail that RESP is able to understand, install, deploy, implement, access, test, build, compile, and use the RESP Technology Modification as part of the RESP Technology. Within three (3) days following the delivery of such notice to RESP, Licensee shall deliver to RESP any documentation associated with the RESP Technology Modification. Licensee shall assign or cause to be assigned to RESP all right, title and interest in and to the RESP Technology Modification and any and all Intellectual Property Rights and other proprietary rights that Licensee, any Affiliate of Licensee, or any employee, agent, or contractor of any of the foregoing has or may have therein.  Licensee and all Affiliates of Licensee hereby assign to RESP, and RESP accepts assignment of, all of their right, title, and interest (including without limitation all patents and patent rights, trademarks and trademark rights, copyrights, trade secrets and trade secret rights, as well as all goodwill associated therewith) in and to the RESP Technology Modification and all discoveries, improvements, ideas, software (including source code and object code) applications and other works of authorship, inventions, know-how and other proprietary property and rights embodied in, related to or associated with, the RESP Technology Modification as well as all reissues, continuations, continuations-in-part, reexaminations and further proceedings of any kind whatsoever, and all other related Intellectual Property embodied in, related to or associated with the RESP Technology Modification, free and clear of all liens and other encumbrances thereon.  Licensee shall cooperate, and shall cause its Affiliates and all of their employees, agents, and contractors to cooperate, with RESP in: (i) applying for, prosecuting, or enforcing any patent, patent application, invention registration, copyright registration, or other Intellectual Property Registration related to the RESP Technology Modification; and (ii) memorializing, formalizing, perfecting, or recording RESP's right, title, interest, and ownership in and to any RESP Technology, RESP Technology Modification, or any Intellectual Property or Intellectual Property Registration related to any of the foregoing.

12.2.3   **License to RESP Technology Modifications**.  For the avoidance of doubt, upon its development, creation or reduction to practice, any RESP Technology Modification, owned or licensed with the right to sublicense by RESP, including those set forth in Section 12.2.2 above, shall be included in the License granted under Section 3 of this Agreement without any additional License Fees from Licensee.

12.3.   **Non RESP Technology Development**.  Both Parties understand that if either Party directly invests in its own developments related to operating a facility as contemplated herein, where such a development is not RESP Technology, not a RESP Technology Modification, and does not arise from access to RESP Confidential Information, the Intellectual Property Rights of these new products, solutions and/or modules may be used in the operation of the facility, but the Intellectual Property Rights shall remain fully with the Party that developed the new products.  If the Parties decide to undertake any joint development pursuant to this Agreement, any such joint development will be governed by a separate joint development agreement to be negotiated in good faith by the Parties and executed prior to the commencement of any joint development efforts.

12.4.   **Cross-License for Licensee Technolog**y.  To the extent Licensee develops, creates, or reduces to practice any technology that is related to systems or methods for converting plastic to a liquid hydrocarbon and useful for use with RESP Technology or RESP Technology Modifications, and

13

such is not considered RESP Technology or a RESP Technology Modification ("New Licensee Technology"), Licensee shall enter into good faith negotiations to grant RESP a non-exclusive, limited license solely for use with the RESP Technology licensed by RESP to third parties.

12.5.   **Reservation of Rights**.  Each Party hereby retains and reserves to itself, all rights not expressly granted to the other Party under this Agreement.

12.6.   **Further Assurances and Cooperation**.  Licensee agrees to cooperate with RESP such that RESP may practice, use and enjoy to the fullest extent the RESP Technology Modifications and the Intellectual Property Rights therein and thereto, including, without limitation, providing RESP with all requested information relating to the RESP Technology Modifications and the prompt execution of all documents or instruments deemed reasonably necessary or desirable by RESP to perfect the full transfer of the right, title and interest assigned herein and convey to RESP, and perfect RESP's ownership in, all RESP Technology.

## SECTION 13 -- REPRESENTATIONS AND WARRANTIES

13.1.   **Due Authority**.  Each Party represents and warrants that it has full authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, free of all liens, claims, encumbrances and other restrictions and that its obligations herein are not in conflict with any other obligations of the Party.

13.2.   **RESP Technology**.  RESP represents and warrants that the RESP Technology will conform to the Technical Specifications set forth on Schedule C of the Master Agreement, any other requirements set forth in this Agreement, and all referenced written documents.  Licensee represents and warrants that it will use the RESP Technology in accordance with OSHA standards.

