## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Brightmark Plastics Renewal LLC, *et al.*,[1] | Case No. 25-10472 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 149** |

## DEBTORS' OBJECTION TO MOTION OF
## UMB BANK, N.A., AS TRUSTEE AND COLLATERAL AGENT,
## FOR ENTRY OF AN ORDER (I) DISMISSING THE CHAPTER 11 CASES
## FOR CAUSE PURSUANT TO 11 U.S.C. § 1112 OR (II) IN THE ALTERNATIVE,
## GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby object (this "Objection") to the *Motion of UMB Bank, N.A., as Trustee and Collateral Agent, for Entry of an Order (I) Dismissing the Chapter 11 Cases for Cause Pursuant to 11 U.S.C. § 1112 or (II) in the Alternative, Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362* [Docket No. 149] (the "Motion to Dismiss") filed by UMB Bank, N.A., as trustee and collateral agent (the "Indenture Trustee"). In support of this Objection, the Debtors rely on the *Declaration of Craig R. Jalbert in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 25] (the "First Day Declaration")[2] and respectfully state as follows:

### PRELIMINARY STATEMENT

1.     The Indenture Trustee's Motion to Dismiss is without merit and should be denied because the Debtors clearly filed these Chapter 11 Cases in good faith.

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Brightmark Plastics Renewal LLC (7907); Brightmark Plastics Renewal Indiana LLC (7118); and Brightmark Plastics Renewal Services LLC (3789). The Debtors' headquarters are located at 1725 Montgomery St, Floor 3, San Francisco, CA 94111.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

2.          Despite the Indenture Trustee's insistence otherwise,[3] the purpose of these Chapter 11 Cases is to effectuate a value-maximizing sale of all or substantially all of the Debtors' assets through a competitive postpetition sale and marketing process.  The Debtors have a right to utilize the Bankruptcy Code and the tools afforded by the bankruptcy process, including a sale of their assets under section 363 of the Bankruptcy Code, and choosing to do so is not bad faith.

3.          The Debtors' bankruptcy filing was not made to impair or extinguish the Indenture Trustee's claims or punish the Indenture Trustee.  Rather, as of the Petition Date, the Debtors were in extreme financial distress, facing operational hardships and growing liquidity concerns, and unable to pay their obligations as they came due.  It was these circumstances that led to the filing of these Chapter 11 Cases, not any nefarious reason.

4.          Since the filing of these Chapter 11 Cases, the Indenture Trustee has attempted to distract the Court and the Debtors with complaints that the Bond Collateral isn't worth the total amount of the Prepetition Obligations and the fact that it has, to date, been able to exert little influence over the cases.[4]  The Motion to Dismiss is the Indenture Trustee's latest iteration of these arguments.

5.          The fact that the Debtors obtained postpetition financing on a junior basis and, thus, did not need the Indenture Trustee's consent to secure such financing, is not evidence of a bad faith filing.  Neither is the Debtor's refusal to grant the Indenture Trustee with protections generally

---

[3]     At the hearing before this Court on April 3, 2025, the Debtors clarified what they meant by the statement: "The Debtors are endeavoring to run a sale process for the sole purpose of valuing the Indenture Trustee's collateral." *See Debtors' Reply in Support of Bid Procedures Motion* [Docket No. 80], p. 2.  In fact, the Court confirmed that "this sentence was not meant to suggest that there's anything other than a normal sale process going on."  Hr'g Tr. 27:2-4 (April 3, 2025).  Accordingly, the Indenture Trustee's reliance on this statement throughout the Motion to Dismiss is misleading.

[4]     The Debtors did attempt to engage and negotiate with the Bondholders prior to the Petition Date, but these discussions were fruitless.

afforded to cooperating lenders, when the Indenture Trustee has not even consented to the Debtors' use of its cash collateral.

6.    The Debtors submit that it is in the best interest of all stakeholders that they be permitted the opportunity to remain in Chapter 11, as the bankruptcy filing allows the Debtors to maximize the value of the estates and, ultimately, for greater recoveries for creditors.

7.    For the reasons set forth herein, the Court must deny the Motion to Dismiss.

## BACKGROUND

**A.    Prepetition Circumstances Necessitated the Filing of These Chapter 11 Cases.**

8.    As further described in the First Day Declaration, the Debtors, originally founded in 2016, own and operate a plastics recycling circularity center (the "Circularity Center") in Ashley, Indiana, which utilizes advanced recycling technology to convert mixed post-consumer and post-industrial plastic waste into pyrolysis oil.  This technology (the "Licensed IP") is licensed to Brightmark Indiana by a non-debtor affiliate, Brightmark Technologies, pursuant to a license (the "IP License").  As noted throughout the course of these Chapter 11 Cases, the IP License is limited in scope and would likely terminate in the event of a liquidation or foreclosure.

9.    Unfortunately, upon construction, commission, and start-up of the facility, various aspects of the Circularity Center did not operate as intended and required substantial re-engineering and re-design.  Additionally, in recent years, the Debtors determined that the economic and market circumstances had changed such that it was no longer economically feasible to produce fuel products, and instead focused on pyrolysis oil – the building block for circular plastic products. As a result, as of the Petition Date, the Circularity Center operated at only 5% of the 100,000 tons per year nameplate capacity.

10.     These circumstances, coupled with the significant debt service payments under the Prepetition Credit Documents and the fact that Brightmark Parent, who historically funded the Debtors' operations with equity contributions, determined that it could no longer continue making such equity contributions, led to the Debtors' inability to make their scheduled principal and interest payment under the Prepetition Credit Documents in the amount of $12,941,000 (the "March 2025 Payment").

