## EXHIBIT A

**DRAFT**

ASSET PURCHASE AGREEMENT

BY AND AMONG

BRIGHTMARK PLASTICS RENEWAL INDIANA LLC,

AS SELLER;

BRIGHTMARK PLASTICS RENEWAL LLC

AND BRIGHTMARK PLASTICS RENEWAL SERVICES LLC,

AS CO-DEBTORS OF SELLER;

AND

UMB BANK, N.A., A NATIONAL BANKING ASSOCIATION,

IN ITS CAPACITY AS COLLATERAL AGENT,

AS PURCHASER

DATED AS OF MAY __, 2025

**DRAFT**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is entered into as of May __, 2025 (the "**Agreement Date**"), by and among (i) UMB Bank, N.A., a national banking association, not in its individual capacity but solely in its capacity as Collateral Agent ("**Purchaser**") under that certain Intercreditor Agreement, dated as of April 10, 2019 ("**Intercreditor Agreement**") between, among others, Brightmark Plastics Renewal LLC, a Delaware limited liability company formerly known as RES Polyflow Indiana, LLC, Seller (as defined below), Indiana Finance Authority, and Purchaser, and (ii) Brightmark Plastics Renewal Indiana LLC, an Indiana limited liability company ("**Seller**"); (iii) Brightmark Plastics Renewal Services LLC, an Indiana limited liability company and Brightmark Plastics Renewal LLC, a Delaware limited liability Company (each, a "**Co-Debtor**" and collectively, the "**Co-Debtors**"). Purchaser,  Seller, and Co-Debtors may sometimes be referred to herein individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A.      On March 16, 2025 (the "**Petition Date**"), Seller, along with two of its Affiliates, the Co-Debtors, filed voluntary petitions for relief, jointly administered under Case No. 25-10472 (LSS) (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

B.      Upon the terms and conditions set forth in this Agreement and pursuant to sections 363 and 365 of the Bankruptcy Code, Seller desires to sell, and Purchaser desires to purchase, substantially all of the assets related to the businesses operated by Seller (the "**Business**").

C.      The Parties desire to consummate the transactions contemplated herein as promptly as practicable after the entry of the Sale Order (as defined herein) by the Court.

In consideration of the foregoing recitals and the premises and the representations, warranties, and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as set forth below:

## ARTICLE I.
## DEFINED TERMS

**Section 1.01**  **Defined Terms**. Capitalized terms used in this Agreement and not otherwise defined herein have the meanings ascribed to them in Annex A, Annex B-1 or Annex B-2 hereto, and shall be applicable to the singular and the plural forms of such terms, except as otherwise specifically provided herein.

AFSDOCS:302318670.12

12216731v.1

DRAFT

## ARTICLE II.
## TRANSACTION

**Section 2.01    Purchase and Sale of the Purchased Assets**.

(a)    In reliance upon the representations and warranties and subject to the terms and conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser agrees to purchase and acquire from Seller, and Seller agrees to sell, grant, transfer, assign, convey and deliver to Purchaser, for the consideration specified in this <u>ARTICLE II</u>, all of the rights, title and interests of Seller in and to the Purchased Assets, free and clear of all Encumbrances (except Permitted Encumbrances). Notwithstanding the foregoing, the Purchased Assets shall not include any of the Excluded Assets.

**Section 2.02    Assumption of Liabilities**.

(a)    At the Closing, Purchaser shall assume and agree to pay, discharge or perform, as appropriate, when due only the Assumed Liabilities.

(b)    Notwithstanding or any other provision of this Agreement, Purchaser is not assuming under this Agreement or any other agreement or instrument entered into in connection herewith (i) any Excluded Liability of any Seller Party or (ii) any Liability of any Seller Party that is not specifically identified as an Assumed Liability under <u>Section 2.02(a)</u>. For the avoidance of doubt, all Liabilities that are not Assumed Liabilities shall be Excluded Liabilities.

**Section 2.03    Purchase Price**. In consideration for the sale of the Purchased Assets to Purchaser pursuant to , Purchaser shall pay to Seller an aggregate purchase price of seventeen million three hundred thousand dollars U.S. dollars ($17,300,000.00) consisting of the following (collectively, the "**Purchase Price**"): (i) a credit in the amount of the Purchase Price against the Existing Secured Claims pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid Amount**"); *plus* (ii) the assumption by Purchaser of the Assumed Liabilities, if any.

**Section 2.04    Delivery and Manner of Payment of Purchase Price**.

(a)    At the Closing, in consideration for the Purchased Assets, the Purchaser (and/or, if applicable, the Designated Purchaser) shall release Seller from, the Existing Secured Claims in an amount equal to the Credit Bid Amount and shall assume the Assumed Liabilities in accordance with the terms of this Agreement.

(b)    Purchaser and Seller acknowledge and agree that Purchaser's agreement to buy the Purchased Assets under this Agreement and pay the Purchase Price is by the Purchaser making the credit bid in accordance with this Agreement, and if Purchaser is the successful bidder and the transactions contemplated under this Agreement are consummated, Purchaser is only obligated to pay the Purchase Price by crediting the Credit Bid Amount against amounts owed by Seller in connection with the Existing Secured Claims such that amounts owed by Seller in connection with the Existing Secured Claims will be reduced by the amount of the Credit Bid Amount.

**Section 2.05    Closing**. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place through an exchange of consideration and documents using

electronic mail and/or facsimile transmission at such a time as is three Business Days following the satisfaction of (or waiver by Purchaser of) all conditions precedent to Purchaser's obligations hereunder or such other time, date and place that the Parties may agree (such date of the Closing to be referred to herein as the "**Closing Date**"), provided that the Closing shall be effective for Tax and accounting purposes as of 12:01 am eastern time on the Closing Date. Notwithstanding the foregoing, the Closing shall not occur unless and until the Court shall have entered the Sale Order, transferring the Purchased Assets free and clear of all Encumbrances (except Permitted Encumbrances) and including that Purchaser is a good faith purchaser entitled to protections of sections 363 (m) and (n) of the Bankruptcy Code, on or prior to May 9, 2025, which shall include a waiver of the stay in Bankruptcy Rules 6004(h), 6006(d) and Local Rule 6004-1, and such Sale Order shall be a Final Order. The Closing must occur on or before May 16, 2025 or such later date as may be agreed to in writing by the Purchaser and Seller in their respective sole discretion (the "**Outside Date**").

Section 2.06    **Deliveries of Seller at Closing**. At the Closing, Seller, and each Co-Debtor, as applicable, shall deliver, or cause to be delivered, to Purchaser the deliverables set forth on Annex B-1.

Section 2.07    **Deliveries of Purchaser at Closing**. At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller and the other applicable Persons the deliverables set forth on Annex B-2.

Section 2.08    **Allocation of Purchase Price**. Within thirty (30) calendar days after the Closing, Purchaser shall deliver a proposed allocation of the Purchase Price among the Purchased Assets (the "**Allocation**") to Seller for its review and comment, and Purchaser shall consider Seller's comments to the Allocation in good faith. Once in mutually agreed form, the Allocation shall become part of this Agreement for all purposes. Purchaser and Seller, and each Co-Debtor shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the agreed-upon Allocation.

Section 2.09    **Non-Assignable Assets**. Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any asset of Seller that is intended to be a Purchased Asset (including any Purchased Contract) if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would reasonably likely to subject Purchaser, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any Permit by, any third party thereto, would constitute a breach, default or violation thereof or of any Law or Order (each such action, a "**Necessary Consent**" and each such asset of Seller, a "**Non-Assignable Asset**"), or in any way adversely affect the rights of Purchaser thereunder or (ii) the Bankruptcy Court has not entered an Order (including, for the avoidance of doubt, the Sale Order) approving such assignment or transfer to the extent the Bankruptcy Court has jurisdiction over such asset. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset (including any Purchased Contract) or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided,

however, that Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this Section 2.09, be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, (x) Seller and Purchaser will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including serving as agent or trustee for Purchaser, subcontracting, licensing, and/or cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as soon as reasonably practicable, and (3) upon receipt of any applicable Necessary Consents, to transfer or assign the applicable Purchased Asset to Purchaser, and (y) Seller will, and will cause its Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of any such Purchased Assets.

Section 2.10    **Withholding Taxes**. Purchaser shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable law. Purchaser shall provide Seller with written notice of its intent to withhold at least three (3) days prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the Parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. To the extent that amounts are so withheld and paid over to the appropriate Tax Authority by Purchaser, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

Section 2.11    **Apportionments**.

(a)    To the extent the following (and credits therefor to the extent paid prior to the Closing Date) relate to or arise from a Purchased Contract or a location that is subject to a real property lease assumed by Purchaser, in each case for a period that begins as of the date of this Agreement and ends after the Closing Date, such expenses (and credits) are to be apportioned between Seller, on the one hand, and Purchaser, on the other hand, as of midnight on the Closing Date:

(i)    rent for the month in which the Closing Date occurs;

(ii)    annual utility assessments, water meter charges, and sewer rents, if any, on the basis of the year for which assessed; and

(iii)    charges and fees payable for telephone services, water, heat, steam, electric power, gas and other utilities, at the price charged by the suppliers, including any Taxes thereon and based upon applicable meter readings, where available, made on or immediately prior to or immediately after the Closing Date.

AFSDOCS:302318670.12

12216731v.1

(b)    If, after apportioning the foregoing expenses, a party has borne more than its allocable share of such expenses, the other parties will promptly make the appropriate compensating payment(s) to such party.

# ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF SELLER AND CO-DEBTORS

Except as set forth in the Schedules to this Agreement, Seller, on behalf of itself and each Co-Debtor, represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

### Section 3.01    Binding Obligation; Authority.

(a)    Assuming due authorization, execution, and delivery by Purchaser to this Agreement and subject to the entry of the Sale Order, this Agreement constitutes the legal, valid, and binding obligation of Seller and each Co-Debtor.

(b)    Subject to entry of the Sale Order, Seller and each Co-Debtor have all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Seller and each Co-Debtor of this Agreement, the performance by Seller of its obligations hereunder, and the consummation by Seller and each Co-Debtor of the transactions and each Co-Debtor contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Seller and each Co-Debtor.

### Section 3.02    Organization; Power and Authority.

(a)    Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Indiana.  Each of the Co-Debtors is a limited liability company duly formed, validly existing and in good standing under the law of its state of formation.

(b)    Seller and each Co-Debtor have all necessary limited liability company power and authority to carry on the Business as now conducted and to own or lease all of the properties and assets owned or leased by it. This Agreement and the transactions contemplated hereby have been duly authorized and approved by all requisite corporate action of Seller and each Co-Debtor, and this Agreement has been duly executed and delivered by Seller and each Co-Debtor. Subject to entry of the Sale Order, Seller and each Co-Debtor have all requisite power and authority to execute and perform this Agreement, the Transaction Documents, and the transactions contemplated hereby and thereby.

### Section 3.03    No Conflicts; Consents. The execution, delivery and performance by Seller and each Co-Debtor of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of the organizational documents of Seller and each Co-Debtor; (b) result in a violation or breach of any provision of any law or governmental order applicable to Seller; or (c) result in a violation or breach of any provision of any material Contract to which Seller is a party or by which Seller may be bound or affected. Subject to the entry of the Sale Order, none of Seller nor any Co-Debtor, except as set forth on Schedule 3.03(a) of the Schedules, is required to give any notice to, make

6

any filing with, or obtain any authorization, consent or approval of, any Governmental Authority or other Person in order for such Seller or Co-Debtors to sell and transfer the Purchased Assets to Purchaser pursuant to this Agreement.

**Section 3.04    Purchased Assets**. Seller has good and valid title to, or the right to use, the Purchased Assets. Pursuant, and subject, to the Sale Order, Seller shall convey such title to or rights to use, all the Purchased Assets, free and clear of all liens, Claims, and other interests within the meaning of section 363(f) of the Bankruptcy Code (other than Permitted Encumbrances, if any).

**Section 3.05    Taxes**.

(a)    All Tax Returns required to be filed by Seller or with respect to the Business or any Purchased Asset have been timely and properly filed, and all such Tax Returns are true, correct, and complete in all material respects. All Taxes due and payable by Seller or with respect to the Business or the Purchased Assets have been paid to the appropriate Taxing Authority. Seller has properly and timely withheld or collected and paid or remitted to the appropriate Taxing Authority all Taxes required to have been withheld or collected and paid or remitted by it. There is no Tax related audit, examination, investigation, litigation or other proceeding now pending or threatened in writing against or with respect to Seller or any Purchased Asset. None of the Purchased Assets is an interest in a joint venture, partnership or other arrangement that is treated as a partnership for Tax purposes.

(b)    No Claim, audit or other proceeding with respect to any Taxes or Tax Returns with respect to the Purchased Assets or Assumed Liabilities is currently in progress or has been proposed or threatened in writing.

(c)    There are no material liens for Taxes upon any of the Purchased Assets.

**Section 3.06    Real Property**.  Section 3.06 of the Schedules sets forth each parcel of real property owned by Seller (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "**Real Property**").

**Section 3.07    Insurance**. Schedule 3.07 of the Schedules sets forth the insurance policies of Seller to be purchased by Purchaser and included as Purchased Assets hereunder (collectively, the "**Purchased Policies**"). All of the Purchased Policies are in full force and effect and are valid and enforceable and Seller and each Co-Debtor are not in breach of or default under any such Purchased Policies. Seller and each Co-Debtor have not taken any action or failed to take any action that (with or without notice or lapse of time, or both), would constitute such a breach or default or permit termination or modification of any of the Purchased Policies. All premiums due thereunder have been paid. There are no material claims under any of the Purchased Policies for which coverage has been denied or disputed by the applicable insurance carrier (other than a customary reservation of rights notice). None of the Seller nor and either Co-Debtor has received any written notice that any of the Purchased Policies will be canceled or not renewed or of increase or intent to increase premiums in any significant respect.

**Section 3.08    Intellectual Property**. To the Knowledge of Seller and each Co-Debtor, no Person has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating, any of Seller's Intellectual Property. Neither Seller nor any Co-Debtor has received any written charge, complaint, Claim, demand, notice or other written communication or notice from any Person claiming that the operation of the Business infringes, misappropriates, or violates any Intellectual Property of any Person.

**Section 3.09    Brokers**. No broker, finder, financial advisor or investment banker is entitled to any broker's, finder's, financial advisor's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller for which Purchaser may become liable.

**Section 3.10    No Material Adverse Effect**. Except as set forth on Schedule Section 3.10 of the Schedules, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Effect with respect to Seller taken as a whole.

**Section 3.11    Environmental Matters.**

(a)    The Purchased Assets are in compliance with applicable Environmental Laws and Environmental Permits in all material respects. None of Seller nor any Co-Debtor has received, with respect to the Purchased Assets or the Assumed Liabilities, any written communication alleging that Seller or any of the Purchased Assets currently is not in compliance with or is liable or potentially liable under applicable Environmental Laws or Environmental Permits and neither Seller nor any Purchased Asset is a party to or subject to the provisions of any order or lien pursuant to Environmental Law. There are no actions or information requests pending or threatened against Seller or affecting the Purchased Assets related to Environmental Laws or arising from the release or presence of or exposure to Hazardous Substances. Except as this representation has been expressly limited by Section 3.11(c) below, there has been no release or presence of or exposure to any Hazardous Substances, whether on or off the property currently owned or operated by Seller or any Co-Debtor that would reasonably be expected to result in liability or a requirement for notification, investigation or remediation by Seller or any Co-Debtor under any Environmental Law.

(b)    Seller has made available to the Purchaser true, complete and accurate copies of all material non-privileged environmental site assessments, reports, data, results of investigations, audits, notices of violation, and Orders in the possession of the Seller and each Co-Debtor regarding environmental matters pertaining to (i) any Real Property, and (ii) compliance by Seller and each Co-Debtor with any Environmental Law.

(c)    Notwithstanding anything in this Agreement to the contrary, including Section 3.11(a) hereof, Seller makes no representations herein or elsewhere regarding the absence of dioxin.

**Section 3.12  No Other Representations and Warranties**. Except for the representations and warranties contained in this ARTICLE III, neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or any Co-Debtor, including any representation or warranty as to the accuracy

8

or completeness of any information, documents or material regarding the Business and the Purchased Assets furnished or made available to Purchaser and its Representatives in any form (including any information, documents, or material made available to Purchaser in any virtual data room maintained on behalf of Seller for purposes of this Agreement, or any management presentations made in expectation of the transactions contemplated hereby), or as to the future revenue, profitability, or success of the Business, or any representation or warranty arising from statute or otherwise in Law. For purposes of this Agreement, "**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

**Section 4.01    Binding Obligation; Authority**.

(a)    Assuming due authorization, execution, and delivery by the other Parties to this Agreement, this Agreement constitutes the legal, valid, and binding obligation of Purchaser.

(b)    Purchaser has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Purchaser of this Agreement, the performance by Purchaser of its obligations hereunder, and the consummation by Purchaser of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Purchaser.

**Section 4.02    Organization; Power and Authority**.

(a)    Purchaser is a corporation, limited liability company, national banking association, or limited partnership, as applicable, duly organized or registered, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation.

(b)    Purchaser has all necessary power and authority to consummate the transactions contemplated hereby.

**Section 4.03    No Conflicts; Consents**. The execution and delivery by Purchaser of this Agreement, and the consummation of the transactions contemplated hereby, do not: (a) result in a violation or breach of any provision of the organizational documents of Purchaser; or (b) result in a violation or breach of any provision of any law or governmental order applicable to Purchaser; except in the case of clause (b) where the violation or breach would not have a material and adverse effect on Purchaser.

**Section 4.04    Brokers.** No broker, finder, financial advisor or investment banker is entitled to any broker's, finder's, financial advisor's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser for which Seller may become liable.

9

**Section 4.05**    **Sufficiency of Funds**. Purchaser has sufficient cash on hand or other sources of immediately available funds or Existing Secured Claims due from Seller to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 4.06**    **Independent Investigation**.

(a)    Purchaser has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and each Co-Debtor for such purpose.

(b)    Purchaser acknowledges that: (i) neither Seller nor any other Person on behalf of Seller or any Co-Debtor has made any representation or warranty, express or implied, as to Selleror any Co-Debtor, the Business, or the Purchased Assets, or the accuracy or completeness of any information regarding Seller, any Co-Debtor, or the Purchased Assets furnished or made available to Purchaser, or any other matter related to the transactions contemplated herein, other than those representations and warranties expressly set forth in ARTICLE III of this Agreement, (ii) in determining to enter into this Agreement, Purchaser has not relied on any representation or warranty from Seller, any Co-Debtor, or any other Person on behalf of Seller or any Co-Debtor, or upon the accuracy or completeness of any information regarding the regarding Seller, any Co-Debtor, the Business, or the Purchased Assets furnished or made available to Purchaser and its Representatives, other than those representations and warranties expressly set forth in ARTICLE III of this Agreement, and (iii) neither Seller nor any other Person acting on behalf of Seller shall have any liability to Purchaser or any other Person with respect to any projections, forecasts, estimates, plans, or budgets of future revenue, expenses, or expenditures, future results of operations, future cash flows, or the future financial condition of the Business or the future business, operations, or affairs of the Business, except as expressly set forth in ARTICLE IIIARTICLE III of this Agreement.