13.3.   **Title**.  Licensor represents and warrants that it owns all right, title, and interest, including all Intellectual Property Rights, in and to, or possesses valid and binding licenses for use of, all RESP Intellectual Property utilized by Licensor hereunder.  Unless otherwise expressly provided herein, no license or authorization from any person or entity is required by Licensee to receive or use the RESP Technology as permitted in this Agreement.

13.4.   **Validity and Enforceability**.  (a) RESP represents and warrants that to RESP's Knowledge, all of the RESP Intellectual Property subject to invalidity and unenforceability challenges is valid and enforceable, and all Intellectual Property Registrations are subsisting and in full force and effect; and (b) Licensor has taken all reasonable and necessary steps to maintain the Intellectual Property Rights and to preserve the confidentiality of all Trade Secrets included therein, including by requiring all persons and entities having access thereto to execute binding, written non-disclosure agreements.

13.5.   **Non-Infringement**.  RESP represents and warrants that: (a) the RESP Technology (including the use of the RESP Intellectual Property in connection therewith) solely as currently and formerly used by RESP and as proposed to be used pursuant to the Technical Specifications Documentation, including the use of the RESP Intellectual Property in connection therewith, to RESP's Knowledge, have not infringed, misappropriated, or otherwise violated and will not infringe, misappropriate, or otherwise violate the Intellectual Property Rights or other rights of any person or entity; and (b) to RESP's Knowledge, no person or entity including Charles W. Grispin ("**Grispin**") or Charlie Holding Intellectual Property, LLC. ("**CHIP**"), has infringed, misappropriated, or otherwise violated any RESP Intellectual Property.  Notwithstanding the foregoing, RESP shall be in breach of this representation and warranty with respect to any Intellectual Property of Grispin or CHIP

14

only if (i) either Grispin or CHIP successfully obtain court ordered injunctive relief or a court order for damages against Licensee for which RESP does not have an indemnification obligation to Licensee under this Agreement, prohibiting Licensee from using any portion of the RESP Intellectual Property or requiring payment of such unindemnified damages; and (ii) within sixty (60) days of the grant of the injunctive relief or court order for unindemnified damages, RESP fails to modify such Intellectual Property to eliminate the use of the subject matter of the injunctive relief or unindemnified damages payment, such that the Project returns to the level of productivity either pre-injunctive relief or prior to the court order for unindemnified damages, as applicable.

13.6.    **Employees and Contractors**.  With the exception of Grispin, RESP represents and warrants that (a) it has entered into binding, valid and enforceable, written agreements with each current and former employee and independent contractor who is or was involved in or has contributed to the invention, creation, or development of any Intellectual Property Rights embodied in RESP Technology, and (b) such Persons are obligated to grant to RESP an assignment of any ownership interest such employee or independent contractor may have in or to such Intellectual Property Rights, to the extent such Intellectual Property Rights does not constitute a "work made for hire" under Applicable Law.

13.7.    **No Ancillary Obligations**.  The Parties represent and warrant that neither the execution, delivery, or performance of this Agreement, nor the consummation of the transactions contemplated hereunder, will result in the loss or impairment of or payment of any additional amounts with respect to, or require the consent of any other person or entity in respect of, the other Party's rights including Licensee's right to use any RESP Intellectual Property in the conduct of the Business as proposed to be conducted.

13.8.    **Intellectual Property Legal Actions and Orders**.  RESP represents and warrants that: (a) there are no legal actions (including any opposition, cancellation, revocation, review, or other proceeding), whether settled, pending, or threatened (including in the form of offers to obtain a license) (i) alleging any infringement, misappropriation, or other violation of the Intellectual Property Rights of any person or entity by Licensor in the conduct of its business; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Intellectual Property Rights or Licensor's rights with respect to any Intellectual Property Rights; or (iii) by Licensor or any other person or entity alleging any infringement, misappropriation, or other violation by any person or entity of any Intellectual Property Rights. Licensor is not aware of any facts or circumstances that could reasonably be expected to give rise to any such legal action; and (b) Licensor is not subject to any outstanding or prospective order (including any motion or petition therefor) that does or could reasonably be expected to restrict or impair the ownership or use of any RESP Intellectual Property.