11.     After carefully considering other alternatives, the Debtors, in an exercise of their reasonable business judgment and in consultation with their advisors, determined that filing these Chapter 11 Cases and pursuing a sale of substantially all their assets under section 363 of the Bankruptcy Code (the "Sale") provided the best opportunity to maximize the value of those assets for the benefit of their estates and creditors.

12.     Although the Indenture Trustee asserts that it "applied no pressure for a filing" (*see* Motion to Dismiss ¶ 41), on March 7, 2025, the Indenture Trustee issued a notice of default the "Notice of Default")[5] related to the failure to make the March 2025 Payment.  Under the Prepetition Credit Documents, upon a default, the Indenture Trustee can: (i) declare all debt service payments be immediately due and payable; (ii) recover the costs and expenses of collection; and (iii) pursue any and all remedies to collect amounts due and becoming due under the Indenture Loan Agreement and the related Prepetition Credit Documents.  Such remedies also include, among other things, (a) foreclosure upon the Bond Collateral; (b) at the Indenture Trustee's election, becoming a substituted member in Brightmark Ashley with all the voting and consensual rights, as well as rights to dividends and distributions, afforded by such status, but only with respect to the applicable Bond Collateral; (c) appointment of a receiver over the Ashley Project (as defined

---

[5]     The Notice of Default is attached hereto at **Exhibit A**.

4

in the Prepetition Credit Documents); (d) entry into and operation of the Ashley Project premises; and (e) exercise of any appropriate remedy under the Uniform Commercial Code or any other applicable legal or equitable remedy.  *See* Loan Agreement § 7.2; Mortgage and Security Agreement § 6.2; Pledge and Security Agreement § 6; Membership Interest Pledge Agreement § 9.  Additionally, prior to the Petition Date, the Indenture Trustee swept all the cash, approximately $893,029.23, from the Debtors' bank accounts held at UMB.  Rather than sit and wait for the Indenture Trustee to exercise its additional rights under the Prepetition Credit Documents and suffocate the business further, the Debtors, in consultation with their advisors and as authorized by their Independent Manager, filed these Chapter 11 Cases.  Despite the Indenture Trustee's claims in the Motion to Dismiss, it is clear that these Chapter 11 Cases were not filed in bad faith and should not be dismissed.

**B.**    **The Sale Process Has Been Approved by the Court.**

13.    On March 17, 2025, in furtherance of their efforts to conduct a successful sale process, the Debtors filed a motion seeking approval of the Bidding Procedures and the Sale.  *See* Docket No. 22 (the "Bidding Procedures Motion").  In response, the Indenture Trustee filed its *Initial Objection, Request for Adjournment and Reservation of Rights of UMB Bank, N.A., as Trustee, to Debtors' Bidding Procedures Motion* [Docket No. 74] (the "Bidding Procedures Objection") arguing, among other things, that the Debtors' sale timeline is too accelerated and that the Debtors are attempting to limit the Indenture Trustee's credit bid rights – almost identical arguments presented in the instant Motion to Dismiss.  The Court approved the Bidding Procedures and the proposed sale timeline over the Bidding Procedures Objection on April 4, 2025 [Docket No. 85] (the "Bidding Procedures Order") and scheduled a hearing to consider the Sale (the "Sale Hearing") for May 9, 2025.  Moreover, the Bidding Procedures Order confirms that the Debtors'

sale process is "fair, reasonable, and appropriate and [is] designed to maximize the value of the proceeds of the sale of all, substantially all, or a portion of the Debtors' assets," including the Bond Collateral.  Bidding Procedures Order ¶ D.

**C.      The DIP Facility Has Been Approved by the Court on a Final Basis.[6]**

14.      On March 17, 2025, the Debtors also filed the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims Subject to Certain Permitted Liens; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 26] (the "DIP Motion").  The DIP Motion sought, among other things, adequate protection for the Prepetition Secured Parties, including the Indenture Trustee, and secured postpetition financing on a subordinated priority basis.

15.      On March 21, 2035, the Court entered the Interim DIP Order over the objections of the Indenture Trustee.

16.      Following the entry of the Interim DIP Order, the Indenture Trustee filed its *Preliminary and Limited Objection and Reservation of Rights of UMB Bank, N.A., as Trustee, to Debtors' DIP Financing Motion* [Docket No. 90] (the "DIP Objection") asserting, among other things, that the Indenture Trustee must be provided with adequate protection.  ***Notably, the DIP Objection did not assert that there has been any diminution in value of the Bond Collateral.***  The Debtors filed their reply in support of the DIP Motion [Docket No. 103] (the "DIP Reply") on April 9, 2025, arguing that not only had the value of the Bond Collateral not diminished but it had actually increased since the Petition Date.

---

[6]     Capitalized terms in the section not otherwise defined shall have the meanings ascribe to them in the DIP Motion.

17.     Although the Debtors and the Indenture Trustee worked collaboratively to come to an agreed form of Final DIP Order following the hearing before this Court on April 14, 2025, the Debtors and the Indenture Trustee submitted competing forms of the Final DIP Order,[7] leaving it up to the Court to determine which form of order was appropriate.  *See* Docket No. 133.