## ARTICLE V.
## ADDITIONAL AGREEMENTS OF THE PARTIES

**Section 5.01**    **Tax Matters**.

(a)    The Parties shall cooperate fully, as and to the extent reasonably requested by another Party, in connection with Tax matters arising after the Closing Date related to the Business or the Purchased Assets, including any audit, investigation, litigation or other proceeding with respect to Taxes related to the Business or the Purchased Assets. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such audit, investigation, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Purchaser agrees (i) to retain all books and records with respect to Tax matters pertinent to Seller relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (ii) to give Seller reasonable written notice prior to transferring, destroying or discarding any such

books and records and, if Seller so requests, Seller be permitted to take possession of such books and records.

(b)     If not waived pursuant to the terms of the Sale Order, all transfer, documentary, sales, use, stamp, registration, vehicle titling and registration and other similar Transfer Taxes and governmental charges, and all conveyance fees, recording charges and other similar transfer fees and charges (including any penalties and interest) incurred solely as a result of the purchase of the Purchased Assets and assumption of the Assumed Liabilities pursuant to this Agreement, regardless of the Person against whom they are assessed, shall be paid by Seller when due and in full (collectively, the "**Transfer Taxes**").

(c)     Seller and/or a Co-Debtor shall timely file or cause to be filed when due all applicable Tax Returns and pay all Taxes arising from the operation of the Business for the year ended December 31, 2024 and for the portion of the taxable period that includes the Closing Date for which Purchaser may be liable as a transferee of the Business, including, but not limited to, payroll taxes, sales and use taxes and escheat or unclaimed property.

Section 5.02    **Name Change**. Within ten (10) Business Days following the Closing Date, Seller and each Co-Debtor shall change their respective corporate names to BPRI Debtor LLC, BPRS Debtor LLC and BPRP Debtor LLC, respectively. After the Closing, the Seller and each Co-Debtor shall not, directly or indirectly, use or do business, or allow any Affiliate to use or do business, or assist any third party in using or doing business, under the name "Brightmark Plastics" or any similar variation thereof.

Section 5.03    **Agreement to Cooperate**. Following the Closing, the Seller,each Co-Debtor, and Purchaser shall each deliver or cause to be delivered at such times and places as shall be reasonably requested such additional instruments as Purchaser or the Seller and each Co-Debtor may reasonably request for the purpose of carrying out the transactions contemplated by this Agreement. The Seller and each Co-Debtor will cooperate with Purchaser after the Closing in furnishing information, evidence, testimony and other assistance in connection with any Action of any nature with respect to matters pertaining to all periods prior to the Closing.

Section 5.04    **Confidentiality**.

(a)     Purchaser acknowledges and agrees that the confidentiality agreement, dated as of March 16, 2025, between Purchaser and Seller and each Co-Debtor(the "**Confidentiality Agreement**") remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Purchaser pursuant to this Agreement.

(b)     From and after the Closing, Seller and each Co-Debtorshall hold, and shall use its commercially reasonable efforts to cause its Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that such Seller Party can show that such information (i) is generally available to and known by the public through no fault of such Seller Party or its Representatives; or (ii) is lawfully acquired by such Seller Party or its Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation; provided, however, that

nothing in this Section 5.03 shall prevent any Seller Party from disclosing or utilizing such information as required by law or by a governmental or regulatory body, in which event such Seller Party, as applicable, shall notify Purchaser and cooperate with Purchaser in obtaining reasonable confidentiality protections in advance of such disclosure.

(c)     In the event of an actual or threatened breach by a Party of any provision of this Section 5.03, each Party acknowledges that any actual or threatened breach by a Party of any provision of this Section 5.03 could give rise to irreparable harm to the non-breaching Party, for which monetary Damages would not be an adequate remedy, and the non-breaching Party shall be entitled to injunctive or other appropriate equitable relief, enjoining, restraining and prohibiting such Person from violating this Section 5.03; provided, however, that nothing stated herein shall be construed as prohibiting or limiting the non-breaching Party from pursuing such other remedies as may be available to it in or at equity, including the recovery of Damages. Each Party hereby waives any requirement on the part of each other Party of proving actual Damages or securing or posting any bond in connection with obtaining such injunctive or other equitable relief.

**Section 5.05    Employee Matters**.

(a)     The Seller and each Co-Debtor and their estates will remain liable for all employee compensation (including all applicable wages and taxes), bonuses and benefits, severance, retention, change in control, paid time off, and accrued vacation earned by the Seller Party's employees prior to Closing. Further, the Seller and Co-Debtors shall be solely responsible for any severance or other termination-related liabilities or payment (including payout of accrued paid time off, vacation, or similar benefits) owed to any employee of a Seller Party. Prior to, as of, and following the Closing Date, the Seller, Co-Debtors, and their estates shall be solely responsible for providing continuation coverage (within the meaning of COBRA) to employees of the Seller and each Co-Debtor (and their dependents) for qualifying events occurring up to and including the Closing Date.

**Section 5.06    Receipt of Misdirected Assets; Liabilities**. If after the Closing (i) Purchaser or any of its Affiliates holds any Excluded Assets or Excluded Liabilities, or (ii) any Seller Party holds any Purchased Assets or Assumed Liabilities, Purchaser, Seller, and each Co-Debtor, as applicable, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the applicable other Party. After the Closing, but prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

**Section 5.07    Accounts Receivable**. For a period of one hundred eighty (180) days from and after the Closing, if Seller or any Co-Debtor receive or collect any accounts receivable of Seller following the Closing, such Seller Party shall remit any such amounts to Purchaser within five (5) Business Days of the day on which such Seller Party receives such sum.

**Section 5.08    Submission for Court Approval**.

(a)     Purchaser and Seller acknowledge that this Agreement and the transactions contemplated hereby are subject to approval by the Court and entry of the Sale Order. In the event of any discrepancy between this Agreement and the Sale Order, the Sale Order shall govern.

(b)     Seller and each Co-Debtor shall use commercially reasonable efforts to have the Court hold the sale hearing and enter the Sale Order as promptly as practicable.

(c)     From and after the date hereof, Seller and each Co-Debtor shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order. Purchaser has not colluded in connection with its offer or negotiation of this Agreement.

(d)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller and each Co-Debtor to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; *provided*, *however*, in no event shall Purchaser, Seller, or any Co-Debtor Parties be required to agree to any amendment of this Agreement.

(e)     Seller and each Co-Debtor further covenant and agree that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan Seller or any Co-Debtor submit to the Court, or any other court for confirmation or sanction, shall not be intended to (or reasonably likely to) supersede, abrogate, nullify or restrict the terms of this Agreement in any material respect, or prevent the consummation or performance of the transactions contemplated hereby

**Section 5.09    Cure Costs**. Seller shall sell, transfer and assign, all Purchased Contracts to Purchaser, and Purchaser shall purchase and assume all Purchased Contracts, if any, from Seller, as of the Closing Date pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order. In connection with debts incurred or the assignment and assumption of the Purchased Contracts, Purchaser shall cure any monetary defaults of the debts incurred or under the Purchased Contracts by payment of any Cure Costs as determined in accordance with the Sale Order up to the amounts set forth on Schedule 2.01 of the Schedules, if any, on a Purchased Contract-by-Purchased Contract basis. Purchaser shall be responsible for demonstrating and establishing adequate assurance of future performance before the Court with respect to the Purchased Contracts. For the avoidance of doubt, Purchaser may at any time prior to the Closing, by written notice to Seller, add or remove Purchased Contracts from Schedule 2.01 of the Schedules, in each case without any adjustment to the Purchase Price.

## ARTICLE VI.
## ADDITIONAL INTERIM COVENANTS OF THE PARTIES

**Section 6.01    Maintenance.** Except as required by applicable Law or the Bankruptcy Code, as otherwise expressly contemplated by this Agreement, or with the prior written consent of Purchaser, during the period from the date of this Agreement to and through the Closing Date, Seller and each Co-Debtor will not, and will cause their subsidiaries not to:

(i)     subject any of the Purchased Assets to any Encumbrance, except for existing Encumbrance and Permitted Encumbrances;

(ii)     other than sales of inventory in the ordinary course of Business, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except for the purpose of disposing of obsolete assets);

(iii)     waive or release any material right of Seller or any of its subsidiaries that constitutes a Purchased Asset;

(iv)     amend any of its organizational documents;

(v)     make, change or revoke any election with respect to its Taxes; change (or request to any Governmental Authority to change) any aspect of any method of accounting for Tax purposes;

(vi)     file any amended Tax Return; enter into any "closing agreement" as described in Section 7121 of the Code (or any similar provision of Law) with any Governmental Authority; or surrender any claim for a refund of Taxes to the extent any such action can reasonably be expected to adversely impact Purchaser or the Business;

(vii)     fail to maintain in full force and effect insurance policies covering the Purchased Assets and the operation of the Business, in form and amount consistent with past practices;

(viii)     agree to do anything that would be reasonably expected to cause any of Seller's or any Co-Debtor's representations and warranties in this Agreement to be false; or

(ix)     agree or commit to do any of the foregoing.