13.9.    **Professional Standards**.  The Parties represent and warrant that the Party shall perform all obligations under this Agreement (a) in accordance with applicable professional standards and practices and (b) in a competent, timely, professional, fully functional (as applicable) and workmanlike manner.

13.10.    **Necessary Skills and Resources**.  RESP and RESP Personnel shall have the skills, training, background and experience necessary to meet RESP's obligations under this Agreement.  In recognition of the need for timely completion of RESP's obligations, RESP shall make available the resources, facilities, capacity and manpower that are available to RESP to assure that all of its obligations shall be performed in accordance with the terms of this Agreement.  Licensee and Licensee Personnel shall have the skills, training, background and experience necessary to meet Licensee's obligations under this Agreement.  In recognition of the need for timely completion of

Licensee's obligations, Licensee shall have and shall maintain sufficient resources, facilities, capacity and manpower to assure that all of its obligations shall be performed in accordance with the terms of this Agreement.

13.11. **Compliance with Applicable Laws**.  The Parties represent and warrant that the Party shall comply at all times with, and ensure that Contractors and the Party's Personnel comply at all times with, all Applicable Laws (including in its and their performance of RESP's obligations in this Agreement).

13.12. **Precedent of Agreement**.  In the event of any express conflict between this Agreement and the Master Agreement, the terms and conditions of this Agreement shall govern solely with respect to the conflicting or contradictory term.  If this Agreement is assigned to a third party, the Master Agreement shall be attached as an exhibit to this Agreement solely as a reference for the definition of terms, where no rights are conveyed to assignee third party by operation of attaching the Master Agreement.

## SECTION 14 -- DISCLAIMER OF OTHER WARRANTIES; LIMITATION OF LIABILITY

14.1. Disclaimer of Warranties.

EXCEPT FOR ANY WARRANTIES PROVIDED HEREIN, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY DISCLAIMS ALL WARRANTIES AND CONDITIONS, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, SATISFACTORY QUALITY, AND QUIET ENJOYMENT.

14.2. Limitation of Liability.

EXCEPT FOR A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT, INDEMNIFICATION OBLIGATIONS OR A BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, AND EXCEPT FOR RESP'S BREACH OF ITS EXCLUSIVITY OBLIGATIONS UNDER THIS AGREEMENT (INCLUDING THE REPRESENTATIONS AND WARRANTIES WITH RESPECT TO GRISPIN AND CHIP PURSUANT TO SECTION 13.5(b) OF THIS AGREEMENT), TO THE FULLEST EXTENT PERMITTED BY LAW, IN NO EVENT SHALL:  (A) EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHATSOEVER ARISING UNDER OR RELATING TO THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, LOSS OF BUSINESS, PROFITS, GOODWILL, USE, DATA, OR OTHER ECONOMIC ADVANTAGE); IN EACH CASE, WHETHER CHOATE OR INCHOATE, WHETHER BASED ON STATUTE, WARRANTY, CONTRACT, TORT, OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT A PARTY IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION; AND (B) EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THE AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED $20,000,000.

## SECTION 15 -- NOTICES

All notices and demands of any kind or nature which either Party to this Agreement or SOW may be required or may desire to serve upon the other Party in connection with this Agreement or SOW will be in writing and may be served personally or (as an alternative to personal service) by prepaid registered or certified United States mail or by private mail service, in either case to the applicable Party's address as listed below.  Service of a notice or demand will be deemed complete on the day of actual delivery as shown by the addressee's registry or by carrier or other certification receipt or at the expiration of three (3) days after the date of mailing, whichever is earlier in time.  Either Party may from time to time, by notice in writing served upon the other Party in accordance with this paragraph, designate a different mailing address or a different person to which service of all future notices or demands are thereafter to be addressed.