18.     On April 22, 2025, the Court entered the Debtors' version of the Final DIP Order. *See* Docket No. 152.

## OBJECTION

**A.     No Cause for Dismissal Exists.**

    **i.     Legal Standard.**

19.     Under section 1112(b) of the Bankruptcy Code, a party in interest may seek dismissal of a bankruptcy case if it is "in the best interests of creditors and the estate" and for "cause."  *See* 11 U.S.C. § 1112(b).  Section 1112(b)(4) provides a non-exhaustive list of what may constitute cause for dismissal or conversion of a chapter 11 case.  *See* 11 U.S.C. § 1112(b)(4).

20.     The Indenture Trustee argues that, although it is not expressly listed in section 1112(b)(4), failure to file a case in good faith constitutes "cause," and asserts that cause exits here because the Chapter 11 Cases were not filed in good faith.  *See* Motion to Dismiss ¶ 31; *see also In re LTL Mgmt., LLC*, 64 F.4th 84, 100 (3d. Cir. 2023).

21.     The Third Circuit has emphasized two overarching principles when assessing good faith: the petition must serve a "valid bankruptcy purpose" and the bankruptcy cannot be "merely to obtain tactical litigation advantage."  *In re SureFunding, LLC*, Case No. 20-10953 (LSS), 2020 WL 8834902, *19 (Bankr. D. Del. June 2, 2020) (citing *In re Integrated Telecom Express, Inc.*,

---

[7]    The Indenture Trustee's version of the Final DIP Order included langue concerning the 506(c) Motion (defined below), which the Debtors deemed unnecessary in an order approving postpetition financing.

384 F.3d 108, 119 (3d Cir. 2004)).   An acceptable objective within the scope of bankruptcy includes maximizing property available to satisfy creditors. *In re Am. Cap. Equip.*, LLC, 296 Fed. App'x. 270, 273 (3d Cir. 2008); *see also In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 472-73 ("[B]ecause the Debtor is hopelessly insolvent and has a valid reorganizational purpose [of maximizing the value of the estate for the benefit of creditors], the Court finds that the Debtor's bankruptcy filing satisfies the implicit good faith requirement of section 1112(b)"); *In re Stone Res. Inc.*, 448 B.R. 361, 368 (Bankr. E.D. Pa. 2011) ("Because this Court finds that the Debtor was in financial distress when it filed for chapter 11 relief and that the Debtor's petition will preserve the Debtor as a going concern that will in turn maximize the value of the Debtor's estate, this Court cannot infer that the Debtor acted in bad faith."), *decision rev'd on other grounds in part*, 458 B.R. 823 (E.D. Pa. 2011), *order vacated on other grounds*, 482 Fed. Appx. 719 (3d Cir. 2012); *Integrated Telecom Express, Inc.*, 384 F.3d at 123 (recognizing that "an insolvent debtor can file under Chapter 11 in order to maximize the value of its sole asset to satisfy its creditors").

22.     Ultimately, "[w]hether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances.'" *In re BYJU's Alpha, Inc.*, Case No. 24-10140 (JTD), 2024 WL 3738150, *6 (Bankr. D. Del. Aug. 8, 2024) (quoting *SureFunding, LLC*, 2020 WL 8834902 at *12)).   "The focus of the inquiry is whether the petitioner sought 'to achieve objectives outside the legitimate scope of the bankruptcy laws' when filing for protection under Chapter 11." *Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002).   In conducting this inquiry, courts consider a number of factors, including whether the debtor: (a) has only a single asset; (b) has few unsecured creditors; (c) has no ongoing business or employees; (d) filed the petition on the eve of foreclosure; (e) is engaged in a two-party dispute which can be resolved in

pending state court action; (f) has no cash or income; (g) has no pressure from non-moving creditors; (h) has filed a previous bankruptcy petition; (i) has engaged in improper prepetition conduct; (j) has no possibility of reorganization; (k) was formed immediately prepetition; (l) filed solely to create automatic stay; and (m) has a subjective intent indicative of bad faith. *See Primestone*, 272 B.R. at 557 (applying the above factors); *BYJU's Alpha, Inc.*, 2024 WL 3738150 at *6 (same).

23.     Courts have recognized that dismissal based on a lack of good faith under section 1112(b) is a rare remedy that "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *In re EHT US1, Inc.*, 630 B.R. 410, 429 (Bankr. D. Del. 2021).  Moreover, a finding that a bankruptcy petition was filed in bad faith "'should not [be] lightly infer[red].'" *Perlin v. Hitachi Capital Am. Corp.*, 497 F.3d 364, 373 (3d Cir. 2007) (quoting *In re Tamecki*, 229 F.3d 205, 208 (3d Cir. 2000)).

**ii.        The *Primestone* Factors Are Not Satisfied.**

24.     The Indenture Trustee concedes that only certain of the *Primestone* factors are at issue here.  Specifically, the Indenture Trustee argues that (1) this is a two-party dispute; (2) the Debtors have no cash or income; (3) there is no pressure from other creditors; (4) there is no possibility of a successful reorganization; (5) the Chapter 11 Cases were filed solely for the automatic stay; and (6) the subjective intent of the Debtors is indicative of bad faith.[8]  *See* Motion

---

[8]     Although a debtor's subjective intent is one of the factors articulated in *Primestone*, the Third Circuit has held that good faith depends "more on [an] objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11." *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (citations omitted).

to Dismiss ¶¶ 32-43.  The remaining factors clearly do not apply and, thus, support denial of the Motion to Dismiss.

a. <u>The Chapter 11 Cases Are Not a Two-Party Dispute.</u>

25.    The Indenture Trustee asserts that this is a two-party dispute, between the Debtors and the Indenture Trustee.  This is simply not true.