**Section 6.02    Preservation of Records.** Each of the Seller, Co-Debtors, and Purchaser agrees that each of them will preserve and keep the records held by it or its Affiliates relating to the Business for a period of twenty-four (24) months from the Closing Date (except as provided below) and will make such records and personnel available to the other (a) as may be reasonably required by such party solely to the extent necessary (i) in connection with any insurance claims by, Actions or tax audits against or governmental investigations of Seller, Co-Debtors, or Purchaser or any of their Affiliates or (ii) in order to enable Seller, Co-Debtors, or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby, or (b) as otherwise required by this Agreement.

**Section 6.03    Update of Schedules**. From the date of this Agreement until the Closing Date, Seller shall as promptly as reasonably practicable deliver any new schedules or supplement or amend the Schedules with respect to any matter that, if existing, occurring or known after the date of this Agreement, would have been required to be set forth or described in the Schedules as if such matter had existed, occurred, or been known as of the date of this Agreement. For the avoidance of doubt, from the date of this Agreement until the Closing Date, the Purchaser shall have the right to add or remove Contracts from the Purchased Contract Schedule in its sole discretion. In addition, from time to time prior to the Closing, Purchaser shall have the right, in its sole discretion, to update any Schedule to this Agreement (other than Schedules provided pursuant to ARTICLE III by Seller) to add or remove any asset, Contract or liability from acquisition or

14

assumption hereunder (including any listing of Purchased Assets, Assumed Liabilities (including any Purchased Contracts)); provided that no such change by Purchaser shall modify the cash Purchase Price payable thereby or any of the conditions to Purchaser's obligations hereunder.

Section 6.04    Access. From the date of this Agreement until the Closing Date, the Seller and each Co-Debtor shall give Purchaser and its Representatives reasonable access during normal business hours to the offices, properties, officers, accountants, auditors, counsel and other Representatives, data, books and records of the Seller and each Co-Debtor to the extent relating to the Purchased Assets, as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement. It is acknowledged and understood that no investigation by Purchaser or other information received by Purchaser shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Seller or any Co-Debtor hereunder.

Section 6.05    Notification of Certain Matters. The Seller and each Co-Debtor will give prompt written notice to the Purchaser of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to Seller's obligations to consummate the transactions contemplated hereunder set forth in Article VII not to be satisfied as of any date, including the breach of any representation, warranty, or covenant in this Agreement, (b) any notice or other communication from any Person asserting that the consent of such Person which is or may be required in connection with the transactions contemplated hereunder is not likely to be obtained prior to Closing or any written objection or proceeding challenging the transactions contemplated hereunder or the entry of the approval by the Bankruptcy Court, or (c) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated hereunder; provided, however, that the delivery of any such notice pursuant to this section shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party. Seller shall permit Purchaser or its Representatives to review in advance any proposed material written or material oral communication or information submitted to any Governmental Authority in connection with the transactions contemplated hereunder, shall furnish Purchaser with copies of all correspondence, filings and communications with any Governmental Authority, and shall not agree to participate in any meeting with any Governmental Authority related to the transactions contemplated hereunder unless Seller consults with Purchaser in advance and, to the extent permitted by any such Governmental Authority, give Purchaser the opportunity to attend and participate in such meeting, in each case to the maximum extent practicable and in accordance with applicable Law. Each Party shall furnish the other Party with such necessary information and assistance as such other Party may reasonably request in connection with their preparation of filings, registrations, requests or submissions of information to any Governmental Authority in connection with this Agreement and the transactions contemplated hereunder.

## ARTICLE VII.
## CONDITIONS TO OBLIGATIONS OF THE PARTIES; TERMINATION

Section 7.01    Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated hereunder is subject to the satisfaction (or

written waiver by Purchaser) at or prior to the Closing Date in all material respects of each of the following conditions.

(a)    <u>Accuracy of Representations and Warranties</u>. The representations and warranties of Seller and each Co-Debtor set forth herein, including <u>Article III</u> hereof, shall be true and correct in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    <u>Performance of Obligations</u>. The Seller and each Co-Debtor shall have performed all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date, including all of their interim performance obligations under <u>ARTICLE VI</u> hereof.

(c)    <u>Sale Order</u>. After notice and a hearing as defined in section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order (i) shall have become final and non-appealable, (ii) shall not have been reversed, stayed, modified or amended, vacated, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the Order was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, and (iii) shall not have been amended, supplemented or otherwise modified in a manner that results in such Sale Order no longer being in form and substance acceptable to Purchaser in its sole discretion.

(d)    <u>Officer's Certificate</u>. Purchaser shall have received a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in <u>Section 7.01(a)</u>, and <u>Section 7.01(b)</u> above have been fulfilled.

(e)    <u>No Order</u>. No court or other Governmental Authority has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, staying, enjoining or otherwise prohibiting the transactions contemplated hereunder.

(f)    [<u>Governmental Approvals</u>. (i) All approvals or consents of Governmental Authority required prior to Closing that Purchaser determines in its reasonable discretion to be material to the Purchased Assets or to Purchaser and its Affiliates shall have been obtained, (ii) there shall be no Law or Order that restrains or prevents the transactions contemplated hereunder, and (iii) no Action, investigation, inquiry, or other legal or administrative proceeding shall have been instituted by a Governmental Authority and shall remain pending on the Closing Date, which challenges the validity or legality of the transactions contemplated hereunder.]

(g)    [<u>Permits</u>. The Seller and each Co-Debtor shall have assigned, or shall have made commercially reasonable efforts to assign, to Purchaser pursuant to section 365 of the Bankruptcy Code and the Sale Order, any Permits that Purchaser determines in its reasonable discretion to be

material to the Business, and such Permits shall be in full force and effect and shall not have been revoked.]

**Section 7.02    Conditions Precedent to Obligations of Seller**. The obligation of Seller to consummate the transactions contemplated hereunder is subject to the satisfaction (or written waiver by Seller) at or prior to the Closing Date in all material respects of each of the following conditions:

(a)    Accuracy of Representations and Warranties. The representations and warranties of Purchaser set forth herein, including Article IV hereof, shall be true and correct in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    Performance of Obligations. Purchaser shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)    Sale Order. After notice and a hearing as defined in section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order (i) shall have become final and non-appealable, (ii) shall not have been reversed, stayed, modified or amended, vacated, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the Order was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, and (iii) shall not have been amended, supplemented or otherwise modified in a manner that results in such Sale Order no longer being in form and substance acceptable to Purchaser in its sole discretion.

(d)    No Order. No court or other Governmental Authority has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, staying, enjoining or otherwise prohibiting the transactions contemplated hereunder.

**Section 7.03    Termination of Agreement**. This Agreement may be terminated prior to the Closing as follows:

(a)    by Seller or Purchaser, if the Closing shall not have occurred by the close of business on the Outside Date; provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants, agreements or obligations contained in this Agreement by Purchaser or Sellers Parties, then the breaching Party may not terminate this Agreement pursuant to this Section 7.03(a);

(b)    by mutual written consent of Seller and Purchaser;

**DRAFT**

(c)     by Purchaser, if any event or condition has resulted in one or more of the conditions to the obligations of Seller and each Co-Debtor set forth in <u>Section 7.01</u> being unable to be fulfilled and such event or condition cannot be cured or has not been cured (or waived by Purchaser) by the earlier of (i) thirty (30) days after the giving of written notice by Purchaser to Seller of such breach or (ii) the Outside Date; provided, however, that Purchaser may terminate this Agreement pursuant to this <u>Section 7.03(c)</u> only if Purchaser is not in material breach of this Agreement as of the date of such termination;

(d)     by Seller, if any event or condition has resulted in one or more condition to the obligations of Purchaser set forth in <u>Section 7.02</u> being unable to be fulfilled and such event or condition cannot be cured or has not been cured (or waived by Seller) by the earlier of (i) thirty (30) days after the giving of written notice by Purchaser to Seller of such breach or (ii) the Outside Date; provided, however, that Seller may terminate this Agreement pursuant to this <u>Section 7.03(d)</u> only if no Seller Party is in material breach of this Agreement as of the date of such termination; or

(e)     by Seller or Purchaser, if there shall be in effect a final non-appealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, including any Sale Order that designates another party (other than a Designated Purchaser pursuant to <u>Section 8.05(b)</u>) as the purchaser of all or any portion of the Purchased Assets.

**Section 7.04    Procedure Upon Termination**. In the event of termination by Purchaser or Seller, or both, pursuant to <u>Section 7.03</u>, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller.

**Section 7.05    Effect of Termination.** In the event that this Agreement is validly terminated as provided herein prior to the Closing, then each of the Parties shall be relieved of its duties, covenants, agreements and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller. NOTHING IN THIS SECTION SHALL RELIEVE PURCHASER, SELLER, AND EACH CO-DEBTOR OF ANY LIABILITY FOR A BREACH OF THIS AGREEMENT PRIOR TO THE DATE OF TERMINATION OR THE CLOSING.