**If to RESP:**

RES Polyflow LLC

Attn:  Jay Schabel

8584 E. Washington Street #304

Chagrin Falls, OH 44023

**If to RES Polyflow Indiana LLC:**

Attn:  General Counsel

235 Pine Street, Suite 1100

San Francisco, CA 94104

## SECTION 16 -- INDEMNITY

16.1.    **Licensor Indemnification**.  Licensor shall indemnify, pay and reimburse for, defend, and hold harmless Licensee, its Affiliates, and each of their respective directors, officers, licensors, employees, Contractors, subcontractors, service providers, agents, successors and assigns (the "Indemnified Parties") from and against any and all third party claims, losses, liabilities, damages, fines and penalties (including taxes and interest thereon) and all related costs and expenses (including reasonable attorneys' fees and disbursements, reasonable costs of enforcement of all indemnification obligations, and costs of investigation, litigation, settlement, judgment, interest, and penalties) ("Losses") arising out of or relating to: (a) the material breach of this Agreement by Licensor or any Contractor or Licensor Personnel or the inaccuracy of any representation made by Licensor herein; (b) injuries to persons (including death) or loss, theft or damage to real or tangible personal property arising from the negligence, dishonest or willful acts, or omissions of Licensor, its Contractors or Licensor Personnel; (c) any claim that Licensee is jointly or severally liable or obligated to Licensor's employees, agents, employees' representative, a benefit plan or any governmental fund or entity related to Licensor's employees on the basis of any Applicable Laws relating to employment; (d) any actual or alleged infringement, misappropriation or other violation of any Intellectual Property Rights solely by (including the use of) the RESP Technology; (e) any action or failure to act by Licensor in connection with this Agreement; and (f) Licensor's, its Contractors' or Licensor Personnel's acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard of its duties under the Agreement.

16.2.    **Licensee Indemnification**.  Licensee shall indemnify, pay and reimburse for, defend, and hold harmless Licensor, its Affiliates, and each of their Indemnified Parties from and against any and all Losses arising out of or relating to:  (a) the material breach of this Agreement by Licensee or any

employee or agent of Licensee; (b) injuries to persons (including death) or loss, theft or damage to real or tangible personal property arising from the negligence, dishonest or willful acts, or omissions of Licensee or any employee or agent of Licensee; (c) any claim that Licensor is jointly or severally liable or obligated to Licensee's employees, agents, employees' representative, a benefit plan or any governmental fund or entity related to Licensee's employees on the basis of any Applicable Laws relating to employment; (d) any actual or alleged infringement, misappropriation or other violation of any Intellectual Property Rights by Technology other than the RESP Technology; (e) any action or failure to act by Licensee in connection with this Agreement; (f) the acts and omissions of Licensee and its employees and agents in connection with Licensee's installation, operation, access to, and use of, the RESP Technology contrary to this Agreement; or (g) the violation, infringement or misappropriation by Licensee or any employee or agent of Licensee, of the Intellectual Property Rights or other proprietary rights of RESP or its licensors provided, that such violation, infringement or misappropriation was not authorized by Licensor.

16.3.  **Notice of Claims**.  If any claim is commenced against a Party entitled to indemnification under this paragraph ("Indemnified Party"), the Indemnified Party will provide notice of the claim and copies of all related documentation to the party obligated to provide indemnification ("Indemnifying Party") and the Indemnifying Party will assume control of the defense of such claim at its cost and expense.  Such notice and documentation will be provided as promptly as possible; provided, that in no event shall the Indemnifying Party be relieved of its indemnification obligations hereunder unless the failure to provide notice promptly hereunder results in, and then only to the extent of, actual prejudice to the rights of the Indemnifying Party.

16.4.  **Control of Defense**.  In the event that any of the Indemnified Parties (as defined in Section 16.1) is named as a defendant in, or is otherwise obligated to defend, any action asserting any claim indemnifiable hereunder, the Indemnifying Party will assume, at its expense, the defense of such action on behalf of such Indemnified Parties, *provided* that, to the extent any of the terms of any proposed settlement thereof affect the Indemnified Parties' rights or obligations arising hereunder, no such terms shall be agreed to without the Indemnified Parties' prior written approval, which may be not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, any of the Indemnified Parties shall have the right to file an answer or motion to prevent the entry of a default judgment against it. Any Indemnified Party shall have the right, but not the obligation, at its sole option and at its own expense, to participate in any defense against any claim against such Indemnified Party, control of such defense shall remain with the Indemnifying Party but Parties shall work together in good faith to provide the best defense for all Parties involved.

## SECTION 17 -- RESP SERVICES

17.1.  **Remedy for Breach of Warranties**.  In the event of a breach of the RESP Technology Warranty or the Vessel Warranty pursuant to the terms of the Master Agreement, RESP shall in good faith diligently and in a workmanlike manner attempt to correct any defects, deficiencies, faults, errors, or problems with the affected portion of the RESP Technology or improve any processes as required so that the Unit constructed in the Licensee Production Facility is capable of converting mixed polymer waste to a distributed hydrocarbon vapor ("**RESP Services**").