26.    Delaware courts[9] have opined that two-party dispute cases typically involve litigation in a non-bankruptcy forum and little to no other creditors.  *AIG Fin. Prods. Corp.*, 651 B.R. at 474 (citing *Primestone*'s characterization of a two-party dispute as one "which can be resolved in *pending* state court action" (emphasis added)); *EHT US1*, 630 B.R. at 430 (same); *In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298 (Bankr. D. Del. 2011) (same*); see also In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015) (explaining that even where "many of the Debtors' troubles arise out of their dealings with [one creditor]," the dispute is not necessarily a two-party dispute).  These circumstances are not present here.

27.    *First*, the Debtors are not involved in any litigation with the Indenture Trustee outside of bankruptcy.  In fact, the Indenture Trustee, time and again, asserts that it never put any pressure on the Debtors.  Accordingly, there is no dispute between the Debtors and the Indenture Trustee outside of those created by the instant bankruptcy cases and, thus, no other forum is better suited to address this and distributions to creditors.  *Second*, the Debtors' schedules and statements of financial affairs [Docket Nos. 143-148] (the "<u>Schedules and Statements</u>") evidence that the Debtors owe millions of dollars to more than 200 creditors other than the Indenture Trustee.

---

[9]    The Indenture Trustee cites to non-binding precedent from Texas and Iowa in support of its contention.  *See* Motion to Dismiss ¶ 33.

Additionally, much of that debt is listed as unknown or unliquidated, so that amount may actually increase.

28.    Accordingly, the Chapter 11 Cases are not a two-party dispute and, thus, this *Primestone* factor is not satisfied.

      b.    <u>The Debtors Have Cash and Income.</u>

29.    Despite not citing any relevant case law, the Indenture Trustee asserts that because the Circularity Center is operating at 5% and the Debtors needed additional financing before and after the Petition Date, the Debtors have no cash or income, and this factor weighs in favor of dismissal.

30.    It is true that the Debtors were low on cash and faced liquidity concerns approaching the filing of these Chapter 11 Cases.  But, this is true of most chapter 11 debtors.  If the Debtors were not facing some kind of financial distress, the Debtors would not have needed to file these Chapter 11 Cases in the first place.

31.    To satisfy this factor though, the cash and income of a debtor need not be meaningful or significant, just present.  *See SureFunding, LLC*, 2020 WL 8834902 at *16 (holding that this factor weighed in favor of the debtor because they had $2 million in cash on hand and $142,000 in revenue); *see also In re Four Wells Ltd.*, 2016 WL 1445393, *13 (6th Cir. B.A.P. Apr. 12, 2016) (finding the bankruptcy court's conclusion that the debtor had no cash or income clearly erroneous where the evidence suggested there was some rental income, but affirming the dismissal on other grounds); *AIG Fin. Prods. Corp.*, 651 B.R. at 474 (finding that where a debtor has cash on hand, this *Primestone* factor was absent and did not support dismissal).

32.    Here, the Schedules and Statements reflect that the Debtors had approximately $1.2 million of cash on hand as of the Petition Date.  Additionally, the Approved Budget attached to the

Final DIP Order clearly shows working capital growing throughout the Chapter 11 Cases, largely as a result of financing being provided on a junior basis. *See* Final DIP Order, Ex. 2.

33.     Accordingly, this *Primestone* factor is not satisfied and weighs in favor of not dismissing the Chapter 11 Cases.

c.   Pressure from Other Creditors.

34.     Not only are there a significant number of other creditors in these Chapter 11 Cases, as explained above, but many of them are exerting pressure on the Debtors for payment of their debts.  Since the filing of these Chapter 11 Cases, the Debtors and their counsel have dealt with numerous creditor inquiries, requests for additional adequate assurance, and threats of interrupting or discontinuing services from vendors and contract counterparties that the Debtors rely on. Additionally, a number of other creditors were present at the section 341 meeting, held by the U.S. Trustee on April 23, 2025.   Counsel for one creditor even made a statement on the record, expressing concern over the Motion to Dismiss, stating that there are other creditors in these Chapter 11 Cases, and offering to file proofs of claim before a bar date is set in these Chapter 11 Cases.  *See* Telephonic Section 341(a) Meeting of Creditors Tr. 22:9-19; 23:1-4 (April 23, 2025), attached hereto as **Exhibit B**.

d.   Possibility of Reorganization.

35.     The Indenture Trustee is correct that there is no meaningful possibility of reorganization.[10]  As noted above though, the goal of these Chapter 11 Cases is not reorganization, but rather a sale of the business so that distributions can be made to creditors and the remaining assets, if any, can be liquidated and the proceeds thereof, distributed.  *See Crown Vill. Farm, LLC*

---

[10]    At this point, it is unclear whether or not the Debtors will be in a position to negotiate and execute a plan of liquidation following the Sale.

*v. ARL, L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 92 (Bankr. D. Del. 2009) (citing *Integrated Telecom Express, Inc.*, 384 F.3d at 120, n.4) ("Reorganization . . . is not the only appropriate use of Chapter 11 since the Code clearly contemplates liquidating plans under 11 U.S.C. § 1123(b)(4).")