**ARTICLE VIII.**
**MISCELLANEOUS**

**Section 8.01    <u>Notices</u>**. Any notice, request, instruction or other document to be given under this Agreement will be in writing and will be: (a) delivered personally; (b) sent by U.S. mail, postage prepaid, certified or registered mail, return receipt requested, (c) sent by reputable overnight courier, delivery charges prepaid; or (d) transmitted by electronic mail (and no "bounceback" or "automatic response" message is received). These notices will be sent to the following addresses and will be deemed given: (i) if delivered personally, at the time delivered; (ii) if sent by U.S. mail, 4 days after being deposited in the mail; (iii) if sent by reputable overnight courier, at the time delivered; or (iv) if transmitted by electronic mail during normal business hours, at the time when receipt is confirmed by the sender or sending account, or at the beginning

18

of the recipient's next Business Day after receipt if not received during the recipient's normal business hours.

| If to Seller: | with a copy to (which shall not constitute notice): |
|---|---|
| Brightmark Plastics Renewals Indiana LLC | Potter Anderson & Corroon LLP |
| 1725 Montgomery St., Floor 3 | 1313 N. Market Street, 6th Floor |
| San Francisco, CA 94111 | Wilmington, Delaware |
| Attention: Craig Jalbert, CRO | Attention: Jeremy Ryan, Esq. |
| Email: cjalbert@vlpc.com | Email: jryan@potteranderson.com |
| | |
| If to Purchaser: | with a copy to (which shall not constitute notice): |
| UMB Bank, N.A. | ArentFox Schiff LLP |
| 120 South Sixth Street, Suite 1400 | 1301 Avenue of the Americas |
| Minneapolis MN 55402 | New York, NY |
| Attention: Michael Slade, SVP | Attention: Mark Angelov, Esq. |
| Email: Michael.slade@umb.com | Email: mark.angelov@afslaw.com |

or to another address as either Party may indicate by notice delivered to the other Party in accordance with the provisions of this <u>Section 8.01</u>.

**Section 8.02    Public Announcement**. Prior to Closing, none of Purchaser, Seller, nor any Co-Debtor will issue any press release or make any other public announcement relating to this Agreement or the transactions contemplated hereby without the prior written approval of the other party (which approval will not be unreasonably withheld, conditioned or delayed), unless required by applicable law or by any listing agreement with any national securities exchange. Prior to issuing any such press release or making any such other public announcement as required by applicable law or by any listing agreement with any national securities exchange and without the other party's prior written approval, the disclosing party will give the other party a copy of the proposed press release or other public announcement and a reasonable opportunity to common on the same; *provided, however,* that nothing in this <u>Section 8.02</u> shall restrict the Parties or their Affiliates or Representatives from making disclosures to the Court or in filings in the Court seeking the Court's approval of the Bidding Procedures Order.

**Section 8.03    Access**. From and after the Closing Date, Purchaser shall give Seller reasonable access during normal business hours to the books and records pertaining to the Purchased Assets and Assumed Liabilities and certain key employees, for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of Seller or any Co-Debtor under this Agreement, or (iii) as is reasonably necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases and the winding up of Seller, Co-Debtors, and their assets. Purchaser shall, and shall cause each of its controlled Affiliates to, cooperate with Seller and each Co-Debtor as may reasonably be requested by Seller and each Co-Debtor for such purposes, provided however that Purchaser shall have no obligation to incur any out-of-pocket costs or expend extraordinary efforts to comply with the foregoing access requirements.

**Section 8.04    Entire Agreement; Amendments**. This Agreement, the other agreements referred to in this Agreement and the schedules and exhibits referred to in this Agreement contain

the entire understanding of the Parties with regard to the subject matter contained in this Agreement and supersede all prior written or oral agreements, understandings or letters of intent between the Parties. This Agreement may be amended, modified or supplemented only by a written agreement signed by each of the Parties.

### Section 8.05    Successors and Assigns; Designated Purchaser.

(a)        The rights of each Party under this Agreement are not assignable without the written consent of the other Parties, provided however that, Purchaser may assign this Agreement and its rights hereunder, in whole or in part, to one or more of its Affiliates, to any purchaser of Purchaser or any of its material assets and as security for the account of any lender providing financing (or any refinancing thereof) to Purchaser or its Affiliates for the purpose of securing such financing (or any refinancing thereof), or to a designee of Purchaser, pursuant to the terms set forth in this Section 8.05. This Agreement is binding upon and inures to the benefit of the Parties and their successors and permitted assigns. Nothing in this Agreement, expressed or implied, is intended or will be construed to confer upon any Person other than the Parties and their respective successors and permitted assigns any right, remedy, or Claim under or by reason of this Agreement.

(b)        In connection with the Closing, notwithstanding anything to the contrary contained herein, Purchaser shall be entitled to designate, in accordance with the terms of this paragraph and effective as of the Closing one or more entities to (i) (A) accept an assignment of this Agreement and purchase the Purchased Assets, and (B) pay the Purchase Price and costs of any Cure Costs, if applicable, (ii) assume the Assumed Liabilities, (iii) perform any of the other covenants and agreements hereunder to be performed by Purchaser, and/or (iv) be entitled to the rights and benefits afforded to Purchaser hereunder (any such assignee of Purchaser that shall be properly designated in accordance with this paragraph, a "**Designated Purchaser**") and, in all cases, the performance at or after the Closing by any such Designated Purchaser in accordance with the terms of this Agreement shall be deemed to have satisfied Purchaser's rights and obligations hereunder to the extent performed by either Purchaser or such Designated Purchaser. The above designations shall be made by Purchaser by the Designation Agreement (as defined below) to be delivered in writing to Seller prior to Closing. The Parties agree to modify any Closing deliverables in accordance with the foregoing assignment to provide that upon execution of such deliverables, applicable references to Purchaser made in this Agreement in respect of the right, obligation, purchase, assumption or employment designated to such Designated Purchaser pursuant to this paragraph shall be deemed a reference to the Designated Purchaser, if any, with respect to such provisions. All obligations of Purchaser and any Designated Purchaser shall be several and not joint with respect to Purchaser and the Designated Purchaser, and, notwithstanding anything to the contrary contained herein, Purchaser shall have no obligation for any Assumed Liabilities assumed by a particular Designated Purchaser in accordance with this paragraph, except that Purchaser shall be jointly and severally liable with the Designated Purchaser with respect to the payment of the Purchase Price.

(c)        Seller acknowledges and agrees that Purchaser, as of the date of this Agreement, intends to designate a newly formed Indiana limited liability company ("**NewCo**") as Designated Purchaser to acquire the Purchased Assets, assume the Assumed Liabilities, and perform the other obligations of Purchaser hereunder, provided that Purchaser will continue to be responsible for the payment of the Purchase Price at Closing. Prior to the date designated by the Court for the sale

**DRAFT**

hearing, Purchaser shall provide to Seller a written Designation Agreement between Purchaser and Designated Purchaser (the "**Designation Agreement**"), pursuant to which the Designated Purchaser is assigned by Purchaser the rights under this Agreement and to the Purchaser's successful bid, and under which the Designated Purchaser assumes the obligations under this Agreement except for the obligation to reduce the Existing Secured Claims in a form satisfactory to Purchaser and Seller. In the Designation Agreement, NewCo shall agree (i) to acquire the Purchased Assets, (ii) to assume the Assumed Liabilities, (iii) to perform all other obligations of Purchaser hereunder, and (iv) that Seller may enforce its rights and remedies arising under this Agreement and the transactions contemplated hereby against the Designated Purchaser. Upon such assignment, the Designated Purchaser shall perform all obligations of Purchaser hereunder (other than Purchaser's obligations and covenant under <u>Section 2.04</u>, to release the Existing Secured Claims in the Credit Bid Amount).

**Section 8.06    <u>Expenses; Headings; Further Assurances; No Inferences; Specific Performance; Survival of Representations and Warranties</u>**.

(a)    Except as set forth in this Agreement, each Party shall be responsible for its own respective fees, costs and expenses (including fees, costs and expenses of legal counsel, investment bankers, brokers or other Representatives and consultants and appraisal, costs and expenses) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby.

(b)    Article and section titles and headings in this Agreement have been inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The exhibits and schedules referred to in this Agreement will be construed with and as an integral part of this Agreement to the same extent as if they were set forth in the Agreement.

(c)    From time to time, as and when requested by any Party and at such Party's expense, any other Party shall execute and deliver, or cause to be executed and delivered, all such documents, instruments, conveyances and assurances and shall take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement, including to make more fully effective the transfer of the Purchased Assets as contemplated herein.

(d)    This Agreement has been mutually prepared, negotiated and drafted by the Parties. The Parties agree that the terms of this Agreement will be construed and interpreted against each Party in the same manner and that none of this Agreement's provisions will be construed or interpreted more strictly against one Party on the assumption that an instrument is to be construed more strictly against the Party that drafted the Agreement. The Parties agree that each Party is relying on counsel from its own attorneys, accountants and other advisors.

(e)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by Purchaser, Seller, or any Co-Debtor, as applicable, in accordance with their specific terms or were otherwise breached by Purchaser, Seller, or any Co-Debtor, as applicable. It is accordingly agreed that the Parties shall be entitled to

an injunction or injunctions to prevent breaches of this Agreement by the other party, and to enforce specifically the terms and provisions hereof against such party in any court having jurisdiction, this being in addition to any other remedy to which the parties hereto are entitled at law or in equity.

(f)    The Parties agree that the representations and warranties contained in this Agreement will not survive the Closing, and none of the Parties will have any Liability to each other after the Closing for any breach thereof. The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

**Section 8.07    Waivers**. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, only pursuant to a writing signed by the Party or Parties entitled to the term's or provision's benefit. Any waiver will be validly and sufficiently authorized for purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized Representative of that Party. No waiver or any breach of this Agreement will be held to constitute a waiver of any other or subsequent breach.