17.2.  **Failure to Cure Breach**.  In the event that after a reasonable period of time the RESP Services do not cure a breach despite RESP's diligent and workmanlike efforts, RESP shall notify Licensee of its failure to cure the breach and this Agreement shall terminate.

17.3.  **Facilities**.  In the event RESP is required to perform RESP Services at the Licensee Production Facility in order to cure the breach, Licensee agrees to provide facilities, space, desks, computer

equipment, Internet access, chairs, telephone service and other necessary office supplies and services for all of RESP's employees, agents, and representatives working at the Licensee Production Facility as may be reasonably required for the performance of RESP's obligations under this Section 17.  RESP agrees to abide by the rules and regulations reasonably promulgated by Licensee for the safe, secure, orderly and efficient conduct of the RESP Services at the Licensee Production Facility.  Licensee will enforce observance of those rules and regulations and will maintain discipline and good order among its employees, agents and representatives.

## SECTION 18 -- MISCELLANEOUS

18.1.    **Non-Disclosure of Terms**.  The Parties covenant and agree not to disclose to any third Parties (except their respective attorneys, accountants and financial advisers who are directly involved in the consummation of this Agreement) any information regarding, or the existence of, the engagement negotiations or arrangements between Licensee and RESP unless required by court order or the order of a governmental body or agency.

18.2.    **Amendments**.  This Agreement may be amended only in writing executed by both of the Parties hereto.

18.3.    **Assignment**.  This Agreement shall not be assignable by any Party hereto without the prior written consent of the other Parties, except that this Agreement (i) may be assigned without such consent to a Person acquiring all or a controlling interest in the business or assets of Licensee or (ii) to any Affiliate of Licensee; provided that any such assignment under (i) or (ii) shall not relieve the assigning party of any of its obligations under this Agreement. Except with respect to the assignment permitted under clause (i) of this Section 18.3, no assignment by any Party of this Agreement for any purpose whatsoever shall be valid until all obligations of the assignor hereunder shall have been assumed by the assignee by written agreement delivered to the other Parties. This Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of the parties hereto. Any assignment which does not comply with the provisions of this Section 18.3 shall be null and void.

18.4.    **Entire Agreement**.  This Agreement contains the entire agreement between the Parties hereto regarding the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions (whether oral or written) between the Parties with respect to the subject matter hereof.

18.5.    **Headings**.  Section and paragraph headings are not to be considered part of this Agreement.  They are included solely for convenience and are not intended to be full or accurate descriptions of the contents hereof.

18.6.    **Governing Law**.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of California without regard to its choice of law provisions.

18.7.    **Binding Effect**.  The covenants and conditions contained in this Agreement will apply to and bind the successors, representatives and permitted assigns of the Parties to this Agreement.

18.8.    **Severability**.  All provisions of this Agreement are severable.  If any provision or portion of this Agreement is determined to be unenforceable, the rest of the Agreement will remain in effect, provided that its general purposes are still reasonably capable of being effected.

18.9.    **Recitals**.  The recitals hereto are an integral part of this Agreement and are incorporated herein by

19

reference.

18.10. **Costs and Expenses**.  Each Party will bear its or her own costs and expenses in connection with the negotiation and preparation of this Agreement.

18.11. **Force Majeure**.  Neither Party will be responsible for any failure to perform (except for payment obligations) due to unforeseen circumstances or to causes beyond its control, including but not limited to acts of God, war, terrorism, riot, embargoes, acts of civil or military authorities, fire, floods, accidents, strikes, shortages of transportation facilities, fuel, energy, labor or materials or failures of telecommunications or electrical power supplies. A Party whose performance is affected by a force majeure condition will be excused from its performance to the extent required by the force majeure condition so long as that Party takes all reasonable steps to avoid or remove the force majeure causes of nonperformance and immediately continues performance whenever and to the extent those causes are removed.

18.12. **Waiver**.  A waiver by any Party to this Agreement of any of its terms or conditions in any one instance will not be deemed or construed to be a general waiver of any other terms or conditions or a waiver of any subsequent breach of the same or any other term or condition.