36.     Accordingly, this *Primestone* factor is, at best, neutral.

   e.   <u>These Chapter 11 Cases Were not Filed Solely to Obtain the Benefit of the Automatic Stay.</u>

37.     The Indenture Trustee argues that the Chapter 11 Cases being filed "almost immediately" after the Debtors failed to make the March 2025 Payment is evidence that the Chapter 11 Cases were filed *solely* for the benefit of the automatic stay.  *See* Motion to Dismiss ¶ 37.  In making this argument, the Indenture Trustee likens filing shortly after failing to make the March 2025 Payment to filing on the eve of foreclosure.  *See id.* (citing *In re Myers*, 491 F.3d 120, 126 (3d Cir. 2007).  In other words, the Indenture Trustee argues that the Debtors filed the Chapter 11 Cases *immediately* after failing to make the March 2025 Payment because the Indenture Trustee was going to foreclose on their assets.

38.     But the Indenture Trustee's own words belie this conclusion.  For example, the Indenture Trustee (i) complains that the Debtors "waited over another week" after receiving the Notice of Default "before finally filing for chapter 11" (Motion to Dismiss ¶ 17) and (ii) reiterates multiple times that it "did not request that the Debtors file chapter 11," "initiate any kind of foreclosure proceedings," or exert any pressure on the Debtors at all (Motion to Dismiss ¶ 41). The Indenture Trustee cannot have it both ways.  Debtors that file on the eve of foreclosure do not wait to file bankruptcy because they cannot; that is far from the case here, as admitted by the Indenture Trustee.

39.     Additionally, as noted above and in the First Day Declaration, the complications that arose with the Circularity Center and the Debtors' growing liquidity concerns prompted the filing of these Chapter 11 Cases.  *See e.g., SureFunding, LLC*, 2020 WL 8834902 at *18-19 ("Thus, because it appears the filing was not done solely to invoke the automatic stay, this factor arguably favors Debtor."); *In re DCNC N.C. I, LLC*, 407 B.R. 651, 663-64 (Bankr. E.D. Pa. 2009) (finding that the case was not filed solely to invoke the automatic stay where the debtor was not financially healthy, and an earlier denial of a preliminary injunction was not final); *Crown Vill. Farm, LLC*, 415 B.R. at 92-93 (finding that the case was not filed solely to create the automatic stay where the debtor "was unable to meet its debt obligations under the Credit Agreement . . . and Debtor was unable to generate any income because its sole asset was undeveloped real estate which it could not develop").

40.     Moreover, filing bankruptcy to take advantage of the automatic stay is not, without more, evidence of a bad faith filing.  *In re Harco Co. of Jacksonville, LLC*, 331 B.R. 453, 458 (Bankr. M.D. Fla. 2005) ("If the Court were to consider every bankruptcy fil[ing] made for the purpose of taking advantage of the automatic stay as evidence of a bad faith filing, the protection offered by the automatic stay would be meaningless."); *In re Bullseye Energy, LLC*, 2020 WL 6928198, *6 (Bankr. N.D. Okla. Nov. 23, 2020) (quoting *In re Fox*, 232 B.R. 229, 235 (Bankr. D. Kan. 1999) ("Taking advantage of the automatic stay 'cannot by itself support a finding of bad faith.'")).  In this case, there is nothing more than the Debtors' need for a breathing spell in the midst of financial distress.  *See In re Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991) (explaining that the automatic stay gives debtors a "breathing spell from creditors by stopping all collection efforts, all harassment, and all foreclosure actions.").

Accordingly, this *Primestone* factor is not satisfied and weighs in favor of not dismissing the Chapter 11 Cases.

41.     Looking at the totality of the *Primestone* factors, it is clear that the factors weigh in favor of not dismissing the Chapter 11 Cases.

### iii.     The Chapter 11 Cases Were Filed for a Valid Bankruptcy Purpose.

42.     The Court should deny the Motion to Dismiss because the filing of the Chapter 11 Cases was made in good faith, with undisputed evidence that the Debtors were in financial distress, and that the filing serves a valid bankruptcy purpose – to maximize the value of the estates.

### a.     The Chapter 11 Cases Were Filed in Good Faith Because the Debtors Were in Financial Distress.

43.     Courts have consistently held that being in financial distress is strong evidence that a debtor filed for chapter 11 in good faith.  *Integrated Telecom Express, Inc.*, 384 F.3d at 125; *see also AIG Fin. Prods. Corp.*, 651 B.R. at 472 ("Debtor [is] with minimal remaining assets [and] faces a debt burden of more than $38 billion . . . . The Court, therefore, concludes that the Debtor does face sufficient financial distress to warrant a bankruptcy filing.").

44.     Here, it is undisputed that the Debtors were in financial distress.  As noted above and in the First Day Declaration, the Debtors faced a number of financial challenges leading up to the Petition Date, which left them woefully insolvent.  With the Circularity Center only running at 5%, the Debtors could not generate sufficient revenue to maintain operations and fund capital improvements, exclusive of any repayment to secured creditors.  *See* First Day Declaration, ¶ 23.  As a result, the Debtors could not make the March 2025 Payment.

45.     Moreover, the bankruptcy filing was also critical because, given the financial distress facing the Debtors at the time, the only viable source of funding was the DIP Facility, which was predicated on the filing of these Chapter 11 Cases.  *See* First Day Declaration, ¶ 48;

*Declaration of Mark E. Chesen in Support of the Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims Subject to Certain Permitted Liens; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 27] ¶ 21.  The necessity of the DIP Facility, thus, proved an additional reason that the filing for Chapter 11 was not only done in good faith, but was imperative to prevent the Debtors from completely languishing.  *See In re Alta+Cast LLC*, Case No. 02-12982 (MFW), 2004 WL 484881, \*3 (Bankr. D. Del. Mar. 2, 2004) (finding that the fact that a "loan was extended with the expectation that the chapter 11 petition would be filed" was evidence of good faith filing).