**Section 8.08    Partial Invalidity**. Whenever possible, each provision of this Agreement will be construed in a manner as to be effective and valid under applicable law, but in case any provision contained in this Agreement is, for any reason, held to be invalid, illegal or unenforceable in any respect, that provision will be ineffective only to the extent of that invalidity, illegality or unenforceability without invalidating the remainder of that provision or any other provisions in this Agreement, unless that construction would be unreasonable.

**Section 8.09    Execution in Counterparts**. This Agreement may be executed in any number of counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed an original, but all of which shall be considered one and the same agreement, and shall become effective when each Party has received counterparts signed by each of the other Parties, it being understood and agreed that delivery of a signed counterpart signature page to this Agreement by facsimile transmission, by electronic mail in portable document format ("**.pdf**") form, or by any other electronic means (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) intended to preserve the original graphic and pictorial appearance of a document shall constitute valid and sufficient delivery thereof and shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart executed by the Party against whom enforcement of this Agreement is sought.

**Section 8.10    Disclosure Schedules**. The schedules to this Agreement (each a "**Schedule**" and, collectively, the "**Schedules**") shall be numbered and arranged to correspond to the sections of this Agreement, and the disclosures on any Schedule are to be taken as relating to the representations and warranties contained in the section of this Agreement that correspond to such Schedule; provided, in the event that a disclosure on a Schedule is readily apparent on the

face of such disclosure that it is applicable to another Schedule, such disclosure shall be deemed to be disclosed on such other Schedule for purposes of this Agreement.

**Section 8.11    Interpretation**. In this Agreement, unless the context otherwise requires: (a) references to this Agreement are references to this Agreement and to the schedules and exhibits hereto; (b) references to Articles and Sections are references to articles and sections of this Agreement; (c) references to any Party to this Agreement shall include references to its respective successors and permitted assigns; (d) references to the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and references to any Article or Section are to an article or a section of this Agreement, as applicable, and references to any schedule or exhibit are to a schedule or exhibit to this Agreement, as applicable; (e) references to any document (including this Agreement) are references to that document as of the date hereof and as amended, consolidated, supplemented, novated or replaced by the parties hereto from time to time; (f) references to any law are references to that law as of the date hereof and the Closing Date, and all rules, regulations and guidance promulgated thereunder; (g) references to a judgment shall include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (h) the word "including" and words of similar import shall mean "including, without limitation," and any list of items that may follow such word shall not be deemed to represent a complete list of, or be limited to, the contents of the reference of the subject; (i) unless the context otherwise requires, "or" is not exclusive; (j) the singular shall include the plural, the plural shall include the singular, and all nouns, pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the identity of the Person or Persons may require; (k) time is of the essences in the performance of the Parties' respective obligations under this Agreement; and (l) references to "$" or "dollars" shall be to U.S. dollars and references to "days" shall be to calendar days.

**Section 8.12    Governing Law; Venue**. This Agreement is governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice of law provisions that may direct the application of the laws of another jurisdiction. Any Action seeking to enforce any provision, or based on any right arising out of, or to interpret any provision of, this Agreement may be brought against any of the Parties in the state and federal courts located in the State of Delaware (including, without limitation, the Court), and each of the Parties consents to the exclusive jurisdiction of such courts (including, without limitation, the Court) (and other the appropriate appellate courts) in any such Action and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

**Section 8.13    Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO DEMAND THAT ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE RELATIONSHIPS OF THE PARTIES HERETO BE TRIED BY JURY. THIS WAIVER EXTENDS TO ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY ARISING FROM ANY SOURCE INCLUDING, BUT NOT LIMITED TO, THE CONSTITUTION OF THE U.S. OR ANY STATE THEREIN, COMMON LAW OR ANY APPLICABLE STATUTE OR REGULATIONS. EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY WAIVING ITS RIGHT TO DEMAND TRIAL BY JURY.

AFSDOCS:302318670.12

12216731v.1

**DRAFT**

[*Remainder of page intentionally left blank. Signature page follows.*]

AFSDOCS:302318670.12

12216731v.1

**DRAFT**

        **IN WITNESS WHEREOF**, the Parties have executed this Agreement on and as of the date first written above.

**PURCHASER:**

UMB Bank, N.A., not in its individual capacity but solely in its capacity as Collateral Agent


By:_____
Name:_____
Title:_____


**SELLER**:

Brightmark Plastics Renewal Indiana LLC


By:_____
Name:_____
Title:_____


**CO-DEBTORS:**


**BRIGHTMARK PLASTICS RENEWAL LLC**


By:_____
Name:_____
Title:_____


**BRIGHTMARK PLASTICS RENEWAL SERVICES LLC**


By:_____
Name:_____
Title:_____


[Brightmark - Signature Page to Asset Purchase Agreement]

**DRAFT**

[Brightmark - Signature Page to Asset Purchase Agreement]

## Annex A

### Defined Terms

"**Acquired Business Information**" means all books and records, including financial information, files, ledgers, documentation, instruments, research, reports, papers, data, marketing materials and information, computer codes and sourcing data, supplier lists, customer lists, cost and pricing information, business plans, and manuals, research and development files, sales or technical literature or similar information that, in each case, relating to the Business or the Purchased Assets, that is in the possession or control of Seller, solely to the extent such information is not the confidential and/or proprietary information of another Person.

"**Action**" means any claim, action, suit, charge, complaint, grievance, arbitration, inquiry, mediation, audit, investigation, litigation or other proceeding (whether civil, criminal or administrative) that has been commenced, brought, conducted or heard by or before any Governmental Authority, court, arbitrator or other tribunal.

"**Affiliate**" means with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person.

"**Agreement Date**" shall have the meaning specified in the Preamble.

"**Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement by and among Seller and Purchaser, as applicable, in the form mutually agreed upon by the Parties.

"**Assumed Liabilities**" means the Liabilities, including Cure Costs to the extent applicable, of Seller that Purchaser may agree to assume, in its sole discretion, pursuant to the terms of this Agreement and the Sale Order, as set forth in <u>Section 2.02(a)</u> of the Schedules.

"**Avoidance Actions**" means all of the Seller and Co-Debtors' causes of action for the avoidance of any preferential transfer or fraudulent conveyance arising under Sections 547, 544, 548, 549 or 550 of the Bankruptcy Code or any state fraudulent conveyance or fraudulent transfer statute.

"**Bankruptcy Cases**" shall have the meaning given to such term in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to such term in the Recitals to this Agreement.

"**Benefit Plans**" means, collectively, all "employee benefit plans" as defined in Section 3(3) of ERISA, all benefit plans as defined in Section 6039D of the Code, and all other bonus, commission, equity or equity based, incentive compensation, deferred compensation, profit sharing, stock option, severance, supplemental unemployment, layoff, savings, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, paid time off, sick leave, fringe benefit or welfare plan or employment, consulting, change

AFSDOCS:302318670.12

12216731v.1

of Control, independent contractor, professional services, confidentiality or non-competition agreement or any other similar plan, agreement, policy or understanding (whether oral or written, qualified or non-qualified, and regardless of whether funded) which a Seller Party or any Affiliate currently sponsors, or to which a Seller Party or any Affiliate has any outstanding present or future obligations to contribute or other Liability, whether voluntary, contingent or otherwise.

"**Bidding Procedures Order**" means *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief* [Docket No. 85].

"**Bill of Sale**" means that certain Bill of Sale executed by Seller for the benefit of Purchaser, respectively, in the form mutually agreed upon by the Parties.

"**Business**" shall have the meaning given to such term in the Recitals to this Agreement.

"**Business Day**" means a day other than Saturday, Sunday, or any day on which the principal commercial banks located in New York, New York are authorized or obligated to be closed for business under the federal Laws of the U.S.

"**Cash and Cash Equivalents**" means the cash and cash equivalents (including cash-on-hand, deposit accounts, marketable securities and short-term investments) of Seller.

"**Claim**" means all actions, claims, counterclaims, suits, proceedings, rights of action, causes of action, Liabilities, losses, Damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and Actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Contract**" shall mean any contract, agreement, lease, license, commitment, understanding, franchise agreement, indenture, warranty, guaranty, mortgage, note, bond, loan, instrument, conditional sales contract, purchase order, franchise, insurance policy, letter of credit, commitment or other binding arrangement or consensual obligation, whether or not in written form, that is binding upon a Person or any of its property, together with the amendments, modifications, or supplements thereto.

"**Control**" (including the terms "Controlled by" and "under common Control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the

management policies of a Person, whether through the ownership of voting securities, by contract or credit arrangement, or as trustee, executor or otherwise.

"**Court**" shall have the meaning given to such term in the Recitals to this Agreement.

"**Cure Costs**" means all cure costs that must be paid or otherwise incurred by Purchaser as a result or pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Contracts as agreed by Purchaser, in consultation with Seller and applicable counterparties or as finally determined by the Court.

"**Damages**" means all claims, losses, damages, liabilities, Taxes, judgments, fines, fees, expenses, penalties, disbursements, settlements, awards, charges, obligations, costs and expenses (including court and settlement costs and any reasonable legal, attorneys', consultants', experts' and other fees, costs and expenses and disbursements for investigation, assertion, arbitration or defense thereof and any attorneys' fees and costs incurred in enforcing rights under this Agreement) in each case, of all kinds.

"**Deed**" means with respect to each parcel of Real Property, a special warranty deed in form and substance satisfactory to Purchaser, which together with the Sale Order conveys fee simple title to Purchaser clear of all Encumbrances, except Permitted Encumbrances, leases, and interests in such Real Property or any portion thereof.