18.13. **Export Rules**.  Licensee agrees that access to and use of the RESP Technology will not be provided by Licensee or any employee or agent of Licensee to any citizen of a country to which access or use thereof is barred, or to which exports or shipments are barred, by the United States government. Further, the RESP Technology will not be shipped, transferred or exported by Licensee or any employee or agent of Licensee into any country or used in any manner prohibited by the United States Export Administration Act or any other export laws, restrictions or regulations (collectively the "Export Laws"). In addition, if the RESP Technology is identified as export controlled items under the Export Laws, Licensee represents and warrants that Licensee is not a citizen, or otherwise located within, an embargoed nation (including without limitation Iran, Iraq, Syria, Sudan, Libya, Cuba, North Korea, and Serbia) and that Licensee is not otherwise prohibited under the Export Laws from receiving access to or using the RESP Technology. All rights granted to Licensee under this Agreement are granted on condition that such rights are forfeited if Licensee fails to comply with the terms of this Agreement.

18.14. **Dispute Resolution**.  The parties will attempt to settle any claim or controversy arising out of this Agreement through consultation and negotiation in good faith in a spirit of mutual cooperation.  If those attempts fail, then the dispute will be mediated by a mutually accepted mediator to be chosen by the parties within forty-five (45) days after written notice by either party to the other demanding mediation.  No party may unreasonably withhold consent to the selection of a mediator.  The parties will share the cost of the mediation equally.  By mutual agreement, the parties may postpone mediation until some specified but limited discovery about the dispute has been completed.  The parties may also agree to replace mediation with some other form of alternative dispute resolution. Any dispute which cannot be resolved by the parties through negotiation, mediation or other form of agreed alternative dispute resolution within one hundred twenty (120) days following the date of the initial demand for it by one of the parties may then be submitted to the courts for resolution. Nothing in this section will prevent a party from resorting to judicial proceedings if:  (a) good faith efforts to resolve the dispute under these procedures have been unsuccessful; (b) interim, injunctive or other equitable relief from a court is necessary to prevent serious and irreparable injury to one party or to others; or (c) litigation is required to be filed prior to the running of the applicable statute of limitations.  The use of any alternative dispute resolution procedure will not be construed under the doctrine of latches, waiver or estoppel to affect adversely the rights of either party.  All of the above alternative dispute resolution procedures shall be confidential.

18.15. **Legal Compliance**.  Each Party shall comply with all Applicable Laws in its performance of its obligations under this Agreement.

[*The remainder of this page left intentionally blank, signature page follows*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

RES Polyflow LLC

By: _____
Name: Jay Schabel
Title:  Chief Executive Officer

RES Polyflow Indiana, LLC

By: _____
Name: Jay Schabel
Title:  Chief Executive Officer

**SCHEDULE A**

**RESP TECHNOLOGY**

A processing system based upon any of the following, including any RESP Technology Modifications or derivative works thereto:

1.     All know-how, technology, and intellectual property related or embodied in systems, methods, or devices for converting plastic to a liquid hydrocarbon, including but not limited to the preparation of feed material, processing into a preferred vapor product, and subsequent downstream processing into high value saleable products;

2.     United States Patent No. 7,344,622 issued March 18, 2008;

3.     United States Patent No. 7,883,605 issued February 8, 2011;

4.     United States Patent No. 8,137,508 issued March 20, 2012;

5.     United States Patent No. 8,641,871 issued February 4, 2014;

6.     The inventions disclosed in U.S. Patent Pub. No. 2017/0283706, published October 5, 2017; and

7.     Related trade secrets, know-how and knowledge of RESP.

**SCHEDULE B**

**RESP Licensed Trademarks**

| RUFUS | U.S. Trademark Appl. No. 87153744 |
|---|---|
| RES Polyflow | Common law trademark |
|  | Common law trademark |

**SCHEDULE C**

**LICENSEE OPERATIONAL DATA**

BMERP will provide high-level data to RESP for sharing with prospective purchasers of RESP licenses to aid in prospective purchasers' decisions to develop and build similar facilities ("High-Level Data").

BMERP will provide High-Level Data to RESP as follows:

     (1) to help prospective purchasers understand how the RESP Technology could be used at a similar facility;

     (2) that is derived from actual plant performance (i.e., production yields, general process layouts and other high-level requirements); and

     (3) different information will be provided to prospective purchasers at different stages of the transaction, e.g., during the pitch phase, upon signing a non-disclosure agreement, during the due diligence phase.