46.     As such, the Debtors "face[d] sufficient financial distress to warrant a bankruptcy filing." *AIG Fin. Prods. Corp.*, 651 B.R. at 472; *see In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339 (Bankr. D. Del. 1998) (holding that a Debtor who defaulted on a prepetition obligation and had few assets did not file a petition in bad faith), *subsequently aff'd*, 324 F.3d 197 (3d Cir. 2003); *Alta+Cast LLC*, 2004 WL 484881, at \*3-4 (holding that the Debtor requiring loans, which were the only source of cash in its bank, to meet operating expenses was evidence that it had "severe financial difficulties"); *In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 848 (Bankr. D.N.J. 2011) (finding that the Debtor was "in financial distress" because "[a]n event of default has occurred [and] is expected to persist . . .").

b.   The Chapter 11 Cases Serve a Valid Bankruptcy Purpose Because They Maximize the Value of the Estates.

47.     The Third Circuit has held that "maximizing property available to satisfy creditors" is a "valid bankruptcy purpose." *In re Am. Cap. Equip., LLC*, 296 Fed. App'x. 270, 273 (3d Cir. 2008).  Here, the bankruptcy filing does exactly that.

48.    Without the bankruptcy filing, the Indenture Trustee would have exercised its rights under the Prepetition Credit Documents, including foreclosing on the Bond Collateral.  This would have resulted in the loss of the IP License, loss of jobs, and, ultimately, an end to the Debtors' business, which is focused on making a positive environmental impact.

49.    These Chapter 11 Cases allowed the Debtors to obtain adequate postpetition financing, so that the Debtors could maintain their ordinary course business operations, while pursuing a sale process.  The DIP Facility allows the Debtors to keep operating by funding payments for, among other things, employees, critical vendors, and suppliers.

50.    Accordingly, the DIP Facility, and, by virtue thereof, the Chapter 11 Cases, allows the Debtors to preserve and even enhance[11] the value of the estates, while the Debtors work to ensure a sale of the business as a going concern.  The Sale will result in greater recoveries for trade creditors, employees, and other similar creditors, in the interest of all of the Debtors' stakeholders, as compared to the alternative.

51.    Citing virtually no case law in support, the Indenture Trustee asserts that the Debtors filed these Chapter 11 Cases in bad faith for the sole purpose of impairing the Indenture Trustee's claims, arguing that (i) the Bridge Loan was obtained in bad faith; (ii) the Debtors are attempting to hold the Indenture Trustee's credit bid rights in limbo while "rushing through a remarkably accelerated timeline;" and (iii) the 506(c) Motion[12] is an attempt to punish the Indenture Trustee for participating in these Chapter 11 Cases.  Motion to Dismiss ¶¶ 38-40.  These arguments, the first two of which have been raised previously, have no merit.

---

[11]    The Dip Facility contemplates the funding of capital improvement to the Circularity Center, in efforts to operate at more than the current 5% capacity.

[12]    "506(c) Motion" shall mean the *Debtors' Preliminary Motion for Entry of an Order Authorizing the Debtors to Surcharge Collateral of the Indenture trustee Pursuant to 11 U.S.C. 506(c)* [Docket No. 123].

52.    *First*, the Bridge Loan was not obtained in bad faith.   Once the Debtors, in consultation with their advisors, determined, in their reasonable business judgment, that pursuit of a sale under section 363 of the Bankruptcy Code provided the best opportunity to maximize the value of their assets for the benefit of their estates and creditors, the Debtors began negotiating with the DIP Lender concerning the bankruptcy cases and debtor in possession financing.   Due to the Debtors' extreme liquidity concerns though, the Debtors did not have enough cash on hand to continue operations and continue negotiations with the DIP Lender and other potential sources of financing.   Accordingly, the DIP Lender agreed to provide the Bridge Loan.   The Bridge Loan allowed the Debtors to continue operating, preserve value, and continue negotiating with interested parties, including the Indenture Trustee.   The fact that the proceeds of the Bridge Loan were not used to make the March 2025 Payment is not an indication of bad faith.

53.    *Second*, the Debtors have made it absolutely clear throughout these Chapter 11 Cases that they are in no way attempting to limit or affect in any way the Indenture Trustee's right to credit bid.   As noted above, the Debtors added language in the Final DIP Order to that effect. *See* Final DIP Order ¶ 22 ("[N]otwithstanding anything in this Final Order to the contrary, this Final Order shall not and shall not be deemed to alter, diminish, impair, or otherwise affect the Prepetition Secured Parties' rights under section 363(k) of the Bankruptcy Code.").   Moreover, the Court approved the 35-day sale timeline, over the Indenture Trustee's objection, which is not "remarkably accelerated" in this District. *See* Bidding Procedures Order ¶ 3; *see also, e.g., In re Dynamic Aerostructures LLC*, Case No. 25-10292 (LSS) (Bankr. D. Del. Mar. 25, 2025) [Docket No. 169] (scheduling the sale hearing for 13 days after entry of bidding procedures order); *In re White Forest Res., Inc.*, Case No. 25-10195 (TMH) (Bankr. D. Del. Mar. 10, 2025) [Docket No. 140] (scheduling the sale hearing for 32 days after entry of bidding procedures order); *In re Nikola*