"**Encumbrance**" means any liens (as defined in section 101(37) of the Bankruptcy Code), defenses (including rights of setoff and recoupment), and interests, in each case, in, on, or related to the Purchased Assets, including security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, purchase options, rights of first refusal or offer, deeds of trust, hypothecations, mechanics' and materialman's liens, rights of way, assignments, preferences, debts, easements, charges, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), covenants, put options, title defects, or other survey defects of any kind, indentures, instruments, leases, options, off-sets, causes of action, contract rights, any restriction on or transfer or other assignment, as security or otherwise, of or relating to use, quiet enjoyment, voting, transfer, receipt of income or exercise of any other attribute of ownership, in each case to the fullest extent of the law, in each case, of any kind or nature in, on, or related to the Purchased Assets, known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non- material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights and claims arising out of the Seller's and Co-Debtor's continued operations following the Closing Date.

"**Environmental Costs and Liabilities**" means with respect to any Person, all Liabilities, remedial actions, losses, Damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines and penalties incurred as a result of any Action, Claim or demand by any other Person or in response to any violation of Environmental Law, to the extent based upon, related to, or arising under or pursuant to any Environmental Law, Environmental Permit, or

Annex A-3

**DRAFT**

agreement with any Governmental Authority or other Person, which relates to any environmental, human health (to the extent related to exposure to Hazardous Substances) or workplace safety condition, violation or non-compliance of Environmental Law or a release or threatened release of Hazardous Substances.

"**Environmental Law**" means any law or order relating to protection of the environment, natural resources, human health (to the extent related to exposure to Hazardous Substances) or workplace safety, exposure to Hazardous Substances, to pollution (or the cleanup thereof) or to the use, management, manufacture, treatment, storage, processing, production, disposal, release, threatened release or transportation of Hazardous Substances.

"**Environmental Permit**" means any permit, license, franchise, approval, authorizations letter, clearance, consent, waiver, closure, exemption, decision, or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended and the rules and regulations promulgated thereunder.

"**Excluded Assets**" means (i) all Contracts of Seller or any Co-Debtor (including, without limitation, all Benefit Plans and assets attributable thereto), other than the Purchased Contracts; (ii) the corporate seals, organizational documents, minute books, books of account, or other records having to do with the formation and organization of Seller or any Co-Debtor; (iii) all rights, Claims, or causes of action, including the Avoidance Actions, but excluding any Claims against Purchaser, which Seller, a Co-Debtor, or the Business may have against any Person with respect to the Excluded Assets or related to the Excluded Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; (iv) the rights that accrue or will accrue to the Seller under this Agreement; and (v) for the avoidance of doubt, any and all assets of Seller or any Co-Debtor over (x) which Purchaser did not have a valid, secured lien as of the Petition Date and (y) which are subject to the lien of the DIP Lender (as defined in the Sale Order).

"**Excluded Liabilities**" means any and all Liabilities of each of the Seller, each Co-Debtor, and their Affiliates that are not Assumed Liabilities, including, but not limited to:

(a)     all accrued expenses and accounts payable of Seller and each Co-Debtor arising out of the operation of the Business prior to the Closing other than Cure Costs (the "**Accounts Payable**");

(b)     all Environmental Costs and Liabilities arising out of the operation of the Business prior to the Closing;

(c)     Excluded Taxes;

(d)     all Liabilities arising from or related to the Excluded Assets;

(e)     all Liabilities arising under the organizational documents of any Seller Party, or related to any person or entity's interest in any such entity;

Annex A-4

(f)      all Liabilities relating to employees of Seller and each Co-Debtor, including, but not limited to:

(i)      all payroll and benefits, including accrued and unused vacation hours, sick time, or other paid time off, deferred compensation, retention, incentive, or severance programs, or any other compensation arrangement;

(ii)      all Liabilities, if any, under the WARN Act related to the transactions contemplated hereunder;

(iii)      all COBRA obligations and related Liabilities with respect to all covered current and former employees of a Seller Party and their beneficiaries;

(g)      any Liabilities discharged or from which the Purchased Assets are otherwise released as of the Closing in accordance with the Sale Order; and

(h)      all other Excluded Liabilities set may be forth in <u>Schedule 2.02(b)</u> of the Schedules.

"**Excluded Taxes**" shall mean (i) all Taxes of any Seller Party or any Affiliate of any Seller Party or for which any Seller Party or any Affiliate of any Seller Party is liable, for any taxable period, (ii) all Taxes relating to the Purchased Assets, the Business, or Assumed Liabilities arising from or related to a Pre-Closing Tax Period; (iii) with respect to any Excluded Asset; and (iv) other Taxes of any Seller Party or any Affiliate of any Seller Party of any kind or description (including any Liability for Taxes of any Seller or any Affiliate of any Seller) that becomes a Liability of Purchaser under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of Contract or Law.

"**Existing Secured Claims**" means any claims or obligations held by the Purchaser against Seller arising under the Intercreditor Agreement, including all Obligations as defined therein, as well as under the Trust Indenture, dated as of March 1, 2019 (as amended or supplemented, including by the First Supplemental and Amendatory Trust Indenture, dated as of February 1, 2024, the "**Indenture**"), by and between the Indiana Finance Authority and UMB Bank, N.A., not in its individual capacity, but solely in its capacity as Trustee and as Collateral Agent, and under the all of the Bond Documents, as defined in the Indenture.

"**Final Order**" means an order of the Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing, motion for new trial, or any other proceeding challenging the findings, conclusions or relief granted by the Court has been timely filed or otherwise commenced or, if any of the foregoing has been timely filed or otherwise commenced, it has been disposed of by the Court or other court of competent jurisdiction in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting and/or filing an appeal, a notice of appeal, motion for rehearing, motion for new trial, or any other proceeding challenging the finds, conclusions, or relief granted by the Court or other court of competent jurisdiction shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be

deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**Governmental Authority**" means any nation, state or local government, or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or taxation, including any government authority, agency, department board, commission or instrumentality of the U.S., any State of the U.S. or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

"**Hazardous Substances**" means any toxic, hazardous or dangerous chemical, waste or substance, any pollutant or contaminant regulated under Laws, and any other substance which is regulated, classified, or otherwise characterized under applicable Environmental Laws, including radiation, noise, biological agents, per- and polyfluoroalkyl substances, hydrocarbons, medical waste, petroleum or any fraction or product thereof, toxic mold, mycotoxins or microbial matter (naturally occurring or otherwise), polychlorinated biphenyls, asbestos or asbestos containing materials and any "contaminant," "pollutant", "hazardous waste," "hazardous material", "hazardous substance", "extremely hazardous substance" or "toxic substance" or words of similar import under any applicable Environmental Law.

"**Intellectual Property**" means any and all of the following arising pursuant to the laws of any jurisdiction throughout the world: (i) trademarks, service marks, trade names, logos, corporate names, and similar indicia of source of origin, all registrations and applications for registration thereof, corresponding rights in works of authorship, and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, copyrightable works, rights in databases, data collections, and all registrations and applications, continuations, divisionals, continuations-in-part, reissues and reexaminations for registration thereof; (iii) trade secrets and know-how; (iv) patents and patent applications; (v) internet domain name registrations and social media handles; (vi) software in any form, including internet websites, web content and links, source code, object code and mobile applications; and (vii) other intellectual property and related proprietary rights.

"**Knowledge**" means with respect to Seller, the actual knowledge of Seller's officers and directors, after reasonable inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, Order, guidance, policy, guideline, licensing requirement, pronouncement, principle of common law, or decree enacted, promulgated, issued, enforced or entered by any Governmental Authority, or court of competent jurisdiction, or other requirement or rule of law of any Governmental Authority.

"**Liability**" means any liability or other obligation of any nature, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due.

"**Material Adverse Effect**" means a material adverse effect on (i) the condition (financial or otherwise), business, assets, results of operations or prospects of the Business, excluding any effect resulting from (a) changes in the general economic or political conditions in the United States not having a materially disproportionate effect on the Business relative to other participants

in the industry in which the Business operates, (b) changes (including changes of applicable Law) or conditions generally affecting the industry in which the Business operates and not specifically relating to or having a materially disproportionate effect on the Business, (c) acts of war, sabotage or terrorism or natural disasters involving the United States of America not having a materially disproportionate effect on the Business relative to other participants in the industry in which the Business operates, or (ii) Seller's ability to consummate the transactions contemplated by this Agreement.

"**Order**" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Authority.

"**Permitted Encumbrances**" means (i) mechanic's, materialmen's, carriers', repairers' and other similar Encumbrances arising or incurred in the ordinary course of business for amounts that are not yet delinquent or are being contested in good faith, (ii) liens for Taxes, assessments or other governmental charges not yet due and payable as of the date of this Agreement or which are being contested in good faith, (iii) easements, covenants, and rights of way granted with respect to Seller's Real Property, (iv) Encumbrances granted in connection with any financing related to the transactions contemplated by this Agreement or any financing of Purchaser, and (v) Encumbrances imposed or promulgated by laws with respect to real property and improvements, including zoning, building codes and other land use laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property that would not have a material and adverse effect on the Business.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a Governmental Authority or any other form of entity.

"**Pre-Closing Tax Period**" means (i) any taxable period ending on or before the Closing Date and (ii) the portion of any Straddle Period ending on the Closing Date.