*Corp.*, Case No. 25-10258 (TMH) (Bankr. D. Del. Mar. 7, 2025) [Docket No. 133] (scheduling the sale hearing for 34 days after entry of bidding procedures order); *In re Mondee Holdings, Inc.*, Case No. 25-10047 (JKS) (Bankr. D. Del. Feb. 28, 2025) [Docket No. 383] (scheduling the sale hearing for 26 days after entry of bidding procedures order); *In re Zurvita Holdings, Inc.*, Case No. 24-12823 (MFW) (Bankr. D. Del. Jan. 14, 2025) [Docket No. 69] (scheduling the sale hearing for 17 days after entry of bidding procedures order); *In re Lumio Holdings, Inc.*, Case No. 24-11916 (JKS) (Bankr. D. Del. Sep. 25, 2024) [Docket No. 139] (scheduling the sale hearing for 20 days after entry of bidding procedures order); *In re Ambri Inc.*, Case No. 24-10952 (LSS) (Bankr. D. Del. June 12, 2024) [Docket No. 160] (scheduling the sale hearing for 27 days after entry of bidding procedures order).

54.     *Third*, the 506(c) Motion was filed in good faith.  Despite the Indenture Trustee's allegations that the 506(c) Motion is a "transparent attempt to prime the Trustee's liens and punish the Trustee for merely participating in these cases," that is not the case.  Motion to Dismiss ¶ 39.  As further detailed in the 506(c) Motion, the Debtors submit, and have valid reasons to submit, that virtually every dollar spent by the estates in these Chapter 11 Cases to maintain and stabilize the Debtors' operations, preserve going-concern value, and market the Debtors' assets, has directly benefited the Indenture Trustee.  Accordingly, pursuant to section 506(c) of the Bankruptcy Code, the Debtors are allowed to recover from the Indenture Trustee the reasonable, necessary costs and expenses of preserving the Bond Collateral.  The 506(c) Motion is scheduled to be heard by the Court at a hearing scheduled for May 9, 2025, and the Debtors will not reiterate the bases for granting the 506(c) Motion here.  Additionally, despite the Indenture Trustee's baseless allegations, the Debtors made it abundantly clear that the 506(c) Motion was not intended

to alter, diminish, impair, or otherwise affect the Indenture Trustee's right to credit bid.  *See* 506(c) Motion ¶ 3, n.4.

55.    The Indenture Trustee has failed to meet its burden of demonstrating that "cause" exists to dismiss these Chapter 11 Cases.  Even if the Indenture Trustee had met its initial burden, the Debtors have demonstrated that the petitions were filed in good faith and the Chapter 11 process will benefit the Debtors and all their constituencies.  Therefore, dismissal is not warranted and the Motion to Dismiss must be denied.

**B.    <u>The Indenture Trustee Is Not Entitled to Relief from the Automatic Stay.</u>**

56.    In the alternative, the Indenture Trustee argues (again) that it is not adequately protected and accordingly is entitled to relief from the automatic stay.  The Court should similarly ignore such assertions and deny this request.

**i.    The Indenture Trustee is Adequately Protected.**

57.    Rehashing its arguments in the DIP Objection and Bidding Procedures Objection, the Indenture Trustee argues for over 3 pages that it is not adequately protected and, thus, is entitled to relief from the automatic stay.  What the Indenture Trustee repeatedly fails to realize is that the purpose of adequate protection "is to protect a secured creditor from ***diminution in the value of its interest*** in the particular collateral during the period of use by the debtor."  *In re Satcon Tech. Corp.*, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (emphasis added); *see also In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).  Accordingly, the Indenture

Trustee is **only** entitled to adequate protection to the extent the Bond Collateral has diminished in value.

58.     As further outlined in the DIP Reply, since the Petition Date, and going forward in these Chapter 11 Cases, the Bond Collateral has not diminished in value, but has actually increased in value by $90,000 as of the time the DIP Reply was filed and is expected to increase in value by another $450,000.  *See* DIP Reply ¶ 6; *Declaration of Craig R. Jalbert in Further Support of the Debtors' DIP Motion* [Docket No. 104] ¶ 6.  Additionally, there is uncontroverted testimony that the Approved Budget demonstrates that working capital increases over the lifetime of these Chapter 11 Cases.  *See* Final DIP Order, Ex. 2.  All the Indenture Trustee has at this point is a theoretical depreciation in value.  *Id.* ¶ 7.  Despite this, the Final DIP Order granted the Indenture Trustee Bond Adequate Protection Liens and Bond Adequate Protection Superpriority Claims (collectively, the "Adequate Protection Liens and Claims") to the extent of any such diminution.  Accordingly, the Debtors submit that the Bond Collateral will not be diminished in value during the pendency of the Chapter 11 Cases and, thus, the Indenture Trustee is not entitled to adequate protection.

59.     Moreover, the Indenture Trustee did not, nor has it ever, argued that there has been a diminution of the value of the Bond Collateral.  At this point the Final DIP Order has been entered, **over the Indenture Trustee's DIP Objection**, and the Indenture Trustee has been granted the Adequate Protection Liens and Claims.  If the Indenture Trustee insists on continuing to assert that it is not adequately protected, it must first demonstrate that the Bond Collateral has diminished in value and that the Adequate Protection Liens and Claims are insufficient.  It can do neither.

ii.        **There is No Cause to Lift the Automatic Stay.**

60.    A party seeking to lift the automatic stay must make a threshold showing of "cause." 11 U.S.C. § 362(d)(1). The Bankruptcy Code provides a non-exhaustive list of what constitutes cause, noting that it includes "the lack of adequate protection of an interest in property of such party in interest." *Id.*

61.    The Indenture Trustee has spilled much ink arguing that its security interest is not adequately protected. However, the Court has issued two rulings to the contrary. As explained above, pursuant to the Final DIP Order, the Indenture Trustee has been provided with Adequate Protection Liens and Adequate Protection Superpriority Claims. Additionally, the Indenture Trustee included a reference to an alleged lack of adequate protection in its Bidding Procedures Objection. *See* Bidding Procedures Objection ¶ 20. The Court entered the Bidding Procedures Order over this objection.