"**Purchased Assets**" shall mean all assets, properties, interests, and rights of every nature, kind and description, real, personal, and mixed, tangible and intangible, wherever situated, used, useful, or held for use in the Business as of the Closing Date (whether or not reflected on the books or financial statements of Seller), other than the Excluded Assets, including, without limitation, the following:

(i)    all Cash and Cash Equivalents or other financial assets, of any kind, held by Seller at the Closing including any account number, name or other identifier, password, passcode, pass phrase, recovery phrase or other security protocol required to access all of those assets;

(ii)    all inventory of Seller, including, without limitation, fuel, finished products and goods, raw materials, work in process, replacement, spare, and component parts, supplies (including recycled plastics), including inventory of Seller held at any third-party location and inventory previously purchased and in transit to Seller;

Annex A-7

(iii)    all machinery, equipment, appliances, gear, computers, computer hardware, computer-related hardware and software, signs, network and internet and information technology systems-related equipment, tooling, parts and spare parts, molds, appliances, inventory, fork lifts, cranes, front loaders or other vehicles (including parts and spare parts therefor), any other tangible personal property, supplies, furniture, fixtures and furnishings, together with any express or implied warranty by the manufacturers, Seller or lessors thereof or any component part thereof and all maintenance records and other documents related thereto;

(iv)    [all rights of Seller (and of any Co-Debtor, to the extent they arise under a single agreement) under nondisclosure or confidentiality, non-compete, or non-solicitation agreements, including with regard to current and former employees and agents of the Seller and each Co-Debtor or with third parties related to the Purchased Assets, the Assumed Liabilities, or the Business (or any portion thereof);]

(v)    all insurance policies and all rights of any nature with respect to any such insurance policy, including all claims and proceeds under such insurance policies, and including related letters of credit, cash or other assets that serve as collateral with respect thereto;

(vi)    to the extent transferrable, all security deposits and any other deposits held by vendors, trade creditors, or any other party;

(vii)    any and all proceeds relating to any and all bonds, letters of credit, guarantees or other security provided by Seller and any and all insurance, condemnation and similar proceeds;

(viii)    all prepaid expenses of Seller relating to any of the Purchased Contracts;

(ix)    all rights under any Purchased Contracts and all rights transferable under customer arrangements, licenses, commitments, sales and orders, customer arrangements, and the like;

(x)    all financial, marketing, business, and operating data and records of Seller used in the Business, including information, pricing and cost information, customer lists, business and marketing plans, servers, files, offsite and backup storage, records, data, employee files, plans, schematics, designs, drawings, blue prints, Contracts and recorded information, customer, vendor and supplier lists, production records, recorded knowledge, historical trademark files, prosecution files of Seller in whatever media retained or stored, accounting records, property records, mailing lists, customer pricing information, credit records, correspondence, office supplies, budgets, documents and records similar to the foregoing, and all other records and files with respect to the assets, properties and rights being transferred hereunder;

(xi)    all Acquired Business Information;

(xii)    all Intellectual Property owned or, to the extent assignable, used by Seller and the goodwill associated therewith;

**DRAFT**

(xiii)    [all qualifications, registrations, filings, privileges, franchises, immunities, licenses and permits, authorizations and approvals ("**Permits**") of any Governmental Authority that are used by, or required for, the ownership of the Purchased Assets and/or operation of the Business;]

(xiv)    all rental and other security deposits, credits, prepayments, prepaid expenses, and deferred items (other than deferred Taxes), Claims, deposits, refunds, claims for refunds and rights to offset in respect thereof, rights against third parties, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment, rights to warranty claims, other prepaid items and all other intangible rights relating to the Business and/or the Purchased Assets;

(xv)    Seller's right, title and interest in and to the Business, its goodwill, its corporate name and any other intangible asset owned by Seller and used in the operation of the Business as of the Closing Date;

(xvi)    all rights, title, and interest in and to accounts receivable as of the Closing Date, including all trade and non-trade accounts receivable, notes receivable, other receivables, negotiable instruments, and chattel paper owned or held, together with any unpaid interest of fees accrued thereof or other amounts due with respect thereto;

(xvii)    all keys, locks, passwords, passcodes, pass phrases, recovery phrases, user identifications, or other security protocols required to access all Purchased Assets;

(xviii)    all rights of any Seller under the Purchased Policies;

(xix)    all claims of Seller for refunds of Taxes and other governmental charges;

(xx)    all Tax Returns related to the Business or the Purchased Assets;

(xxi)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(xxii)    all goodwill associated with the Business, the Purchased Assets, or the Assumed Liabilities;

(xxiii)    all rights to receive vendor rebates accruing in respect of purchases made by Seller;

(xxiv)    [all rights, Claims, or causes of action which Seller or the Business (and any Co-Debtor to the extent they arise from the same set of facts, agreement, or event) may have against any Person with respect to the Purchased Assets or related to the Business or the Assumed Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for any such rights, Claims, or causes of action which Seller or the Business may have against Purchaser relating to this Agreement, the Sale Order, and the Transaction Documents;]

AFSDOCS:302318670.12

12216731v.1

(xxv)   the Real Property, together with (to the extent of Seller's interest therein) the structures located on or attached to the Real Property and all leasehold or possessory interests, or other rights to use or occupy all or any portion of the same, of the Seller or any Co-Debtor , and all rights, title, interest and entitlement arising from or thereunder; and

(xxvi)  any other asset of Seller listed on <u>Schedule 2.01</u> of the Schedules.

"**Purchased Contracts**" means all Contracts assumed and assigned from Seller to Purchaser listed on <u>Schedule 2.01</u> (the "**Purchased Contracts Schedule**").

"**Sale Order**" means an order of the Court, in form and substance acceptable to Purchaser in its sole discretion, substantially in the form attached hereto as <u>Exhibit A</u>, approving this Agreement and the terms and conditions hereof and authorizing Seller and each Co-Debtor to consummate the transactions contemplated hereby pursuant to sections 363, 365, and 1146(c) of the Bankruptcy Code.

"**Straddle Period**" means any taxable period that includes but does not end on the Closing Date.

"**Tax**" or "**Taxes**" mean any federal, state, local or foreign, net or gross income, gross receipts, sales, use, ad valorem, transfer, franchise, license, withholding, escheat, abandoned or unclaimed property, and any and all other taxes, however denominated, including any interest, penalties or additions with respect thereto.

"**Tax Authority**" means any government or subdivision, agency, commission or authority thereof that has jurisdiction over administration, assessment, determination, collection, enforcement, or other imposition of Taxes.

"**Tax Return**" as used herein, means any return (including any information return), declaration, form, filing, notice, statement or report filed or required to be filed with or supplied to a Tax Authority in connection with Taxes, including any schedules, exhibits, and/or amendments thereto.

"**Transaction Documents**" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale, the Deed, and all other agreements, documents and instruments to be executed and delivered hereunder.

"**U.S.**" means the United States of America.

"**WARN Act**" means the Workers Adjustment and Retraining Notification Act or any similar Law of any state, and the rules and regulations promulgated thereunder.

AFSDOCS:302318670.12

12216731v.1

**DRAFT**

## Annex B-1

### Closing Deliveries by Seller

1. <u>Asset Purchase Agreement</u>. This Agreement, duly executed by Seller and each Co-Debtor.

2. <u>Assignment and Assumption Agreement</u>. The Assignment and Assumption Agreement, duly executed by Seller.

3. <u>Bill of Sale</u>. The Bill of Sale, duly executed by Seller for the benefit of Purchaser.

4. <u>Deed</u>. The Deed, duly executed by Seller, notarized, and in recordable form, for the benefit of Purchaser or Designated Purchaser.

5. <u>Required Consents</u>. Reasonable evidence that Seller has obtained the consents, assignments and approvals and provided the notices, in each case as set forth on <u>Schedule 3.03(a)</u> (the "**Required Consents**").

6. <u>Officer's Certificate</u>. One or more certificates dated as of the Closing Date and executed by an authorized officer of Seller certifying as to (i) true and complete copies of the resolutions of the governing body of Seller authorizing the execution, delivery and performance by Seller of this Agreement and the other agreements that Seller is required to execute and deliver pursuant to the terms of this Agreement, (ii) true and complete copies of Seller's organizational documents, (iii) the incumbency of the officer of Seller executing this Agreement and any other agreement or instrument contemplated herein to which Seller is a party on behalf of Seller, and (iv) a good standing certificate for Seller from the jurisdiction in which Seller is formed.

7. <u>Vehicle Titles</u>. Endorsed certificates of title and registrations for any and all trucks, motor vehicles, and trailers among the Purchased Assets to be conveyed, transferred, and sold by Seller.

8. <u>W-9</u>. An Internal Revenue Service Form W-9 properly executed and completed by Seller.

9. <u>Notices of Transfer</u>. Notices of transfer of Permits pursuant to the Agreement signed by Seller or its Affiliates, as applicable.

10. <u>Sale Order</u>. A copy of the Sale Order.

AFSDOCS:302318670.12

12216731v.1

**DRAFT**

**Annex B-2**

**Closing Deliveries by Purchaser**

1.      <u>Purchase Price</u>. The Purchase Price payable to Seller as provided in Section 2.02.

2.      <u>Asset Purchase Agreement</u>. This Agreement, duly executed by Purchaser.

3.      <u>Assignment and Assumption Agreement</u>. The Assignment and Assumption Agreement, duly executed by Purchaser.

4.      <u>Resale Certificate</u>. A duly executed and completed Indiana Department of Revenue Form ST-105, General Sales Tax Exemption Certificate.

AFSDOCS:302318670.12
12216731v.1

**DRAFT**

**EXHIBIT A**

**Sale Order**

A-1