62.    Moreover, although it may not technically apply here, the court in *Rexene* provided guidance on when stay relief should be granted, and under a *Rexene* analysis, stay relief is not warranted in this case. *See In re Abeinsa Holding, Inc.*, Case No. 16-10790, 2016 WL 5867039, at *2 (Bankr. D. Del. Oct. 6, 2016) (explaining that requests for relief from the automatic stay in the Third Circuit "are customarily evaluated under the three-factor test articulated in *In re Rexene Products Co.*"). Specifically, courts look to whether (i) any great prejudice to either the bankruptcy estate or the debtor will result from lifting the stay; (ii) whether the hardship to the creditor by maintenance of the stay considerably outweighs the hardship to the debtor; and (iii) the probability of the creditor prevailing on the merits. *See In re Rexene Prods. Co.*, 141 B.R. 574, 576-77 (Bankr. D. Del. 1992); *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010) (applying the same three factor test). *Rexene* is typically used to analyze whether to grant stay relief to continue

prepetition litigation, but the "analysis ultimately boils down to a common-sense judgment about whether it makes good sense to have the case proceed in the court where it was pending as opposed to being heard in the bankruptcy court." *In re AP Orangevale, LLC*, 2023 WL 5093819, *7 (Bankr. D. Del. Aug. 8, 2023).

63.     In the absence of compelling evidence demonstrating that the *Rexene* factors significantly weigh in the movant's favor, relief from the automatic stay should be denied.  *See, e.g., W.R. Grace*, 2007 WL 1129170, Case No. 01-1139, 2007 WL 112170, *3 (Bankr. D. Del. Apr. 13, 2007) (denying motion to lift stay because movant "presented no compelling evidence that the balance of the hardships [was] in its favor"); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) (denying motion to lift stay because movant failed to demonstrate "that the balance of hardships from not obtaining relief tips significantly in [its] favor.").  Here, the *Rexene* factors, as well as common-sense judgment, weigh in favor of not lifting the automatic stay.

64.     *First*, the Debtors would be greatly prejudiced if the automatic stay were to be lifted.  The Debtors' sale process, which includes the sale of the Bond Collateral, was approved by the Court, is intended to be value-maximizing, and is nearly complete.  *See* Bidding Procedures Order.  Indeed, the Debtors, with the assistance of their investment banker, have completed a thorough marketing process and expect to receive multiple bids, for which the deadline to submit is May 5, 2025 (the "Bid Deadline").  Allowing the Indenture Trustee to lift the automatic stay to foreclose on its collateral at this point would prejudice every party that has participated in the Court approved sale process, especially any such party that submits a bid by the Bid Deadline.  *Second*, the Indenture Trustee would likely suffer no hardship, and may actually benefit, if the automatic stay were to remain in place.  If the Sale is successful, the Indenture Trustee will receive the fair

market value of its collateral – a result arguably better than if the Indenture Trustee were to foreclose on that same collateral.  Moreover, the Indenture Trustee is free to credit bid the amount of its claim for the Debtors' assets through the sale process, which accomplishes the same result as a foreclosure, but with the added benefit of a free and clear finding.  Accordingly, the hardship to the Debtors if the automatic stay were to be lifted greatly outweighs any minimal hardship the Indenture Trustee is facing.

65.      The third *Rexene* factor is, at best, neutral, as the Indenture Trustee can, absent the automatic stay, foreclose on its collateral.  However, placing any weight on this factor under the circumstances here would defy the common-sense basis underlying *Rexene*.  There is no foreclosure proceeding pending outside of bankruptcy and the sale process is nearly complete.  The bid deadline is a handful of days away, and the Sale Hearing is seven days from the date of the filing of this Objection.  No matter the likelihood of success of a nonbankruptcy foreclosure proceeding in this case, the outcome of the Court-approved sale process which will be complete in about a week will be, on balance, a greater benefit to the Indenture Trustee than the speculative outcome of a nonbankruptcy option that has yet to be commenced.

66.      Accordingly, the *Rexene* factors weigh in favor of keeping the automatic stay in place, and the Court should deny the Indenture Trustee's request.

*[Remainder of Page Intentionally Left Blank]*

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtors respectfully request that the Court deny the Motion to Dismiss and, in the alternative, the Indenture Trustee's request for relief from the automatic stay.

Dated: May 2, 2025
       Wilmington, Delaware

Respectfully submitted,

*/s/ Katelin A. Morales*
Jeremy W. Ryan (No. 4057)
R. Stephen McNeill (No. 5210)
Brett M. Haywood (No. 6166)
Katelin A. Morales (No. 6683)
James R. Risener III (No. 7334)
Andrew C. Ehrmann (No. 7395)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: jryan@potteranderson.com
       rmcneill@potteranderson.com
       bhaywood@potteranderson.com
       kmorales@potteranderson.com
       jrisener@potteranderson.com
       aehrmann@potteranderson.com

*Counsel to the Debtors and Debtors in Possession*

12193479v.3